IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RECEIPT #_____
AMOUNT $ 250
SUMMONS ISSUED____ n/a
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. PM
DATE____ 8-18-05

KATHLEEN A. MARTIN,

Plaintiff,

v.

MERCK & CO., INC., et als

Defendants.

CIVIL ACTION No. _____

# 05 ᵔ 1 1 7 1 6 MLW

### NOTICE OF REMOVAL

MAGISTRATE JUDGE _Alexander_

Defendant Merck & Co, Inc. ("Merck"), by its undersigned counsel, hereby removes the above-captioned action from Massachusetts Superior Court, Essex County, to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. §§ 1332, 1441 and 1446 and respectfully files this Notice of Removal and states:

1.      This is one of numerous actions that have been filed recently in both federal and state courts around the country concerning the pharmaceutical VIOXX®. On or about October 21, 2004, Merck filed a motion for coordinated pre-trial proceedings with the Judicial Panel on Multidistrict Litigation ("JPML") to coordinate all cases involving the pharmaceutical VIOXX® ("VIOXX® cases") pending in federal courts in a single district court ("MDL"), pursuant to 28 U.S.C. § 1407 and Rule 7.1(b) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation. These pending cases, while involving different and distinct legal facts, raise certain overlapping factual issues and allege similar legal theories. Merck intends to seek the inclusion of this case within such MDL proceedings.

2.      On or about April 19, 2005 Kathleen A. Martin ("plaintiff"), commenced this action against Merck and other defendants by filing a complaint in Essex County Superior Court in the Commonwealth of Massachusetts, bearing the Case No. 050641.

3.      As more fully set out below, this case is properly removed to this Court pursuant

to 28 U.S.C. § 1441 because Merck has satisfied the procedural requirements for removal and

this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1441(a).

## I.      MERCK HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.

4.      Merck was served with a copy of plaintiff's Complaint on July 18, 2005.

Accordingly, this Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b). A true and

correct copy of the Summons and Complaint served on Merck, together with Merck's Answer, is

attached hereto as Exhibit A.  28 U.S.C. § 1446(a).

5.      All properly joined and served defendants consent to this removal.[1]

6.      Venue is proper in this Court pursuant to 28 U.S.C. §115(a)(2) because it is the

"district and division embracing the place where such action is pending." *See* 28 U.S.C.

§1441(a).

7.      No further proceedings have been had in the state court action.

8.      No previous application has been made for the relief requested herein.

9.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served

upon counsel for plaintiff and a copy is being filed with the Clerk of Court, Essex County

Superior Court.

---

[1]      28 U.S.C. 1441(b) does not bar removal. It is well-settled that co-defendants who have not yet been properly served or who are fraudulently joined need not join in the removal. *See Getty Oil Corp. v. Insurance Co. of North Amer.,* 841 F.2d 1254, 1261 n.9 (5th Cir. 1988). Defendants Dartmouth-Hitchcok Medical Center, Dr. Roshini Pinto Powell, and Dr. Charles Carr (collectively, "New Hampshire Healthcare Defendants") have indicated that they have not been properly served with the complaint because, as citizens of New Hampshire being sued for alleged actions taken in new Hampshire, Massachusetts courts, whether state or federal, lack personal jurisdiction over these New Hampshire Defendants. Accordingly, the New Hampshire Defendants contend that they were not properly served and, therefore, their consent is not required at this time. The consent of the New Hampshire Healthcare Defendants is also not required because, as set out more fully below, these defendants are fraudulently joined. The only remaining defendants, Brigham & Women's Hospital and Dr. Peter J. Millett (collectively, "Massachusetts Healthcare Defendants") are also fraudulently joined. Therefore, their consent to removal is not required.

- 2 -

## II.    REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441.

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and is between citizens of different states.

### A.    Complete Diversity of Citizenship.

11.    There is complete diversity as between Plaintiff and the only arguably properly joined defendant - Merck. Plaintiff is, upon information and belief, a citizen of Massachusetts. (Complaint ¶ 9.) Merck is, and was at the time plaintiff commenced this action, a corporation organized under the laws of the State of New Jersey with its principal place of business in New Jersey and, therefore, is a citizen of New Jersey for purposes of determining diversity. 28 U.S.C. § 1332(c)(1).

12.    There also is complete diversity as between Plaintiff and the New Hampshire Healthcare Defendants – Dartmouth–Hitchcock Medical Center, Dr. Roshini-Pinto Powell, and Charles Carr, all of whom are, upon information and belief, citizens of New Hampshire. (See Complaint ¶¶11-13.)

13.    Defendants Brigham & Women's Hospital and Dr. Peter Millet are the only alleged non-diverse defendants.

### 1.    The Healthcare Defendants Are Fraudulently Joined.

14.    Joinder of the Healthcare Defendants, collectively, does not defeat removal because these defendants are fraudulently joined. *See, e.g.*, *Carey v. Bd. of Governors of Kenwood Country Club*, 337 F. Supp. 2d 339, 341-43 (D. Mass. 2004); *Mills v. Allegiance Healthcare Corp.*, 178 F. Supp. 2d 1, 4-5 (D. Mass. 2001). Joinder of a non-diverse defendant is "fraudulent" when the claims against the defendant do not have a "reasonable basis in law and

- 3 -

fact." *Mills*, 178 F. Supp. 2d at 4. "A mere theoretical possibility of recovery under state law does not suffice to preclude removal." *Id.* at 5. Joinder of the Healthcare Defendants is fraudulent in this instance because there is no reasonable basis in law or fact for the claims against these defendants for the following reasons.

15.      **First**, Plaintiff makes only vague and conclusory allegations against the Healthcare Defendants. Plaintiff cannot defeat removal by simply adding Healthcare Defendants to the caption and making passing reference to these defendants in the complaint. *See, e.g., Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5ᵗʰ Cir. 1999) (finding in-state defendant fraudulently joined where plaintiff refers to the in-state defendant only in passing and directs specific allegations towards the diverse defendants). In fact, with respect to the only non-diverse defendants – Dr. Millet and Brigham & Women's Hospital – Plaintiff alleges even less. The only factual allegation that the plaintiff makes as to Dr. Millet is that Plaintiff "on multiple occasions was treated by Defendant Millet and provided prescriptions by Defendant Millet," and that Dr. Millet somehow breached the standard of medical care. (Complaint ¶¶ 95 & 96.) The plaintiff does not allege anywhere in the Complaint that Dr. Millet prescribed Vioxx to her. Nor does Plaintiff allege any connection between her alleged use of VIOXX®, her alleged injuries, and her alleged treatment by Dr. Millet at Brigham & Women's Hospital.

16.      **Second**, the Non-Diverse Defendants are fraudulently joined for the additional reason that the claims against them are wholly inconsistent with the gravamen of his allegations: that Merck misled the public at large and the healthcare community regarding the safety of VIOXX®. In *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 00 Civ. 2843, 2003 WL 43356, *1 (S.D.N.Y. Jan. 6, 2003) (attached as Ex. B), the court held that conclusory allegations that a defendant physician failed to warn the plaintiff of the risks of a drug, like those in this case, are

- 4 -

legally insufficient where the complaint contains detailed contradictory allegations that the manufacturer hid those very risks. "[I]n light of plaintiff's myriad allegations that the [pharmaceutical] defendants withheld information concerning the risks of Rezulin from physicians and others, an entirely conclusory allegation that the physician failed to warn of risks of Rezulin is insufficient to provide the defendant sufficient notice of the claim against him." *Id.* at *1 (footnote omitted); *see also In re Rezulin Prods. Liab. Litig.*, MDL No. 1348. 00 Civ. 2843, 2002 WL 31852826, at *2 (S.D.N.Y. Dec. 18, 2002) (attached as Ex. C) (finding fraudulent joinder of conclusory malpractice allegations where "the main tenor of plaintiffs' complaints is that Rezulin was an unsafe drug and that the manufacturers concealed its risks from the public, physicians, and others").

17.    Other courts have reached the same result when faced with similar conflicting claims against Merck and non-diverse physicians or defendants in the Vioxx® litigation. *See, e.g., Flores v. Merck & Co., Inc.*, No. C-03-362 slip op. at 2 (S.D. Tex. Mar. 15, 2004) (finding doctor fraudulently joined where allegations against the doctor were conclusory and where plaintiffs "claim[ed] that Merck 'failed to adequately and timely inform the health care industry of the risks of serious personal injury and death from Vioxx ingestion'") (attached as Ex. D); *Omobude v. Merck & Co.*, Inc., No. 3:03CV528LN, slip op. at 3-5 (S.D. Miss. Oct. 3, 2003) (attached as Ex. E) (finding fraudulent joinder of a physician in a suit against Merck for injuries allegedly caused by VIOXX®: "[W]here a plaintiff has specifically alleged facts from which one would necessarily infer that the defendant in question would not have known information otherwise alleged to have been misrepresented or concealed from him, then . . . to sustain his pleading burden, the plaintiff would have to plead at least some facts tending to show why or how the defendant knew or should have known of the information."); *see also Chiles v. Am.*

- 5 -

*Home Prods. Corp.*, No. 4:03-CV-802-A, slip op. at 4 (N.D. Tex. Sept. 26, 2003 (finding doctors fraudulently joined in thimerosal litigation and denying remand where plaintiffs had alleged misrepresentation against a drug manufacturer that "negate[d] any possible liability of the physicians" (attached as Ex. F).

18.    The Healthcare Defendants in this case are fraudulently joined for the same reason – the claims against them are fraudulently inconsistent with the claims against Merck and are not supported by specific factual allegations. On the one hand, Plaintiff alleges that Merck successfully misrepresented and concealed the risks of VIOXX® from the general public and the medical community, proximately causing his injury. On the other, Plaintiff maintains that Drs. Powell and Carr should have known the information concerning the risks of VIOXX® that she claims was hidden from everyone, including the medical community.

## B.    The Amount in Controversy Requirement is Satisfied.

19.    Plaintiff's allegations clearly meet the amount-in-controversy threshold. Plaintiff alleges that she "continues to suffer serious and debilitating health conditions as a result of the use of the Vioxx prescribed, including but not limited to elevated risk of stroke, elevated blood pressure, complications during two (2) different medical [sic] with respect to procedures in relation to Plaintiff's left knee, and other cardiac issues." (Complaint, ¶ 58) Plaintiff also claims the disgorgement of all profits associated with VIOXX®. It is well established that the amount in controversy requirement is easily satisfied in cases alleging personal injury. *See, e.g.*, *In re Rezulin Prods. Liability Litig.*, 133 F. Supp. 2d 272, 296 (S.D.N.Y. 2001) (amount in controversy requirement satisfied in case alleging personal injury where "[t]he complaint . . . does not preclude recovery in excess of $75,000"); *Cygielman v. Cunard Line Ltd.*, 890 F. Supp. 305, 306-07 (S.D.N.Y. 1995) (in personal injury action, finding amount in controversy requirement

satisfied where it did not appear to legal certainty that claim was for less than jurisdictional amount).

20.     Federal courts around the country have ruled that the amount-in-controversy threshold was met in similar actions alleging personal injuries caused by VIOXX®. *See, e.g.*, *Stubblefield v. Merck & Co., Inc.*, Civ. No. H-02-3139 (S.D. Tex. Oct. 8, 2002); *Zeedyk v. Merck & Co., Inc.*, No. 02-C-4203 (N.D. Ill. Aug. 30, 2002); *Abrusley v. Merck & Co., Inc.*, No. 02-0196 (W.D. La. June 18, 2002); *Jones v. Merck & Co., Inc.*, Civ. No. 02-00186 (D. Haw. June 5, 2002). These courts were all presented with complaints seeking actual damages for injuries caused by VIOXX® and all found, either explicitly or implicitly, that the requirements for federal diversity jurisdiction, including the amount in controversy, were satisfied.

**WHEREFORE**, Defendant Merck respectfully removes this action from the Essex County Superior Court to this Court pursuant to 28 U.S.C. § 1441.

> MERCK & CO., INC.
> By its attorneys:
>
> James J. Dillon (BBO# 124660)
> Lucy Fowler (BBO# 647929)
> FOLEY HOAG LLP
> 155 Seaport Boulevard
> Boston, MA 02110-2600
> (617) 832-1000

Dated: August 17, 2005

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing NOTICE OF REMOVAL was served by U.S. mail on August 17, 2005, upon:

Andrew J. Tine
Haese, LLC
30 Franklin Street, 3rd Floor
Boston, MA 02110

Dartmouth Hitchcock Medical Center
One Medical Center Drive
Lebanon, NH  03756

Dr. Roshini-Pinto Powell
Dr. Charles Carr
Dartmouth Hitchcock Medical Center
One Medical Center Drive
Lebanon, NH  03756

Brigham & Women's Hospital
75 Francis Street
Boston, MA  02115

Dr. Peter Miller
Brigham & Women's Hospital
75 Francis Street
Boston, MA  02115



KCF
**RAYMOND V. GILMARTIN**

JUL 18 2005



Via U.S. Mail – CERTIFIED/RETURN RECEIPT REQUESTED

**haese**

Attorneys at Law
30 Federal Street, 3rd Floor
Boston, Massachusetts 02110-2508

Telephone 617.428.0266
Facsimile 617.428.0276
Web Site www.haese.com

100 Pearl Street, 14th Floor
Hartford, Connecticut 06103

Telephone 860.249.7194
Facsimile 860.249.7195

July 14, 2005

Raymond V. Gilmartin
President
Merck & Co., Inc.
1 Merck Drive
Whitehouse Station, NJ 08889

  Re: Martin v. Merck et al.

Dear Mr. Gilmartin:

This Firm represents Plaintiff Kathleen Martin in the above referenced
lawsuit, brought against Merck & Co., Inc. and others. Please find
enclosed the below listed legal documents, being served in accordance
with Massachusetts law.

1. Summons;
2. Complaint;
3. Civil Action Cover Sheet; and
4. Tracking Order- A Track.

A response to the Complaint is required or a default judgment may be
entered and collection upon same pursued by the Plaintiff.

Sincerely,

Andrew J. Tine
AJT:mm

Enc.

Attorneys also admitted to practice in
Colorado, Connecticut, Rhode Island
and France

RECEIVED
JUL 1 9 2005
By

(TO PLAINTIFF'S ATTORNEY: *Please Circle Type of Action Involved:* - TORT - MOTOR VEHICLE TORT - CONTRACT - EQUITABLE RELIEF - OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT
CIVIL ACTION
No. 050641

Kathleen A. Martin

........................................................., Plaintiff(s)

v.

Merck & Co., Inc. et al.

........................................................., Defendant(s)

**SUMMONS**

To the above named ~~Defendant:~~ Merck & Co., Inc.

You are hereby summoned and required to serve upon _____ Andrew J. Tine of Haese, LLC

plaintiff's attorney, whose address is 30 Federal St., Boston, MA 02110 , an answer to the

complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the

day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the

complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at

Lawrence, Essex County either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**Barbara J. Rouse**

WITNESS, SUZANNE V. DelVecchio, Esquire, at Salem, the

day of                              , in the year of our Lord two thousand

*Thomas H. Driscoll Jr.*
Clerk

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) | Trial Court of Massachusetts Superior Court Department County:_____ |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Kathleen A. Martin | Merck & Co., Inc., et al. |

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE | ATTORNEY (if known) |
|---|---|
| Andrew J. Tine, Haese, LLC, 30 Federal Street, 3rd Floor, Boston, MA 02110<br>Board of Bar Overseers number: 633639 | |

**Origin code and track designation**

Place an x in one box only:
- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct.C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B05 | Tort | (A ) | (X ) Yes    ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses .................................................. $ ..........
2. Total Doctor expenses .................................................. $ ..........
3. Total chiropractic expenses .................................................. $ ..........
4. Total physical therapy expenses .................................................. $ ..........
5. Total other expenses (describe) .................................................. $ ..........
   Subtotal $ 70,000 (est.)
B. Documented lost wages and compensation to date .................................................. $ ..........
C. Documented property damages to date .................................................. $ ..........
D. Reasonably anticipated future medical and hospital expenses .................................................. $ unknown ....
E. Reasonably anticipated lost wages .................................................. $ ..........
F. Other documented items of damages (describe) Future Medical Monitoring
   $ unknown ....

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)
   Plaintiff was prescribed and ingested VIOXX. Plaintiff has experienced various medical concerns, not limited to, cardiac concerns, bleeding, and vascular concerns.
   $ 1,000,000 .
   **TOTAL $ 1,100,000 +.**

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)
Provide a detailed description of claim(s):

**TOTAL $. ..........**

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____    DATE: 4-19-05

ACTC-6 mtc005-11/99
A.O.S.C. 1-2000

## COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss                                    SUPERIOR COURT
                                             CIVIL ACTION NO.:_____

KATHLEEN A. MARTIN,                    )
    Plaintiff,                         )
                                       )
           v.                     )
                                       )
MERCK & CO., INC., DARTMOUTH           )
-HITCHCOCK MEDICAL CENTER,             )
DR. ROSHINI PINTO POWELL,              )
DR. CHARLES CARR, BRIGHAM AND          )
WOMEN'S HOSPITAL and DR. PETER J. )
MILLETT,                               )
    Defendants.                        )

### COMPLAINT AND JURY DEMAND

       This is an action brought by Plaintiff for damages resulting from the ingestion of

the non-steroidal, anti-inflammatory pain medication called Vioxx (chemical name

"rofecoxib"). This action seeks damages and the establishment of a medical monitoring

program on behalf of the Plaintiff for the diagnosis and treatment of Vioxx-related

adverse health effects from which Plaintiff presently suffers. This action is also brought

based on the actions or inactions of the Dartmouth-Hitchcock Medical Center and

Brigham and Women's Hospital in allowing the drug to be prescribed to Plaintiff as well

as the specific actions of Dr. Roshini-Pinto Powell and Dr. Peter J. Millet in prescribing

the medication and/or failing to provide the proper treatment to Plaintiff.

### I.  INTRODUCTION

    1. Plaintiff Kathleen A. Martin ("Martin") brings this civil action for damages and

medical monitoring as a result of harm suffered from (a) the purchase and use of Vioxx;

(b) the increased risk of health problems causally connected to the consumption of

Vioxx; and (c) the actual health problems already experienced by Plaintiff as a result of the consumption of Vioxx.

2. Plaintiff purchased Vioxx and ingested the drug on a regular basis, as prescribed by her physicians, Dr. Roshini Pinto-Powell, Dr. Charles Carr, and Dr. Peter Millet. At all times relevant hereto, Defendants Dr. Roshini Pinto-Powell and Defendant Dr. Charles Carr were employed and/or otherwise affiliated with the Defendant Dartmouth-Hitchcock Medical Center. At all relevant times hereto, Defendant Dr. Peter Millet was employed and/or otherwise affiliated with the Defendant Brigham and Women's Hopsital.

3. Ingestion of Vioxx has been linked to an increased risk of adverse health effects for users, including the increased risk of cardiovascular events such as heart attack, stroke, and risk of GI bleeding.

4. The Food and Drug Administration ("FDA") approved Vioxx in 1999 for the reduction of pain and inflammation caused by osteoarthritis, as well as for acute pain in adults and for the treatment of menstrual pain. The FDA accelerated the approval process of Vioxx because of a perceived benefit to consumers over the available alternatives at the time, including ibuprofen and naproxen. Subsequently, the FDA approved Vioxx to treat the signs and symptoms of rheumatoid arthritis in adults and children.

5. In June 2000, Merck & Co. Inc. ("Merck") submitted to the FDA a safety study called VIGOR (Vioxx Gastrointestinal Outcomes Research) that found an increased risk of serious cardiovascular events including heart attacks and strokes, in patients taking Vioxx compared to patients taking naproxen. Defendant Merck attributed these results to a purported "cardio-protective effect" of naproxen.

6.   Despite reports over the next few years to the contrary, Defendant Merck continued to maintain that Vioxx did not increase a user's risk of cardiovascular events such as heart attack and stroke.

7.   On September 30, 2004, Defendant Merck revealed that Vioxx doubled the risk of heart attack and stroke to consumers who took the drug for longer than 18 months, as compared to subjects taking a placebo. As a result of this revelation, Vioxx was withdrawn from the market worldwide.

8.   However, the withdrawal from the market came after Plaintiff Kathleen A. Martin ingested the drug without notice of the inherent risks to her health. As such, Plaintiff suffered harm in that her consumer choice was distorted by misleading representations by Defendant Merck, and now Plaintiff is at increased risk of cardiovascular events, such as heart attack and stroke, and thrombosis, hemorrhage, and drainage to GI track, and thus requires medical monitoring.

## II.  PARTIES

9.   Plaintiff Kathleen A. Martin is currently a resident of the Commonwealth of Massachusetts and acquired and ingested Vioxx while first a resident of Vermont and later of Rockport, Massachusetts.

10.  Defendant Merck & Co., Inc. describes itself as a global research-driven pharmaceutical company which discovers, develops, manufactures and markets a broad range of products to improve human and animal health, directly and through joint ventures. Merck is incorporated under the laws of the State of New Jersey with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey.

Defendant was in the business of profiting from the design, manufacture, marketing, distribution and/or sales of the brand-name prescription drug Vioxx.

11. Defendant Dartmouth Hitchcok Medical Center is a patient treatment medical facility organized under the law of the State of New Hampshire with its principal place of business located at One Medical Center Drive, Lebanon, New Hampshire.

12. Defendant Brigham and Women's Hospital is a medical facility organized under the laws of the Commonwealth of Massachusetts with its principal place of business located at 75 Francis Street, Boston, Massachusetts.

13. Defendants Dr. Roshini-Pinto Powell and Dr. Charles Carr are medical doctors affiliated with and practicing under the auspices of the Defendant Dartmouth-Hitchcock Medical Center, both with business addresses of One Medical Drive, Lebanon, New Hampshire.

14. Defendant Dr. Peter Millet is a medical doctor affiliated with and practicing under the auspices of the Defendant Brigham and Women's Hospital, with a business address of 75 Francis Street, Boston, Massachusetts.

## III.  FACTUAL BACKGROUND

15. At all times relevant, Defendant Merck, itself or by use of others, did distribute, market, sell, promote, advertise, and otherwise distribute in the Commonwealth of Massachusetts, the pharmaceutical product Vioxx.

16. Vioxx belongs to a class of drugs called "non-steroidal anti-inflammatory drugs," or "NSAIDs." NSAIDs reduce pain by blocking the body's production of enzymes called cyclooxygenase, or "COX." of which there are two forms: COX-1 and COX-2. Most traditional NSAIDs (such as ibuprofen and naproxen) work by blocking the

COX-1 enzyme, which reduces pain but may lead to gastroinstestinal perforations and bleeds.

17.  Vioxx, it is believed, blocks the COX-2 enzyme that triggers pain and inflammation while sparing the COX-1 enzyme that helps maintain normal stomach lining. It is indicated for treating the signs and symptoms of osteoarthirtis and rheumatoid arthritis, management of acute pain in adults, and treatment of primary dysmenorrhea.

18.  Vioxx did not promise to be any more effective than traditional NSAIDs, like ibuprofen and naproxen, at treating inflammation and pain. The sole advantage of Vioxx over other NSAIDs was its purported improved safety profile.

19.  Vioxx is a brand name used by Merck to market and distribute rofecoxib. Vioxx was approved for marketing based on information in the New Drug Application submitted by Merck to the FDA. The FDA put Vioxx on a fast-track approval process that lasted approximately 6 months. Merck obtained FDA approval on Vioxx in or around May of 1999 and began its distribution and sale throughout the United States, including Massachusetts, in or about May of 1999.

20.  Merck concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for Merck and safety concerns over hypertension, edema and/or cardiovascular events would have drastically impacted positioning in the market as compared to the competing drug, Celebrex (clecoxib), which was placed into the market by Merck competitors Pharmacia and Pfizer some three months prior to the launch of Vioxx.

21.    Merck knowingly chose to place these adverse health risks on its consumers despite its knowledge at product launch and in post-marketing data thereafter that use of Vioxx carried significant risk factors. These adverse effects were realized in adverse event reports, in clinical trials adjudicated by primary investigators with Merck's assistance, and in one or more studies shortly after market launch, which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

22.    On or about December 16, 1999, the FDA called Merck to task for its materially false and misleading marketing and promotional materials. The FDA sent Merck an official letter (the "First FDA Warning Letter") admonishing it that the "promotion pieces.. .that promoted VIOXX (rofecoxib) ... are false and misleading because they contain misrepresentations of VIOXX's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."

23.    In March 2000, Merck released the results of a Merck-sponsored VIGOR Study, which had begun in or around January of 1999. The VIGOR Study revealed, among other things, "significantly fewer heart attacks were observed in patients taking Naproxen (0 percent) compared to the group taking VIOXX 50 mg (0.5 percent) in this study. There was no difference in cardiovascular mortality between the group treated with VIOXX or Naproxen."

24.    Merck attributed the difference in rates of cardiovascular events to the fact that riaproxen has "cardio-protective effects," and not to an increased risk of cardiovascular events attributable to Vioxx.

25.  In designing the VIGOR Study, Merck took the exceptional step of including an "external Vascular Event Committee (VEC), containing three separate subspecialty committees (cardiac, cerebrovascular, and peripheral), [] for surveillance, monitoring, and adjudication of vascular events occurring in COX-2 inhibitor trials." According to a July 13, 2002 article that appeared in the British medical journal, *The Lancet*, Merck "apparently was aware of possible myocardial toxicity before the [VIGOR] trial, because it set in place a separate adjudication procedure to study the event."

26.  While VIGOR did demonstrate that Vioxx reduced the incidence of serious gastrointestinal side effects as compared to naproxen, it did not demonstrate an improved safety profile for Vioxx. The VIGOR data revealed that:

a.  Patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on naproxen;

b.  Patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on naproxen;

c.  According to the FDA. [e]valuation of safety by routine parameters showed no advantage of [vioxx] rofecoxib over Naproxen; and

d   Patients on Vioxx actually suffered *more* cases of serious disease (either gastrointestinal or cardiovascular) than did naproxen users (61 and 57 cases respectively).

27.  In industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction. Merck denied these

studies as to the hypertension problems in the official publication of the American Pharmaceutical Association, Pharmacy Today. (*Spin War Aside, Lessons Emerge From Cox-2 Trials*, August 2000, page 3).

27.    Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping the profits obtained through the non-disclosure. Merck engaged in a massive advertising and sampling program and gained continued increases in market share, which enhanced Merck's financial bottom line. The effect was a more than $2 billion profit for Merck in 2000 and a 23 percent market share.

28.    Merck continued to withhold relevant data from the public throughout the Class Period. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with Vioxx consumption over Naproxen consumption.

29.    On February 8, 2001, Merck submitted the results of the VIGOR Study to the FDA Arthritis Advisory Committee as part of Merck's application to modify the prescribing information for Vioxx to reflect the Drug's purported gastrointestinal ("GI") benefits.

30.    In considering the VIGOR Study results, however, the FDA Advisory Committee concluded (in February 2001) Vioxx has no safety advantage over the generic drug naproxen, a drug that sells for a fraction of the cost of Vioxx. According to the *FDA Advisory Committee Briefing Document, VIOXX Gastrointestinal Safety,* dated February 8, 2001: "[I]n the VIGOR Study the potential advantage of decreasing the risk of

complicated [GI side effects] was paralleled by the increased risk of developing cardiovascular thrombotic events."

31.   According to a memo prepared by an Advisory Committee member, Lourdes Villalba, M.D., dated February 8, 2001, which discusses the "Overall Safety" of Vioxx, "the VIGOR Study found there were more overall deaths among Study participants taking Vioxx than those taking naproxen (22 and 15, respectively).

32.   The VIGOR results showed that 50mg doses of Vioxx increased the risk of heart attacks and cardiovascular disease. Faced with this treat to the success of its new blockbuster drug, Defendant Merch offered an unfounded explanation for the negative cardiovascular findings of the VIGOR Study. Defendant Merck asserted that the dramatically increased risk of heart attacks in persons taking Vioxx 50mg was not due to Vioxx; rather, Defendant Merck claimed naproxen was cardio-protective and thus dramatically reduced the risk of heart attacks. Tellingly, the marketers of naproxen have never promoted their drug as being cardio-protective.

33.   On August 22, 2001, the *Journal of the American Medical Association* ("JAMA") published an article authored by cardiologists Eric J. Topol and Steven E. Nessen of the Cleveland Clinic Foundation entitled "*Risk of cardiovascular Events Associated With Selective Cox-2 Inhibitors*," which reported the results of a study of Vioxx and Celebrex. The JAMA article reported the findings of the Cleveland Clinic's study that "current data would suggest that use of these so-called 'COX-2 inhibitors' might lead to increased cardiovascular events."

34. The day before the JAMA article was published, *Bloomberg News* reported that Merck commented, with regard to the article, "We have additional data beyond what they cite, and the findings are very, very reassuring. Vioxx does not result in any increase in cardiovascular events compared to placebo." Further, on August 23, 2001, the day after the article was published, Merck stated in a press release, "the Company stands behind the overall and cardiovascular safety profile...of Vioxx."

35. In a follow-up study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor tips the balance of prostacyclinlthromboxane in favor of thromboxane, leading to increased vascular and thrombotic events.

36. In September 2001, the FDA sent Defendant another warning letter (the "Second FDA Warning Letter") which again warned Defendant that Merck's marketing of VIOXX was "false, lacking in fair balance, or otherwise misleading..." The Second Warning Letter went on to advise Merck that Merck's marketing "minimize[s] the potential serious cardiovascular findings that were observed in the VIGOR Study. minimize[s] the VIOXX/Coumadin drug interaction, omit[s] crucial risk information associated with VIOXX therapy. contain[s] unsubstantiated comparative claims, and promote[s3 unapproved uses."

37. The Second Warning Letter also reprimanded Merck for:

> "assert[ing] that Vioxx does not increase the risk of [heart attacks] and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties."

38. Merck denied reports concerning the increased risk of cardiovascular problems as inaccurate and inconclusive. For example, on May 22, 2001, Merck issued a press release through the *PR Newswire* that stated, among other things: "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx."

39. The theory that naproxen had a cardioprotective effect and therefore accounted for the higher cardiovascular risks among Vioxx users was debunked in approximately January of 2002 by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study. The study was published in *The Lancet*, and concluded that there is an absence of a protective effect of naproxen or other non-aspirin non-steroidal anti-inflammatory drugs on risk of coronary heart disease. Ray, W., et. at., *Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease: An Observational Cohort Study, The Lancet,* 359: 118-123, Jan. 12, 2002.

40. The FDA's Adverse Reporting System ("AERS") database is a computerized system for collecting and maintaining information about adverse events reported by drug manufacturers, health professionals, and others. The system contains adverse events detected and reported after marketing of the drug.

41. According to AERS, through October of 2003, almost 2,000 adverse cardiovascular events were experienced by persons taking Vioxx, including myocardial infarctions, cardiac arrests, and cardiac failures. These cardiac events reported to the FDA, which, according to some measures, represent underreporting of as much as 99%, resulted in such outcomes as hospitalization, life threatening conditions, and even death.

42. On October 22, 2003, *Reuters* published an article that stated "arthritis drug is suffering from clinical trial data suggesting it might slightly raise the risk of heart attacks, and the growing perception that its pain-fighting capabilities are no better than traditional painkillers."

43. On October 30, 2003, in an article entitled "Vioxx Study Sees Heart-Attack Risk," *The Wall Street Journal* reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients taking the pill [Vioxx]." According to *The Wall Street Journal* article, within the first 30 days of taking Vioxx, the risk of a heart attack was increased 39% as compared to Vioxx's competitor, Celebrex.

44. At all times relevant to this litigation, Defendant Merck had a significant market share based upon claims of Vioxx's efficacy, a very aggressive marketing program which involved financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive advertising and sampling program.

45. If Merck had not engaged in this conduct, consumers, including Plaintiff, would have known the true risks of ingesting Vioxx and would have switched from Vioxx to safer products or refrained wholly from its use.

46. The marketing strategies of the Merck targeted Plaintiff and the other users to induce them to purchase Vioxx. At the time the Merck distributed, manufactured and marketed Vioxx, Merck intended that Plaintiff would rely on the marketing, advertisements and product information propounded by Merck, as well as Merck's omission of relevant negative information from such materials.

47. From the initial marketing of Vioxx until April 2002, the safety label for Vioxx set forth an explicit warning concerning "Gastrointestinal (GI) Effects." Specifically, the safety label warned of the "Risk of GI Ulceration, Bleeding, and Perforation." Nowhere within the safety label did Merck make full or adequate disclosure of the cardiovascular safety issues related to Vioxx.

48. After reviewing the results of the VIGOR study and other available data from controlled clinical trials, the FDA consulted with its Arthritis Advisory Committee. In April 2002, pursuant to the review by the FDA and resultant instructions, Merck implemented labeling changes for Vioxx to reflect the findings from the VIGOR study. The labeling changes included information about the occurrence of cardiovascular events, including heart attack and stroke, in some patients. At no time did the safety label disclose the level of risk that consumers were subjected to as a result of their ingestion of Vioxx. In fact, Merck continued to stand by the "safety profile" of Vioxx.

49. The April 2002 labeling changes were insufficient to put the consuming public on notice of the extent of the risk of adverse health effects that use of Vioxx presented.

50. Thus, despite knowledge in its clinical trials and post-marketing reports, studies and information relating to cardiovascular-related adverse health effects, Merck promoted and marketed Vioxx as safe and effective for persons such as Plaintiff.

51. Merck failed to reveal the true connection between use of Vioxx and cardiovascular events until September 30, 2004.

52. On June 2, 2002, Plaintiff Martin underwent surgery at the Dartmouth-Hitchcock Medical Center to repair the left anterior cruciate ligament tear in her left leg; the surgical procedure being performed under the care of Dr. Charles F. Carr, MD.

53. On or December 19, 2002, Martin was prescribed Vioxx by Dr. Roshini Pinto-Powell, M.D. of the Dartmouth-Hitchcock Medical Center.

54. Dr. Powell, Dr. Carr and the Dartmouth-Hitchcock Medical center knew or should have known of the dangers and contraindications posed by the prescription to and subsequent use by Plaintiff Martin of the drug Vioxx, but prescribed the drug without regard thereto.

55. Martin continued to take the prescribed Vioxx through and including March of 2004.

56. On or about March 10, 2004, Martin experienced severe bleeding and hemorrhaging, and was admitted to Massachusetts General Hospital, on an outpatient basis, and then sent home on an out-patient basis.

57. On or about March 11, 2004, Martin again experienced major gastrointestinal bleeding, was admitted again to Massachusetts General Hospital for emergency treatment, said treatment requiring the transfusion of 12 units of packed red blood cells to deal with the blood loss and hemorrhaging.

58. Martin continues to suffer serious and debilitating health conditions as a result of the use of the Vioxx prescribed, including but not limited to elevated risk of stroke, elevated blood pressure, complications during two (2) different medical with respect to procedures in relation to Plaintiff's left knee, and other cardiac issues.

### COUNT I

### (Misrepresentation)

59. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

60. Defendant Merck intentionally employed deceptive representations as to the risks and side effects of Vioxx in the marketing, promotion and sale of the drug to consumers, as set forth above.

61. Defendant Merck's wrongful conduct included the issuance of the false and misleading representations and omissions of material facts regarding Vioxx's capabilities and the side effects of Vioxx upon which Plaintiff relied.

62. Defendant Merck failed to sell Vioxx in the manner and of the nature advertised or offered, and was unable to provide Vioxx in accordance with other terms or conditions.

63. The fraudulent practices of Defendant Merck have directly, foreseeably, and proximately caused damages and injury to Plaintiff.

64. Defendants Merck's conduct, in part, caused Plaintiff to acquire and ingest Vioxx.

65. By reason of Defendant Merck's unlawful conduct, Plaintiff has suffered losses and is entitled to damages.

## COUNT II

### (Medical Monitoring)

66. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

67. As a direct and proximate result of Defendants' acts and omissions as set forth herein, Plaintiff was exposed to a hazardous substance and, as a result, now suffers a significantly increased risk of contracting further serious injury or latent disease,

including heart attack and stroke. This increased risk makes periodic diagnostic and medical examination reasonable and necessary. Easily administered, cost-effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

68. The recommended testing and monitoring procedures will be subject to expert testimony at the time of trial.

69. The increased susceptibility to injuries and irreparable threat to the health of Plaintiff resulting from Plaintiff's exposure to Vioxx can only be mitigated or addressed by the creation of a comprehensive medical monitoring program.

70. Plaintiff has no adequate remedy at law in that monetary damages alone cannot compensate for the continuing nature of the harm to her, and a monitoring program which notifies her of possible injury and aids in the diagnosis and treatment of these injuries can prevent the greater harms which may not occur immediately and which may be preventable if proper research is conducted and the health risks are diagnosed and treated before they occur or worsen.

71. The susceptibility of Plaintiff to heart attacks, strokes, and other disorders is a result of her use of Vioxx. Early detection and diagnosis of these conditions is clinically invaluable because it can prevent and/or significantly delay resulting pain, suffering and/or death.

72. In the absence of a court-approved and supervised medical monitoring program, Plaintiff will not receive prompt medical care which could detect injury and disease and prolong her productive life, increase her prospects for improvement, and minimize disability.

## COUNT III

### (Unjust Enrichment as to Merck)

73. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

74. As a direct proximate, and foreseeable result of Defendant Merck's acts and otherwise wrongful conduct, Plaintiff was economically harmed. Defendant Merck profited and benefited from the sale of Vioxx, even as Plaintiff suffered the noted harm.

75. Defendant Merck has voluntarily accepted and retained these profits and benefits, derived from Plaintiff with full knowledge and awareness that, as a result of Defendant Merck's unconscionable and intentional wrongdoing, Plaintiff, was not receiving products of the quality, nature, fitness, or value that had been represented by Defendant Merck or that a reasonable consumer would have expected. Plaintiff purchased medicine that she expected would improve her health, and instead found that her health was instead negatively affected.

76. By virtue of the conscious wrongdoing alleged in this Complaint, Defendant Merck has been unjustly enriched at the expense of Plaintiff, who is entitled to in equity, and hereby seeks, the disgorgement and restitution of Merck's wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Merck's unjust enrichment.

## COUNT IV

### (Medical Malpractice as against Defendants Pinto-Powell and Carr)

77. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

78. Defendant Dr. Pinto-Powell and Dr. Charles Carr are medical doctors licensed to deliver medical services to the public at large within the State of New Hampshire.

79. Plaintiff on multiple occasions was treated by Defendants Pinto-Powell and Defendant Carr and provided prescriptions by Defendant Pinto-Powell.

80. Defendant Pinto-Powell and Defendant Carr breached the standard of medical care, or in other words, was negligent in the delivery of medical services and treatment as set forth above and thus breached the standard of due care and diligence in the medical treatment of the Plaintiff.

81. Plaintiff Martin has suffered injuries from the medical services and treatment received from Defendant Pinto-Powell and Defendant Carr.

82. Defendant Pinto-Powell and Defendant Carr acted negligently in providing medical services and treatment to Plaintiff Martin, resulting in damages and injuries to Plaintiff Martin.

### COUNT V

**(Breach of Contract as against Defendant Dartmouth–Hitchcock Medical Center)**

83. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

84. Defendant Dartmouth sought services from the physicians and medical staff at Defendant Dartmouth's facilities and entered into a contract with Defendant Dartmouth for treatment of Plaintiff's medical condition.

85. Defendant Dartmouth failed to provide medical services in a professional and reasonable manner in accordance with standard practices and requirements.

86. Defendant Dartmouth failed to warn Plaintiff of the dangers of Vioxx, even though Defendant Dartmouth and/or its medical professionals and staff knew or had reason to know of the dangers of Vioxx and thus failed to deliver the medical and supporting services in accordance with the agreement between the parties and/or in accordance with standard medical practice.

87. Defendant Dartmouth failed to warn Plaintiff of the dangers of Vioxx, even though Defendant Dartmouth and/or its medical professionals and staff knew or had reason to know of the dangers of Vioxx in violation of state law.

88. Defendant Dartmouth breached the contract between Defendnat Dartmouth and Plaintiff Martin resulting in substantial injury, harm and damages to Plaintiff Martin.

## COUNT VI

### (Unjust Enrichment as against Defendant Dartmouth-Hitchcock Medical Center))

89. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

90. As a direct proximate, and foreseeable result of Defendant Dartmouth-Hitchcock Medical Center's acts and otherwise wrongful conduct, Plaintiff was economically harmed. Defendant Dartmouth-Hitchcock Medical Center profited and benefited from the sale of Vioxx, even as Plaintiff suffered this harm.

91. Defendant Dartmouth-Hitchcock Medical Center has voluntarily accepted and retained these profits and benefits, derived from Plainitiff with full knowledge and awareness that, as a result of Defendant's unconscionable and intentional wrongdoing, Plaintiff was not receiving products of the quality, nature, fitness, or value that had been represented by Defendant or that a reasonable consumers, expected. Plaintiff purchased

medicine that she expected would improve her health, and instead found her health negatively affected.

92. By virtue of the conscious wrongdoing alleged in this Complaint, Defendant Dartmouth has been unjustly enriched at the expense of Plaintiff, who is entitled to in equity, and hereby seek, the disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

## COUNT VII

### (Medical Malpractice as against Defendant Millet)

93. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94. Defendant Dr. Peter Millet is medical doctors licensed to deliver medical services to the public at large within the Commonwealth of Massachusetts.

95. Plaintiff on multiple occasions was treated by Defendant Millet and provided prescriptions by Defendant Millet.

96. Defendant Millet breached the standard of medical care, or in other words, was negligent in the delivery of medical services and treatment as set forth above and thus breached the standard of due care and diligence in the medical treatment of the Plaintiff.

97. Plaintiff Martin has suffered injuries from the medical services and treatment received from Defendant Millet.

98. Defendant Millet acted negligently in providing medical services and treatment to Plaintiff Martin, resulting in damages and injuries to Plaintiff Martin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows on each and every Count of its

Complaint:

1. General damages in amount to be proven at trial and in excess of the

jurisdictional minimum of this Court;

2. Pre-judgment and post-judgment interest as provided by law;

3. Full refund of all purchase costs Plaintiff paid for Vioxx;

4. Compensatory damages in excess of the jurisdictional minimum of the Court,

according to proof;

5. Consequential damages in excess of the jurisdictional minimum of the Court,

according to proof;

6. Disgorgement of all profits associated with Vioxx;

7. Injunction requiring Defendant to fund a medical monitoring program to

address the needs of the Plaintiff associated with the use of Vioxx; and

8. Such further relief as this Court deems necessary, just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS AND ISSUES SO

TRIABLE

Plaintiff,
By her attorneys,

Andrew J. Tine
BBO#633639
Haese, LLC
30 Franklin Street, 3rd Floor
Boston, MA 02110
Tel. (617) 428-0266
Fax (617) 428-0276

## Commonwealth of Massachusetts
### County of Essex
### The Superior Court

CIVIL DOCKET# ESCV2005-00641-D

RE:  **Martin v Merck & Co Inc et al**

TO:Andrew J Tine, Esquire
Haese Law Office
70 Franklin Street
9th floor
Boston, MA 02110



**RECEIVED**
APR  2005

**Haese, LLC**

### TRACKING ORDER - A TRACK

You are hereby notified that this case is on the average (A) track as per Superior Court
Standing Order 1-88. The order requires that the various stages of litigation described below
must be completed not later than the deadlines indicated.

| **STAGES OF LITIGATION** | **DEADLINE** |
|---|---|
| Service of process made and return filed with the Court | 07/20/2005 |
| Response to the complaint filed (also see MRCP 12) | 09/18/2005 |
| All motions under MRCP 12, 19, and 20 filed | 09/18/2005 |
| All motions under MRCP 15 filed | 07/15/2006 |
| All discovery requests and depositions completed | 06/10/2007 |
| All motions under MRCP 56 served and heard | 08/09/2007 |
| Final pre-trial conference held and firm trial date set | 12/07/2007 |
| Case disposed | 04/20/2008 |

The final pre-trial deadline is **not the scheduled date of the conference.** You will be
notified of that date at a later time.
**Counsel for plaintiff must serve this tracking order on defendant before the deadline
for filing return of service.**

This case is assigned to session D sitting in CtRm 2 (Lawrence), Essex Superior Court.

Dated: 04/25/2005

Thomas H. Driscoll Jr.
Clerk of the Courts
BY: Philip Massa
Assistant Clerk

Location: CtRm 2 (Lawrence)
Telephone: (978) 687-7463

Check website for status of case: http://ma-trialcourts.org/tclc
cvdtraca_2.wpd 541849 inldoc01 exarhose

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS                                          SUPERIOR COURT

KATHLEEN A. MARTIN,

        Plaintiff,

                        CIVIL ACTION No. 050641

        v.

MERCK & CO., INC., et al.

        Defendants.

## ANSWER TO COMPLAINT AND JURY CLAIM

        Defendant Merck & Co., Inc. ("Merck") responds to the numbered allegations set forth in the Complaint of Kathleen A. Martin on behalf of Merck only and not for any other defendant as follows:

### INTRODUCTION

    1.    Merck denies every allegation in Paragraph 1 of the Complaint, except admits that Plaintiff Kathleen Martin purports to bring a civil action for damages and medical monitoring.

    2.    Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 2 of the Complaint and therefore denies the same.

    3.    Merck denies every allegation in Paragraph 3 of the Complaint.

    4.    Merck denies every allegation in Paragraph 4 of the Complaint, except admits that Merck sought and, in May 1999, received FDA approval to manufacture and market the prescription medicine VIOXX® subject to the information contained in the FDA-approved prescribing information for VIOXX® and respectfully refers the Court to the relevant prescribing information for its actual language and text.

    5.    Merck denies every allegation in Paragraph 5 of the Complaint and avers that in March 2000 Merck forwarded to the FDA the VIOXX® Gastrointestinal Outcomes Research

(VIGOR) study and subsequently, in June 2000, filed a supplemental New Drug Application (sNDA) that included the VIGOR study. Merck respectfully refers the Court to the referenced sNDA for its actual language and full text.

6.    Merck denies every allegation in Paragraph 6 of the Complaint.

7.    Merck denies every allegation in Paragraph 7 of the Complaint except admits that on September 30, 2004 Merck announced the voluntary worldwide withdrawal of VIOXX® and respectfully refers the Court to the referenced announcement for its actual language and full text. Merck further avers that it announced on September 30, 2004 that in a prospective, randomized, placebo controlled clinical trial there was an increased risk for confirmed cardiovascular events beginning after 18 months of treatment in the patients taking VIOXX® compared with those taking placebo and that Merck concluded that given the availability of alternative therapies and questions raised by the data from that trial, Merck concluded that a voluntary withdrawal of VIOXX® best served the interests of patients.

8.    Merck denies every allegation in Paragraph 8 of the Complaint.

PARTIES

9.    Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 9 of the Complaint and therefore denies the same.

10.    Merck denies every allegation in Paragraph 10 of the Complaint, except admits that Merck is a New Jersey corporation with its principal place of business in the State of New Jersey and admits that Merck is a leading research-driven pharmaceutical products and services company that researches, discovers, develops, manufactures, and markets a broad range of innovative pharmaceutical products.

11.    Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 11 of the Complaint and therefore denies the same.

12.    Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 12 of the Complaint and therefore denies the same.

13.    Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 13 of the Complaint and therefore denies the same.

14.    Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 14 of the Complaint and therefore denies the same.

FACTUAL BACKGROUND

15.    Merck denies every allegation in Paragraph 15 of the Complaint except admits that Merck manufactured, marked and distributed the prescription medicine VIOXX® until Merck voluntarily withdrew VIOXX® from the market on September 30, 2004.

16.    Merck denies every allegation in Paragraph 16 except admits that VIOXX® is part of a class of drugs known as NSAIDs and that Merck manufactured, marketed and distributed the prescription medicine VIOXX® which reduces pain and inflammation and that the mechanism of action is believed to be due to the inhibition of prostaglandin synthesis via inhibition of an enzyme known as cyclooxygenase-2 (COX-2).

17.    Merck denies every allegation in Paragraph 17 of the Complaint except admits that the mechanism of action for VIOXX® is believed to be due to inhibition of prostaglandin synthesis via inhibition of an enzyme known as COX-2. Merck further avers that the FDA approved VIOXX® as safe and effective for certain indicated uses subject to the information contained in the FDA-approved prescribing information for VIOXX® and respectfully refers the Court to the relevant prescribing information for its actual language and full text.

18.     Merck denies every allegation in Paragraph 18 of the Complaint.

19.     Merck denies every allegation in Paragraph 19 of the Complaint except admits that Merck sought and, in 1999, received FDA approval to manufacture and market the prescription medicine VIOXX®. Merck further admits that VIOXX® is the brand name for rofecoxib.

20.     Merck denies every allegation in Paragraph 20 of the Complaint.

21.     Merck denies every allegation in Paragraph 21 of the Complaint.

22.     Merck denies every allegation in Paragraph 22 of the Complaint except admits that Merck received a letter from a regulatory review officer dated December 16, 1999 and respectfully refers the Court to the referenced letter for its actual language and full text.

23.     Merck denies every allegation in Paragraph 23 of the Complaint except admits that the VIGOR study involving VIOXX® exists and respectfully refers the Court to the referenced study for its actual conclusions and full text.

24.     Merck denies every allegation in Paragraph 24 of the Complaint.

25.     Merck denies every allegation in Paragraph 25 of the Complaint except admits that the article referenced in sentence two of Paragraph 25 exists and respectfully refers the Court to said article for its actual language and full text. Merck further avers that prior to the VIGOR trial, Merck had put in place a cardiovascular standard operating procedure consisting of three external panels of experts, the purpose of which was to adjudicate investigator reported cardiovascular adverse events from clinical trials of VIOXX®.

26.     Merck denies every allegation in Paragraph 26 of the Complaint including subparagraphs (a)-(d) except admits that VIOXX® is a selective NSAID and that the inhibition of cyclooxygenase-1 (COX-1) in patients taking traditional non-selective NSAIDs such as

- 4 -

naproxen is believed to be associated with gastric damage and increased bleeding among patients taking such traditional non-selective NSAIDs.

27.     Merck denies every allegation in Paragraph 27 of the Complaint except admits that the studies referenced in sentence one of Paragraph 27 and the article referenced in sentence two of Paragraph 27 exist, and respectfully refers the Court to said publications for their actual language and full text.

27a.    Merck denies every allegation in Paragraph 27a of the Complaint.[1]

28.     Merck denies every allegation in Paragraph 28 of the Complaint except admits that the referenced publication exists and respectfully refers the Court to said publication for its actual language and full text.

29.     Merck denies every allegation in Paragraph 29 of the Complaint except admits that on February 8, 2001, the Arthritis Advisory Committee met and discussed, among other things, the VIGOR data.

30.     Merck denies every allegation in Paragraph 30 of the Complaint except admits that the referenced briefing document exists and respectfully refers the Court to said document for its actual language and full text.

31.     Merck denies every allegation in Paragraph 31 of the Complaint except admits that the memorandum document exists and respectfully refers the Court to said memorandum for its actual language and full text. Merck further admits that the VIGOR study exists and respectfully refers the Court to the VIGOR study for its actual conclusions and full text.

32.     Merck denies every allegation in Paragraph 32 of the Complaint.

---

[1] Plaintiff's Complaint contains two paragraphs numbered 27. To maintain consistency between the Complaint and Merck's Answer, Merck has renumbered the second paragraph numbered 27 as Paragraph 27a.

33.     Merck denies every allegation in Paragraph 33 of the Complaint except admits the existence of the journal, the article contained therein, and that plaintiff appears to have accurately quoted the document referenced in said paragraph, and respectfully refers the Court to the referenced document for its actual language and full text.

34.     Merck denies every allegation in Paragraph 34 of the Complaint except admits that the referenced article and press release exist and respectfully refers the Court to the referenced documents for their actual language and full text.

35.     Merck denies every allegation in Paragraph 35 of the Complaint except admits that the referenced study exists and respectfully refers the Court to said study for its actual language and full text.

36.     Merck denies every allegation in Paragraph 36 of the Complaint except admits that Merck received a letter from a regulatory review officer in September 2001 and respectfully refers the Court to that letter for its actual language and full text.

37.     Merck denies every allegation in Paragraph 37 of the Complaint except admits that Merck received a letter from a regulatory review officer in September 2001 and respectfully refers the Court to that letter for its actual language and full text.

38.     Merck denies every allegation in Paragraph 38 of the Complaint except admits that Merck issued a press release on May 22, 2001 entitled "Merck Confirms Favorable Cardiovascular Safety Profile of VIOXX®" and respectfully refers the Court to the referenced press release for its actual language and full text.

39.     Merck denies every allegation in Paragraph 39 of the Complaint except admits that the referenced article exists and respectfully refers the Court to the referenced publication for its actual language and full text.

- 6 -

40.    Merck denies every allegation in Paragraph 40 of the Complaint except admits that the referenced system for adverse event reporting exists, although the reports on the system are not necessarily accurate. Merck further avers that adverse events are reported without regard to causality and do not reflect a conclusion by the reporter of the adverse event or the Food and Drug Administration that the event was caused by the drug.

41.    Merck denies every allegation in Paragraph 41 of the Complaint except admits various cardiovascular adverse events associated with VIOXX® have been reported to the AERS system and respectfully refers the Court to the AERS for complete data on particular reported events.

42.    Merck denies every allegation in Paragraph 42 of the Complaint except admits that the *Reuters* article referenced in Paragraph 42 of the Complaint exists and that plaintiff purports to quote from the referenced article, but respectfully refers the Court to the referenced publication for its actual language and full text.

43.    Merck denies every allegation in Paragraph 43 of the Complaint except admits that the referenced article exists and respectfully refers the Court to said article for its actual language and full text.

44.    Merck denies every allegation in Paragraph 44 of the Complaint.

45.    Merck denies every allegation in Paragraph 45 of the Complaint.

46.    Merck denies every allegation in Paragraph 46 of the Complaint.

47.    Merck denies every allegation in Paragraph 47 of the Complaint and respectfully refers the Court to the relevant FDA-approved prescribing information for VIOXX® for its actual language and full text.

- 7 -

48.     Merck denies every allegation in Paragraph 48 of the Complaint except admits that in April 2002 the FDA approved certain changes to the VIOXX® prescribing information and respectfully refers the Court to the prescribing information for VIOXX® for its actual language and full text.

49.     Merck denies every allegation in Paragraph 49 of the Complaint.

50.     Merck denies every allegation in Paragraph 50 of the Complaint.

51.     Merck denies every allegation in Paragraph 51 of the Complaint.

52.     Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 52 of the Complaint and therefore denies the same.

53.     Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 53 of the Complaint and therefore denies the same.

54.     The allegations contained in Paragraph 54 of the Complaint are not directed at Merck, and therefore no responsive pleading is required. Should a response be deemed required, Merck denies every allegation in Paragraph 54 of the Complaint.

55.     Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 55 of the Complaint and therefore denies the same.

56.     Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 56 of the Complaint and therefore denies the same.

57.     Merck lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 57 of the Complaint and therefore denies the same.

58.     Merck denies every allegation in Paragraph 58 of the Complaint.

## COUNT I

### (Misrepresentation)

59.     Merck hereby incorporates by reference the preceding specific responses to the allegations in Paragraphs 1 through 58 of the Complaint.

60.     Merck denies every allegation in Paragraph 60 of the Complaint.

61.     Merck denies every allegation in Paragraph 61 of the Complaint.

62.     Merck denies every allegation in Paragraph 62 of the Complaint.

63.     Merck denies every allegation in Paragraph 63 of the Complaint.

64.     Merck denies every allegation in Paragraph 64 of the Complaint.

65.     Merck denies every allegation in Paragraph 65 of the Complaint.

## COUNT II

### (Medical Monitoring)

66.     Merck hereby incorporates by reference the preceding specific responses to the allegations in Paragraphs 1 through 65 of the Complaint.

67.     Merck denies every allegation in Paragraph 67 of the Complaint.

68.     Merck denies every allegation in Paragraph 68 of the Complaint.

69.     Merck denies every allegation in Paragraph 69 of the Complaint.

70.     The allegations of Paragraph 70 of the Complaint are legal conclusions to which no responsive pleading is required. Should a response be deemed required, Merck denies every allegation in Paragraph 70 of the Complaint.

71.     Merck denies every allegation in Paragraph 71 of the Complaint.

72.     Merck denies every allegation in Paragraph 72 of the Complaint.

## COUNT III

### (Unjust Enrichment as to Merck)

73.    Merck hereby incorporates by reference the preceding specific responses to the allegations in Paragraphs 1 through 72 of the Complaint.

74.    Merck denies every allegation in Paragraph 74 of the Complaint.

75.    Merck denies every allegation in Paragraph 75 of the Complaint.

76.    Merck denies every allegation in Paragraph 76 of the Complaint except admits that the Plaintiff purports to state a claim for damages, but Merck denies that there is any legal or factual basis for said relief.

## COUNT IV

### (Medical Malpractice as Against Defendants Pinto-Powell and Carr)

77.    Merck hereby incorporates by reference the preceding specific responses to the allegations in Paragraphs 1 through 76 of the Complaint.

78-82.  Count IV and each of Paragraphs 78 through 82 make no allegations against Merck, and Merck therefore need make no response.  To the extent that Merck may be deemed to be required to respond to these allegations, Merck denies every allegation contained in Paragraphs 78 through 82.

## COUNT V

### (Breach of Contract as against Defendant Dartmouth-Hitchcock Medical Center)

83.    Merck hereby incorporates by reference the preceding specific responses to the allegations in Paragraphs 1 through 82 of the Complaint.

84-88.  Count V and each of Paragraphs 84 through 88 make no allegations against Merck, and Merck therefore need make no response.  To the extent that Merck may be deemed

- 10 -

to be required to respond to these allegations, Merck denies every allegation contained in Paragraphs 84 through 88.

## COUNT VI

### (Breach of Contract as against Defendant Dartmouth-Hitchcock Medical Center)

89.     Merck hereby incorporates by reference the preceding specific responses to the allegations in Paragraphs 1 through 88 of the Complaint.

90-92.  Count VI and each of Paragraphs 90 through 92 make no allegations against Merck, and Merck therefore need make no response. To the extent that Merck may be deemed to be required to respond to these allegations, Merck denies every allegation contained in Paragraphs 90 through 92.

## COUNT VII

### (Medical Malpractice as against Defendant Millet)

93.     Merck hereby incorporates by reference the preceding specific responses to the allegations in Paragraphs 1 through 92 of the Complaint.

94-98.  Count VI and each of Paragraphs 94 through 98 make no allegations against Merck, and Merck therefore need make no response. To the extent that Merck may be deemed to be required to respond to these allegations, Merck denies every allegation contained in Paragraphs 94 through 98.

## RESPONSE TO "WHEREFORE..."

The allegations contained in the "Wherefore . . ." section of the Plaintiff's Complaint are not allegations to which any responsive pleading is required. Should a response be deemed required, Merck admits that the Plaintiff purports to state a claim for damages, but Merck denies that there is any legal or factual basis for said relief.

- 11 -

## RESPONSE TO JURY DEMAND

Merck admits that the Plaintiff demands a trial by jury.

## JURY DEMAND

Merck hereby requests a trial by jury.

## DEFENSES

## FIRST DEFENSE

The Complaint fails to set forth a cause of action upon which relief can be granted.

## SECOND DEFENSE

Any product for which Merck was responsible at the time of the occurrence or injuries alleged by the Plaintiff was not defective and unreasonably dangerous in its design, manufacture, or marketing, and was at all times reasonably safe and reasonably fit for its intended use. The warnings and instructions accompanying the product or products at issue at the time of the occurrence or injuries alleged by the Plaintiff were legally adequate warnings and instructions.

## THIRD DEFENSE

The occurrence and injuries alleged by the Plaintiff were caused or contributed to by the negligence, breaches of warranty, or defective products of third parties over whom Merck had no control and for whom Merck is not responsible.

## FOURTH DEFENSE

If the Plaintiff has sustained injuries or losses as alleged in the Complaint, upon information and belief, such injuries and losses were caused by the actions of persons having no real or apparent authority to take said actions on behalf of Merck and over whom Merck had no control and for whom Merck may not be held accountable.

## FIFTH DEFENSE

The occurrence and injuries alleged by the Plaintiff resulted from an intervening cause or

- 12 -

a new and independent cause which was the proximate and/or producing cause and/or the sole proximate and/or sole cause of the occurrence and injuries alleged by the Plaintiff. Moreover, the occurrence and injuries were caused by separate and independent events or agencies not reasonably foreseeable. Such separate and independent events or agencies destroy the causal connection, if any, between any breach of legal duty on the part of Merck and the occurrence and injuries alleged by the Plaintiff, and thereby become the immediate and/or sole cause, and/or sole proximate and/or sole producing cause of such occurrence and injuries, relieving Merck of liability to the Plaintiff or any other parties.

### SIXTH DEFENSE

If the Plaintiff sustained the injuries or incurred the expenses alleged, the same were caused, in whole or in part, by operation of nature or an act of God.

### SEVENTH DEFENSE

If the Plaintiff sustained the injuries or incurred the expenses alleged, the same were caused by an idiosyncratic reaction, without any negligence, defect, or failure on the part of Merck.

### EIGHTH DEFENSE

The injuries and damages alleged in the Plaintiff's Complaint were the result of unavoidable circumstances that could not have been prevented by anyone, including Merck.

### NINTH DEFENSE

Any and all damages alleged by the Plaintiff were caused by misuse of the product or products at issue in this case, failure to use the product or products properly, and/or alteration or negligent use of the product or products.

### TENTH DEFENSE

The Plaintiff cannot recover under the Complaint because the product at issue was made in accordance with the state of the art at the time it was manufactured.

### ELEVENTH DEFENSE

The Plaintiff' claims are barred by the Plaintiff's contributory negligence and the contributory negligence of others.

### TWELFTH DEFENSE

The Plaintiff's claims are barred by the Plaintiff's express and/or implied assumption of the risks, if any, inherent in the alleged use of the product or products at issue.

### THIRTEENTH DEFENSE

Each and every claim asserted or raised in the Complaint is barred by the doctrine of laches.

### FOURTEENTH DEFENSE

The benefits of the product or products at issue outweigh the risks, if any, that may be attendant to their use.

### FIFTEENTH DEFENSE

The damages and injuries alleged, if any, were caused or enhanced by a preexisting medical condition of the Plaintiff that was not related to any product manufactured by Merck.

### SIXTEENTH DEFENSE

Each and every claim asserted or raised in the Complaint is barred by the doctrine set forth in Comment k of the Restatement (Second) of Torts § 402A as to the product or products at issue.

## SEVENTEENTH DEFENSE

The Plaintiff's claims are barred in whole or in part pursuant to comment f to Section 6 of the Restatement (Third) of Torts: Product Liability.

## EIGHTEENTH DEFENSE

The Plaintiff's claims are barred in whole or in part pursuant to comment j to Section 402A of the Restatement (Second) of Torts.

## NINETEENTH DEFENSE

The Plaintiff's claims are barred under Section 4 et seq. of the Restatement (Third), of Torts: Product Liability.

## TWENTIETH DEFENSE

Any warnings that Merck gave were transmitted to the prescribing physicians and/or health care providers, and under Massachusetts law Merck's only obligation is to warn the prescribing physician and/or health care providers and said obligation was fulfilled.

## TWENTY-FIRST DEFENSE

Merck has complied with all requirements of the Food and Drug Administration of the United States Department of Health and Human Services, and the product or products at issue were approved pursuant to the applicable statutes and regulations. Pursuant to such, the product or products at issue could only be used pursuant to the prescription of a licensed prescriber. The package insert for the product or products at issue was also approved by the Food and Drug Administration, and the marketing was conducted in conformity with the regulations of the Food and Drug Administration. Therefore, the Plaintiff's claims are preempted.

## TWENTY-SECOND DEFENSE

The Plaintiff's claims are barred by the applicable statute(s) of limitations.

## TWENTY-THIRD DEFENSE

If the Plaintiff sustained the injuries and damages alleged in the Complaint, such injuries

resulted, in whole or in part, from the negligence or fault of the Plaintiff and/or third parties, not

from any negligence or breach of duty by Merck. Judgment may not enter for the Plaintiff if it is

found that the Plaintiff was more negligent than Merck. If judgment is rendered in the Plaintiff's

favor, the amount of such judgment must be reduced under the doctrine of comparative

negligence.

## TWENTY-FOURTH DEFENSE

Merck is unaware at this time of any settlement by any alleged joint tortfeasor. However,

in the event any settlement is or has been made by any alleged joint tortfeasor, Merck is entitled

to a credit/offset for such settlement.

## TWENTY-FIFTH DEFENSE

The extent of any risk associated with the use of Merck's product, the existence of which

is not admitted, was, at the time of the distribution of the product by Merck, unknown and could

not have been known by the use of ordinary care by Merck.

## TWENTY-SIXTH DEFENSE

At the time the product at issue was manufactured, there was no practical and technically

feasible alternative design or formulation that would have prevented the alleged harm without

substantially impairing the usefulness of the product.

## TWENTY-SEVENTH DEFENSE

Merck made no express or implied representations or warranties of any kind to the

Plaintiff, nor did the Plaintiff rely on any representations or warranties made by Merck. To the

extent the Plaintiff relied on any representations or warranties, such reliance was unjustified.

## TWENTY-EIGHTH DEFENSE

Merck did not breach any duty of care to the Plaintiff.

## TWENTY-NINTH DEFENSE

The Plaintiff's claims are barred by the doctrine of estoppel.

## THIRTIETH DEFENSE

The Plaintiff's claims are barred by the doctrine of waiver.

## THIRTY-FIRST DEFENSE

The Plaintiff has failed to join all necessary and indispensable parties.

## THIRTY-SECOND DEFENSE

The Plaintiff's claims are barred because the Plaintiff has failed and refused to mitigate her alleged damages.

## THIRTY-THIRD DEFENSE

Merck did not violate any state or federal statute, regulation or ordinance to cause the Plaintiff's alleged injuries.

## THIRTY-FOURTH DEFENSE

The Plaintiff's claims are barred in whole or in part due to a lack of notice.

## THIRTY-FIFTH DEFENSE

To the extent that the Plaintiff asserts claims based on Merck's adherence to and compliance with applicable state laws, regulations, and rules, such claims are preempted by federal law under the Supremacy Clause of the United States Constitution.

## THIRTY-SIXTH DEFENSE

The Plaintiff's claims are barred, in whole or in part, because the Plaintiff lacks capacity and/or standing to bring such claims.

## THIRTY-SEVENTH DEFENSE

To the extent the Plaintiff is seeking recovery for benefits entitled to be received or actually received from any other source for injuries alleged in the Complaint, such benefits are not recoverable in this action.

## THIRTY-EIGHTH DEFENSE

The Plaintiff's state-law claims are barred, in whole or in part, because VIOXX® was subject to and received pre-market approval by the FDA under 52 Stat. 1040, 21 U.S.C. § 301.

## THIRTY-NINTH DEFENSE

The Complaint and the causes of action contained therein are barred in whole or in part by the United States and Massachusetts Constitutions, which prohibit the extraterritorial application of Massachusetts law.

## FORTIETH DEFENSE

The Complaint and the causes of action contained therein are barred in whole or in part by the U.S. Constitution, article I, section VIII, clause 3 to the extent they seek to regulate Merck's practices outside of Massachusetts. That constitutional provision prohibits a State from regulating conduct that occurs wholly outside of its borders.

## FORTY-FIRST DEFENSE

Merck hereby gives notice that it intends to rely upon such other defenses as may become available or appear during discovery proceeding in this case or that are included in the master answer to be filed in the Multidistrict Litigation proceeding before Judge Fallon of the Eastern District of Louisiana. Merck hereby reserves the right to amend its answer to assert any such defense.

**WHEREFORE**, Defendant Merck & Co. respectfully requests that the Plaintiff take nothing in this suit, that it recover its costs of court and expenses and such other relief to which it may show itself justly entitled.

> MERCK & CO., INC.
> By its attorneys:
>
> _(signature)_
> James J. Dillon (BBO# 124660)
> Lucy Fowler (BBO# 647929)
> FOLEY HOAG LLP
> 155 Seaport Boulevard
> Boston, MA 02110-2600
> (617) 832-1000

Dated: August 5, 2005

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Answer was served on August 5, 2005 by U.S. mail, upon:

Andrew J. Tine
Haese, LLC
30 Franklin Street, 3rd Floor
Boston, MA 02110

Dartmouth Hitchcock Medical Center
One Medical Center Drive
Lebanon, NH 03756

Dr. Roshini-Pinto Powell
Dr. Charles Carr
Dartmouth Hitchcock Medical Center
One Medical Center Drive
Lebanon, NH 03756

Brigham & Women's Hospital
75 Francis Street
Boston, MA 02115

Dr. Peter Miller
Brigham & Women's Hospital
75 Francis Street
Boston, MA 02115

_(signature)_

- 19 -

Exhibit B

## **Index to Exhibit B -- Cases**

Abrusley v. Merck & Co., Inc., et al., No. 02-0196, Report & Recommendation (W.D. La. June 18, 2002)

Abrusley v. Merck & Co., Inc., et al., No. 02-0196, Judgment (W.D. La. July 23, 2002)

Flores v. Merck & Co., Inc., et al., No. 03-362, slip op. at *2 (S.D. Tex. Mar. 15, 2004)

In re Diet Drugs, 220 F. Supp. 2d 414, 424 (E.D. Pa. 2002)

In re Rezulin Prods. Liab. Litig., 133 F. Supp. 2d 272, 295 (S.D.N.Y. 2001) ("Rezulin I")

In re Rezulin Prods. Liab. Litig., 2002 WL 31852826, *2 (S.D.N.Y. Dec. 18, 2002) ("Rezulin II")

In re Rezulin Prods. Liab. Litig., 2003 WL 21276425 (S.D.N.Y. June 2, 2003) ("Rezulin III")

Louis v. Wyeth-Ayerst Pharms., Inc., No. 5:000 CV 102 LN, slip op. at 2 (S.D. Miss. Sept. 25, 2000)

Macone v. Nelson, 274 F. Supp. 2d 136 (D.P.R. 2003)

Omobude v. Merck & Co., et al., No. 5:000 CV 102 LN, Memorandum Opinion and Order Denying Remand (S.D. Miss. Oct. 3, 2003)

Zeedyck v. Merck & Co., Inc., No. 02-C-4203, Order (N.D. Ill. Aug. 30, 2002)

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

JUL 23 2002

ROBERT H. SHEMWELL, CLERK
BY_____
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

JOHN ABRUSLEY, SR.              :       DOCKET NO. 02-0196

VS.                            :       JUDGE TRIMBLE

MERCK & CO., INC., ET AL.       :       MAGISTRATE JUDGE WILSON

## JUDGMENT

For the reasons stated in the Report and Recommendation of the Magistrate Judge

previously filed herein and after an independent review of the record, and a *de novo*

determination of the issues, and consideration of the objections filed herein, and having

determined that the findings are correct under applicable law;

IT IS ORDERED that plaintiff's motion to remand or alternatively, motion for leave to

amend and then remand [doc. # 20], be, and it is hereby DENIED.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 23rd day

of _____, 2002.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

JUDGMENT ENTERED
7/26/02
BY _____
COPY _____

JTT/Rld
JB



U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA.
F I L E D

JUN 1 8 2002

ROBERT H. SHUMWELL, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

JOHN ABRUSLEY, SR.               :     DOCKET NO. 02-0196

VS.                              :     JUDGE TRIMBLE

MERCK & CO., INC., ET AL.        :     MAGISTRATE JUDGE WILSON

### REPORT AND RECOMMENDATION

Before the court is plaintiff's motion to remand or alternatively, motion for leave to
amend and then remand. [doc. # 20].[1]

In the summer of 2001, John Abrusley Sr. went to see his doctor because he was
experiencing hip pain. (Petition, ¶ 2). His doctor gave him an injection of Risticar and supplied
him with samples of Vioxx. *Id.* Abrusley used the Vioxx for two to three weeks, before
stopping. *Id.* at ¶ 4. However, several days later, Abrusley suffered a stroke and collapsed –
breaking his wrist. *Id.* at ¶¶ 5-9. Abrusley believes that Vioxx caused his stroke and resulting
injuries. *Id.* at ¶ 11. Accordingly, on January 11, 2002, Abrusley filed the instant action against
the Vioxx manufacturer, Merck, & Co., Inc. ("Merck") in the 33rd Judicial District Court for the
Parish of Allen, State of Louisiana. Also made defendant was John Doe, the fictitious name for
Merck's salesman or detailer who provided the product samples to plaintiff's doctor.

On January 31, 2002, Merck, timely removed the case to federal court on the basis of
diversity jurisdiction. 28 U.S.C. § 1332. Plaintiff is a Louisiana domiliary, and thus, is deemed a

---

[1] The motion has been referred to the undersigned for decision pursuant to 28 U.S.C. §
636(b)(1)(A).

citizen of this state for purposes of jurisdiction. (Petition, preamble). Merck is a New Jersey corporation, with its principal place of business in said state. (Notice of Removal, ¶ 6). The citizenship of John Doe was disregarded because he is a fictitious party. 28 U.S.C. § 1441(a).

On March 27, 2002, plaintiff filed the instant, well-written, motion to remand or alternatively, motion for leave to amend and then remand.[2] Plaintiff contends that because John Doe was sufficiently described in the complaint and readily identifiable by Merck, then he should be considered for purposes of assessing diversity.[3] *Ibieta v. Brinks*, 1997 WL 781291 (E.D. La. 1997); *Tomkins v. Lowe's Home Center, Inc.*, 847 F.Supp. 462 (E.D. La. 1994). We respectfully disagree with these cases. Section 1441(a) unequivocally states that ". . . the citizenship of defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(a). No exceptions are contemplated by this rule, and we are not at liberty to impose any.

Even if we treated John Doe as a named, non-diverse defendant, then it would have been incumbent upon the removing defendant to establish that plaintiff had no possibility of recovery against the in-state defendant, and that he had been joined merely to defeat diversity. *Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 815 (5th Cir. 1993)(citing, *Dodson v. Spiliada Maritime Corp.*, 951 F.2d 40, 42 (5th Cir. 1992)). Here, defendant satisfied that burden.

In *Furlough v. Warner Lambert Co.*, we recognized that under Louisiana law the only duty owed by detailmen is to deliver and explain the new package inserts to the physicians in their territory. *Furlough v. Warner Lambert Co.*, Civil Action No. 3:01-0704 (W.D. La. 8/8 &

---

[2] After delay for discovery and briefing, the matter is now before the court.

[3] Plaintiff does not contest that the amount in controversy exceeds the requisite jurisdictional minimum. *See*, 28 U.S.C. § 1332. Moreover, we have reviewed plaintiff's allegations and the Notice of Removal. (*See*, Notice of Removal, ¶ 5). We are satisfied that plaintiff's claims exceed the jurisdictional minimum.

9/13/01)(citing, *Wallace v. Upjohn Co.*, 535 So.2d 1110 (La. App. 1ˢᵗ Cir. 1988)). However, the

instant plaintiff's original petition is devoid of any specific allegations that John Doe, (a

detailman) failed to provide the product insert to his physician or that he failed to explain the

product insert.[4] Thus, on its face, plaintiff's petition does not state a cause of action against the

fictitious defendant, and plaintiff had no possibility of recovery against said defendant at the time

of removal. John Doe is properly excluded from the assessment of diversity.

Plaintiff alternatively seeks to amend his petition to substitute Bryant Tansil for John

Doe, and to add defendant-detailmen/salesmen, Sonja Ragusa, James White, Stacey Walters,

John Matthews, Vincent Moronto, John Matthews, and Sonya Brantley. (*See*, First Supplemental

and Amending Complaint). Plaintiff alleges that these individual defendants are Louisiana

residents.[5] Of course, the post-removal joinder of any non-diverse defendant will destroy

diversity jurisdiction and require remand. *Cobb v. Delta Exports, Inc.*, 186 F.3d 675 (5ᵗʰ Cir.

1999); 28 U.S.C. § 1447(e).[6]

In *Hensgens v. Deere and Company*, the Fifth Circuit stated that "the district court, when

confronted with an amendment to add a non-diverse non-indispensable party, should use its

---

[4] The closest that plaintiff comes to stating an actionable claim against John Doe is his
allegation that he failed to convey the hazardous and dangerous nature of Vioxx to plaintiff and his
physician. (Petition, ¶ 15, 53). However, this declaration does not specifically allege that the
detailman failed to deliver or explain the package inserts to the prescribing physician. *See, Griggs
v. State Farm Lloyds*, 181 F.3d 694, 699 (5ᵗʰ Cir. 1999)(a petition which fails to state any specific
actionable conduct on the part of a non-diverse defendant does not satisfy the liberalized
requirements of notice pleading such as to state a valid cause of action); *Hart v. Bayer Corp.*, 199
F.3d 239, 247-248 (5ᵗʰ Cir. 1999).

[5] Presumably, they are Louisiana domiciliaries.

[6] The post-removal substitution for a fictitious defendant is also analyzed under 28 U.S.C.
§ 1447(e). *See, Doleac ex rel. Doleac v. Michalson*, 264 F.3d 470 (5ᵗʰ Cir. 2001).

3

discretion in deciding whether to allow that party to be added. . . ." *Hensgens v. Deere and Company*, 833 F.2d 1179, 1182 (5th Cir. 1987)(citations omitted).[7] In exercising its discretion, the district court is to consider the following factors,

> . . . the extent to which the purpose of the amendment is to defeat federal jurisdiction, whether plaintiff has been dilatory in asking for an amendment, whether plaintiff will be significantly injured if an amendment is not allowed, and any other factors bearing on the equities.

*Hengens*, 833 F.2d at 1182.

Our first consideration is the extent to which the purpose of the amendment is to defeat federal jurisdiction. Related to this issue is whether plaintiff has a real possibility of recovery against the proposed defendants. *See, Cobb,* 186 F.3d at 678 (a court should never permit the joinder of a jurisdiction-destroying defendant when recovery against that defendant is not really possible). Without question, plaintiff's amended complaint alleges a cause of action against the putative individual defendants.[8] However, Merck submitted an uncontroverted affidavit which establishes that prior to the summer of 2001, putative defendant, Stacy K. Walters, provided the Vioxx product circular to Dr. Nesom (plaintiff's doctor), and explained it to him. (Def. Exh. C). Thus, Walters discharged her limited duty as a detailman. Moreover, even if the remaining putative defendants did not discharge their individual duties to provide and explain the product inserts to Dr. Nesom, any breach of that duty could not have been a cause-in-fact of plaintiff's injuries because Stacy Walters provided that information to Dr. Nesom prior to the summer of

---

[7] *Hensgens* was decided prior to the 1988 enactment of 28 U.S.C. § 1447(e). However, some courts have suggested that § 1447(e) was a codification of *Hengens. See, Heininger v. Wecare Distributors, Inc.,* 706 F.Supp. 860, 862, n. 4 (S.D. Fla. 1989); *Chism v. Burlington Northern Railroad Co.,* 1996 Westlaw 408907 (N.D. Miss. 1996).

[8] *See e.g.,* ¶ 1(c)(the detailman/salesman did not convey or explain the Vioxx package inserts to plaintiff's physician).

4

2001. Accordingly, the uncontroverted evidence establishes that plaintiff does not have a real possibility of recovery against any of the putative individual defendants.

Independent of plaintiff's chances of recovery against the individual defendants, we note that the nature of the claims and parties in this case strongly indicate that the primary purpose of the amendment is to defeat federal subject matter jurisdiction. Plaintiff alleges that the detailmen/salesmen are employees of Merck. Thus, Merck would be vicariously liable for any negligence committed by its employees within the course and scope of their employment. The joinder of Merck's employees adds nothing to plaintiff's case – except to secure remand to state court.

Merck concedes that plaintiff was not dilatory in seeking leave to amend. However, Merck alleges that plaintiff will not be significantly injured if the amendment is disallowed. We agree. As stated above, Merck is vicariously liable for its employees' negligence. Merck is fully capable of satisfying any judgment against it. To the extent that Merck could prove insolvent à la Enron or Global Crossing, the fiscal health of the individual employees would be no better. They would find themselves unemployed and struggling to meet mortgage and credit card payments.[9]

For the foregoing reasons,

IT IS RECOMMENDED that plaintiff's motion to remand or alternatively, motion for leave to amend and then remand [doc. # 20], be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have ten (10) business days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

---

[9] There are no other dispositive equities to be considered.

5

FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this _18th_ day of June, 2002.

COPY SENT:
DATE: 6/19/02
BY: _KGD_
TO: _Hodiu_
_McCall_
_Cohen_
_APWIBB_
_JB_

ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE

6

`

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

United States District Court
Southern District of Texas
ENTERED

MAR 1 5 2004

| | | |
|---|---|---|
| THE HEIRS OF THE ESTATE OF | § | Michael N. Milby, Clerk of Court |
| PABLO FLORES, INDIVIDUALLY AND | § | |
| ON BEHALF OF THE ESTATE | § | 23 |
| | § | |
| v. | § | CIVIL ACTION NO. C-03-362 |
| | § | |
| MERCK & CO., INC. AND RANDY | § | |
| FUENTES, M.D. | § | |

## ORDER DENYING PLAINTIFFS' MOTION TO REMAND AND DISMISSING CLAIMS AGAINST DEFENDANT FUENTES

After careful consideration, the Court DENIES plaintiffs' Motion to Remand (D.E.

9) and DISMISSES all claims against defendant Fuentes.

*Fraudulent Joinder:*

Defendant Merck removed this action alleging fraudulent joinder of defendant

Fuentes. Fraudulent joinder is established by showing (1) actual fraud in pleading

jurisdictional facts or (2) inability of the plaintiff to establish a cause of action against the

non-diverse plaintiff. *Travis v. Irby*, 326 F.3d 644, 647 (5th Cir. 2003). The Court must

determine whether there is arguably a reasonable basis for predicting that state law might

impose liability. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d

305, 312 (5th Cir. 2002). There must be a reasonable possibility of recovery, not merely a

theoretical one. *Ross v. Citifinancial, Inc.*, 344 F.3d 458, 462 (5th Cir. 2003). "Although

the Fifth Circuit has not drawn a bright-line distinction between a reasonable possibility and

1

a theoretical one, it has held that, when plaintiffs make general allegations and fail to support them with specific, underlying facts, they have not established a reasonable basis for the Court to predict that relief may be granted." *Staples v. Merck & Co., Inc.*, 270 F.Supp.2d 833, 837 (N.D. Tex. 2003) (citing *Great Plains Trust Co.*, 313 F.3d at 329).

Plaintiffs' petition alleges negligence, strict liability, fraud, misrepresentation, breach of warranty, and derivative wrongful death and survival claims. The Court finds that there is not arguably a reasonable basis for predicting that state law might impose liability upon Fuentes for any of these claims. *Great Plains Trust Co.*, 313 F.3d at 312.

Plaintiffs make conclusory, general allegations of negligence against Fuentes which they fail to support with specific, underlying facts. In plaintiffs' petition, the only allegation that directly refers to Fuentes is that "Plaintiff Decedent was prescribed Vioxx® by defendant Dr. Fuentes. Decedent presented in part with a serious history of cardiac disease, hypertension and/or other risk factors contrary to the ingestion of Vioxx®." Yet, the plaintiffs later claim that Merck "failed to adequately and timely inform the health care industry of the risks of serious personal injury and death from Vioxx® ingestion." The Court finds that there is not arguably a reasonable basis for predicting that state law might impose liability upon Fuentes for negligence when the plaintiffs' own petition states that Fuentes, as a member of the health care industry, was not made aware of the risks of the ingestion of the drug.

2

Also, the strict liability claim does not form an arguably reasonable basis for the imposition of state law liability.[1] Plaintiffs further fail to provide any factual support for their fraud or misrepresentation claims as they apply to Fuentes; they rely on speculative and conclusory allegations, which are insufficient to support these claims. *See, e.g., Staples*, 270 F.Supp.2d at 844. Also, the breach of warranty claim is asserted solely against Merck and not against Fuentes. Finally, it follows that the derivative claims fail to form a basis for the imposition of state law liability upon Fuentes as well. *See Schaefer v. Gulf Coast Regional Blood Center*, 10 F.3d 327, 330 (5th Cir. 1994) (Wrongful death and survival claims "are derivative actions and condition the plaintiff's ability to recover upon the decedent's theoretical ability to have brought an action had the decedent lived.").

As such, the Court concludes that Fuentes was fraudulently joined. Therefore, the Court DENIES plaintiffs' motion to remand and DISMISSES all claims against defendant Fuentes.

ORDERED this *12* day of *March*, 2004.

*Hw Head*

HAYDEN HEAD
CHIEF JUDGE

---

[1] On the facts, it is extremely unlikely a Texas court would find Fuentes strictly liable for the prescription. *See, e.g., Cobb v. Dallas Forth Worth Medical Center–Grand Prairie*, 48 S.W.3d 820, 826 (Tex. App. 2001). Also, a strict liability claim would be time-barred under the two-year statute of limitations of Tex. Civ. Prac. & Rem. Code 16.003(b) (Vernon 2003) because decedent died on September 9, 2000 and plaintiffs did not file their action until March 6, 2003. *See also Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 668 (Tex. 1999) ("The statute of limitations is only . . . two years on a strict liability claim.") The agreed tolling stipulations do not affect this time bar

Westlaw.

220 F.Supp.2d 414
220 F.Supp.2d 414
**(Cite as: 220 F.Supp.2d 414)**

Page 1

# H

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
In re DIET DRUGS (PHENTERMINE,
FENFLURAMINE, DEXFENFLURAMINE)
PRODUCTS
LIABILITY LITIGATION.
Sandra Anderson, et al.
v.
American Home Products Corporation, et al.
Latrell Ashley, et al.
v.
American Home Products Corporation, et al.
Tanya Sherelle Castal, et al.
v.
American Home Products Corporation, et al.
**Nos. MDL 1203, Civ.A. 01-20182, Civ.A. 02-20098,
Civ.A. 02-20107.**

Aug. 13, 2002.

In mass tort litigation involving the diet drugs known
as "fen-phen," brought against a seller of the drugs,
phentermine manufacturers, physicians, pharmacies,
and sales representatives, plaintiffs in three actions
moved to remand their suits to state court, from
which they had been removed by the seller. The
District Court, Bartle, J., held that: (1) manufacturers
of the drug phentermine were fraudulently joined; (2)
physicians were fraudulently joined as to all but two
plaintiffs; and (3) pharmacies were fraudulently
joined; and (4) sales representatives were fraudulently
joined.

Ordered accordingly.

West Headnotes

**[1] Removal of Cases** ⬤➡36
334k36 Most Cited Cases

**[1] Removal of Cases** ⬤➡82
334k82 Most Cited Cases
Seller of diet drugs known as "fen-phen" showed that
tort plaintiffs had no real intention in good faith to
seek a judgment against non-diverse manufacturers
of the drug phentermine, and thus, that phentermine

manufacturers were fraudulently joined, such that
their lack of consent to removal would be ignored in
determining the propriety of removal; no court had
found scientifically reliable evidence of phentermine
causing valvular heart disease (VHD) or primary
pulmonary hypertension (PPH), and there was
evidence of agreements under which plaintiffs would
ultimately dismiss the phentermine manufacturers in
exchange for their refusal to consent to removal. 28
U.S.C.A. § § 1441, 1447(c).

**[2] Removal of Cases** ⬤➡36
334k36 Most Cited Cases
In mass tort litigation involving the diet drugs known
as "fen-phen," non-diverse physician defendants were
fraudulently joined for purposes of determining
removability of the actions, except as to plaintiffs
they had allegedly treated. 28 U.S.C.A. § § 1441,
1447(c).

**[3] Removal of Cases** ⬤➡36
334k36 Most Cited Cases
Non-diverse pharmacies were fraudulently joined in
mass tort litigation involving the diet drugs known as
"fen-phen," such that their nondiverse citizenship was
immaterial to a removal jurisdiction analysis; under
Mississippi's learned intermediary doctrine,
pharmacies had no duty to question a prescribing
physician's judgment or to warn patients, and there
was a pattern of pharmacies being named in
complaints, but never pursued to judgment, typically
being voluntarily dismissed at some point after the
defendants' ability to remove the case had expired.
28 U.S.C.A. § § 1441, 1446(b), 1447(c).

**[4] Federal Courts** ⬤➡157
170Bk157 Most Cited Cases
Multi-district litigation (MDL) court sitting within
the Third Circuit had to apply its Court of Appeals'
fraudulent joinder standard to removed actions. 28
U.S.C.A. § § 1441, 1447(c).

**[5] Removal of Cases** ⬤➡36
334k36 Most Cited Cases
Non-diverse sales representatives were fraudulently
joined in mass tort litigation involving the diet drugs
known as "fen-phen," such that their nondiverse
citizenship was immaterial to a removal jurisdiction
analysis; there was no indication that any of the
plaintiffs, or any of the plaintiffs' doctors, received
any drugs from the sales representatives, and under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mississippi's learned intermediary doctrine, the representatives had no duty to question a prescribing physician's judgment or to warn patients, and they could not be held liable for breach of warranty. 28 U.S.C.A. § 1441, 1447(c).

**\*415** Thomas W. Pirtle, O'Quinn & Laminack, Houston, TX, for Sandra Anderson, Plaintiff (01-CV-20182).

Darlene Marie Jacobs, New Orleans, LA, Richard N. Laminack, O'Quinn & Laminack, Houston, TX, Robert G. Harvey, Sr., Mark Philip Glago, Tamara Kluger Jacobson, Harvey Jacobson & Glago, APLC, New Orleans, LA, for Sherrie Age Audrict, Jennifer Ashby, Nicole Barnes, Theresa Bartholomew, Stephanie Clark Bethley, Ruby Beverly, Tesha Bickhan, Elizabeth Bosworth, Almeda Brown, Deborah Brown, Marquerite Burns, Beverly Butler, Deborah Butler, Della Caples, Linda Williams Carter, Reginal Carter, Belinda Chism, Dorothy Cook, Myrna Darby, Patrick Morris, Sandra Nunez, Gail Price, JanieRobertson, Melissa Spurlock-Homer, Audrey Adams, Glenda Barnes, Marie Barney, Clarence Barney, Pearlie Bender, Maxine Bethley, Dorothy Boyd, Etta Briscoe, Gertrude Carr, Veronica Causey, Karen Chaubert, Gilda Crawford, Tabbatha Cuiellete, Ann Duplessis, Earlene Eacher, Wanda Evans, Tracy Flores, Katherine Ford, Andrea Forsyth, Richard Francois, Vada Franklin, Kim Gibson, Bernice Heath, Jamie Hogan, Intervenors-Plaintiffs (01-CV-20182).

Henri Wolbrette, III, Kathleen Ann Manning, McGlinchey, Stafford, et al., New Orleans, LA, Paul B. Kerrigan, Reed, Smith, Shaw & McClay, Philadelphia, PA, Robert D. Rosenbaum, Arnold & Porter, Washington, DC, for American Home Products Corporation, Defendant (01-CV-20182).

Henri Wolbrette, III, Kathleen Ann Manning, McGlinchey, Stafford, et al., New Orleans, LA, Peter Zimroth, New York City, Robert D. Rosenbaum, Arnold & Porter, Washington, DC, Daniel S. Pariser, Arnold & Porter, Washington, DC, for Wyeth-Ayeth Pharmaceuticals, Inc., Defendant (01-CV-20182).

James B. Irwin, V, Kim E. Moore, Brian P. Quirk, Irwin, Fritchie, Urquhart & Moore, LLC, New Orleans, LA, for Gate Pharmaceuticals, Intervenor-Defendant (01-CV-20182).

Stanton E. Shuller, Jr., Leake and Anderson, New Orleans, LA, for Geneva Pharmaceuticals, Inc., Intervenor-Defendant (01-CV-20182).

Vance Arnold Gibbs, Kean, Miller, Hawthorne, D'Armond et al., Baton Rouge, LA, Jason R. Cashio, Kean Miller Hawthorne D'Armond McCowan & Jarman, Baton Rouge, LA, for Interneuron Phaceceuticals, Inc., Intervenor-Defendant (01-CV-20182).

Henri Wolbrette, III, Kathleen Ann Manning, McGlinchey, Stafford, et al., New Orleans, LA, Robert D. Rosenbaum, Arnold & Porter, Washington, DC, for Wyeth-Ayerst Pharmaceuticals, Inc., American Home Products Corporation, Intervenors-Defendants (01-CV-20182).

Paul McConnell Batiza, Deborah Inchaustegui Schroeder, Esq., Mang Batiza Gaudin Godofsky & Penzato, Metairie, LA, for Sheldon Hersch, M.D., Intervenor-Defendant (01-CV-20182).

**\*416** Henri Wolbrette, III, Kathleen Ann Manning, McGlinchey, Stafford, Et al., New Orleans, LA, Robert D. Rosenbaum, Arnold & Porter, Washington, DC, Mindy Brickman Patron, A Professional Limited Liability Company, New Orleans, LA, for Wyeth-Ayerst Laboratories Company, Intervenor-Defendant (01-CV-20182).

Stanton E. Schuler, Jr., Leake and Andersson, New Orleans, for Rugby Laboratories, Inc., Intervenor-Defendant (01-CV-20182).

Terry Christovich Gay, Janet L. White, Christovich and Kearney, New Orleans, LA, for Medeva Pharmaceuticals Inc., Intervenor-Defendant (01-CV-20182).

Robert W. Moak, Esq., Bobby Moak, Attorney, Bogue Chitto, MS, Edward Blackmon, Jr., Blackmon & Blackmon, Canton, MS, Andrew M. Westerfield, Westerfield & Janoush, Cleveland, MS, Justin G. Witkin, Aylstock Witkin & Sasser, PLC, Gulf Breeze, FL, for Latrell Ashley, Glenda Parks, Plaintiffs (02-CV-20098).

Christy D. Jones, Butler, Snow, O'Mara et al., Jackson, MS, for American Products Corporation, Wyeth-Ayerst Laboratories, Wyeth-Ayerst Laboratories, Company, Defendants (02-CV-20098).

Anand Agneshwar, Arnold & Porter, New York City, for Wyeth laboratories, Inc., Defendant (02-CV-20098).

Luther M. Dove, Jr., Dove & Chill, Jackson, MS, for French's Pharmacy, Inc., Defendant (02-CV-20098).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Stephanie M. Rippee, Butler, Snow, O'Mara, Stevens & Canada, Jackson, MS, for Forrest Brantley, Jr., Defendant (02-CV-20098).

Jennifer A. Butler, Snow, O'Mara, et al., Jackson, MS, for Susan Bodne, Jewell E. Norman, Defendants (02-CV-20098).

Neville H. Boschert, Watkins, Ludlam and Stennis, Jackson, MS, for MCR Pharmaceuticals, Inc., a/k/a American Pharmaceuticals, Inc., a/k/a MCR/American Pharmaceuticals, Inc., Defendants (02-CV-20098).

Sheila M. Bossier, Esq., Forman, Perry, Watkins, Krutz & Tardy, Jackson, MS, for Qualitest Products, Inc., Defendant (02-CV-20098).

J. Stewart Tharp, W. Luther Wilson, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, Ray M. Aragon, MC, Kenna & Cuneo, LLP, Washington, DC, for EON Labs Manufacturing, Inc., Defendant (02-CV-20098).

Kenna L. Mansfield, Jr., Wells, Marble & Hurst, Jackson, MS, for Gate Pharmaceuticals, Defendant (02-CV-20098).

Jimmie B. Reynolds, Jr., Steen, Reynolds & Dalehite, Jackson, MS, for Interneuron Pharmaceutical, Inc., Defendant(02-CV-20098).

Kimberly Nelson Howland, Wise, Carter, Child & Carway, Jackson, MS, for Medeva Pharmaceuticals, Inc., Defendant (02-CV-20098).

Ronald G. Peresich, Page, Mannino, Peresich & McDermott, Biloxi, M S, for R ugby Laborities, Inc., Defendant (02-CV-20098).

Patrick N. H arkins, I II, W atkins & E ager, Ja ckson, MS, for Smithline Beecham Corporation, Defendant (02-CV-20098).

Robert W. Moak, Bobby Moak, Attorney, Bogue Chitto, MS, Andrew M. Westerfield, Westerfield & Janoush, Cleveland, MS, Justin G. Witkin, Aylstock Witkin & Sasser, PLC, Gulf B reeze, F L, for T anya Sherelle Castal, Debbie Maxwell, Plaintiffs (02-CV-20107).

James B. Galloway, Butler, Snow, O'Mara, Stevens & Cannada PPLC, Gulfport, MS, William M. Gage, Christy D. Jo nes, B utler, S now, O'Mara, S tevens &

Cannada PLLC, Jackson, MS, for American Home Products Corporation, Wyeth-**\*417** Ayerst Laboratories, Wyeth-Ayerst Laboratories Company, Wyeth-Ayerst Pharmaceuticals, Inc., Defendants (02-CV-20107).

Anand Agneshwar, Arnold & Porter, New York City, James B. Galloway, Butler Snow O'Mara Stevens & Canada PLLC, Gulfport, MS, William M. Gage, Christy D. Jones, Butler, Snow, O'Mara, et al., Jackson, MS, for Wyeth Laboratories, Inc., Defendant (02-CV-20107).

Luther M. Dove, Jr., Dove & Chill, Jackson, MS, for Medical Arts Pharmacy, Inc., Defendant (02-CV-20107).

Stephanie M. Rippee, Butler, Snow, O'Mara, Stevens & Canada, Jackson, MS, for Forrest Bratley, Jr., Defendant (02-CV-20107).

Jennifer A. Hawks, Butler, Snow, O'Mara, et al., Jackson, MS, for Susan Bodne, Jewell E. Norman, Defendants (02-CV-20107).

Neville H. Boschert, Watkins, Ludlam and Stennis, Jackson, MS, for MCR Pharmaceuticals, Inc., Defendant (02-CV-20107).

Matthew J. Ungarino, Shannon Marie Bruno, Ungarino and Eckert, for Jones Medical Industries, Defendant (02-CV-20107).

Sheila M. Bossier, Esq., Forman, Perry, Watkins, Krutz & Tardy, Jackson, MS, for Qualitest Products, Inc., Defendant (02-CV-20107).

J. Stewart Tharp, W. Luther Wilson, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, Ray M. Aragon, MC Kenna & Cuneo, LLP, Washington, DC, for EON Labs Manufacturing, Inc., Defendant (02-CV-20107).

Kimberly Nelson Howland, Wise, Carter, Child & Caraway, Jackson, MS, for Fisons Corporation, Medeva Laboratories, Inc., Defendants (02-CV-20107).

Charles E. Griffin, Griffin & Associates, Jackson, MS, for Gate Pharmaceuticals, Defendant (02-CV-20107).

Jimmie B. Reynolds, Jr., Bradley B. Vance, Steen, Reynolds & Dalehite, Jackson, MS, for Interneuron Pharmaceuticals, Inc., Defendant (02-CV-20107).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ronald G. Peresich, Page, Mannino, Peresich & McDermott, Biloxi, MS, for Rugby Laboratories, Inc., Defendant (02-CV-20107).

Patrick N. Harkins, III, Walter T. Johnson, Watkins & Eager, Jackson, MS, for Smithkline Beecham Corporation, Defendant (02-CV-20107).

## *MEMORANDUM AND PRETRIAL ORDER NO. 2567*

BARTLE, District Judge.

Before the court is the motion of plaintiffs in *Anderson v. American Home Products Corp.,* Civ. A. No. 01-20182, to remand to the Civil District Court for the Parish of Orleans, Louisiana, and the motions of plaintiffs in *Ashley v. American Home Products Corp.,* Civ. A. No. 02-20098, and *Castal v. American Home Products Corp.,* Civ. A. No. 02-20107, to remand to the Circuit Courts of Sunflower County and Coahoma County, Mississippi, respectively. The motions are before the undersigned as the transferee judge in MDL 1203, the mass tort litigation involving the diet drugs known as fen-phen. No federal claim for relief is alleged in any of these complaints.

The *Anderson* action was initially instituted in the state court in Louisiana by Louisiana citizens against various defendants including American Home Products Corporation ("AHP"), which is incorporated in Delaware with its principal place of business in New Jersey. [FN1] In brief summary,**\*418** the complaint alleges that the plaintiffs have suffered severe injuries, including valvular heart disease ("VHD"), pulmonary hypertension, and neurotoxicity, due to their ingestion of the drugs Pondimin, Redux, and phentermine. In the beginning the only plaintiffs in the action were individuals who had initially opted out of the Nationwide Class Action Settlement Agreement with American Home Products Corporation ("Settlement Agreement").

> FN1. AHP changed its name to Wyeth on March 11, 2002. Because all of the actions at issue here were filed before this date, their complaints name AHP as a defendant. We will continue to use that name for purposes of this memorandum.

On June 5, 2001 the petition for intervention of 50 more Louisiana citizens ("Age plaintiffs") [FN2] in the *Anderson* action was granted by a Louisiana state

court judge. These plaintiffs are intermediate opt-outs under the Settlement Agreement. The petition named as defendants AHP, three Louisiana physicians, and eight manufacturers of phentermine products ("phentermine defendants"), all eight of which are of diverse citizenship from plaintiffs. [FN3] On July 12, 2001 AHP filed a notice of removal in the U.S. District Court for the Eastern District of Louisiana as to the Age plaintiffs. Removal was based on the All Writs Act, 28 U.S.C. § 1651. The original plaintiffs are no longer in the case, and all parties agree that the claims of the Age plaintiffs are deemed to be separate from those of the original plaintiffs.

> FN2. The first of the fifty intervening plaintiffs is Sherrie Audrict Age.

> FN3. Because it is not relevant for present purposes, we will not refer to each phentermine defendant separately.

On July 13, 2001 the Age plaintiffs then filed a motion for remand under 28 U.S.C. § 1446 as well as a motion for summary remand under 28 U.S.C. § 1446(c)(4). The plaintiffs maintain that remand is appropriate because all defendants have not consented to removal and because complete diversity does not exist as required under 28 U.S.C. § 1332(a). The federal court in Louisiana did not rule on the motions before the Judicial Panel on Multidistrict Litigation ("JPML") transferred the case to this court. On January 24, 2002, the Age plaintiffs filed a new motion to remand with this court. On April 5, 2002, AHP filed a supplemental notice of removal. The Age plaintiffs also filed an amended motion to remand on May 6, 2002, to which AHP responded on July 9, 2002.

We also have before us similar remand motions in *Ashley* and *Castal,* two actions originally filed in the state courts of Mississippi. *Ashley* was filed on behalf of two Mississippi citizens on October 8, 2001 in the Circuit Court of Sunflower County. On that same day, two other Mississippi citizens filed *Castal* in the Circuit Court of Coahoma County. The *Ashley* and *Castal* complaints make similar allegations against AHP and the phentermine defendants of harm suffered due to the use of Pondimin, Redux, and phentermine. Each also makes claims against a Mississippi pharmacy and three sales representatives of AHP who are citizens of Mississippi.

AHP removed both actions to the U.S. District Court for the Northern District of Mississippi under the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

authority of the All Writs Act and on the basis of diversity of citizenship under 28 U.S.C § 1332. The plaintiffs in each case moved to remand the cases pursuant to 28 U.S.C § 1447(c). They contend that removal was inappropriate because all defendants did not consent and because several of the defendants are Mississippi citizens. The federal court in Mississippi declined to rule on the motions, pending a decision by the JPML as to whether the cases should be transferred *419 here. Upon the JPML's transfer of the cases to this court, the plaintiffs reasserted their remand motions.

AHP has now withdrawn its argument that these actions are properly removed under the All Writs Act and relies solely on 28 U.S.C. § 1441. AHP maintains that it is the only proper defendant and that diversity exists between it and all plaintiffs in *Anderson, Ashley,* and *Castal.* [FN4] AHP further asserts that the phentermine defendants, which have diverse citizenship from plaintiffs and which have not consented to removal, were fraudulently joined and thus their lack of consent to removal is immaterial. According to AHP, the Louisiana medical doctor defendants in *Anderson,* and the Mississippi pharmacy and sales representative defendants in *Ashley* and *Castal* should be disregarded because they too are the subject of fraudulent joinder.

> FN4. Each complaint also names a variety of entities related to AHP, such as subsidiaries. They are all diverse from plaintiffs and for the sake of simplicity we will not and need not refer to them.

AHP originally argued that the intervention of 50 additional plaintiffs in *Anderson* violated the terms of the court approved Settlement Agreement on the ground that the Agreement prohibits numerous plaintiffs in one action. This issue, however, is now moot because the parties have stipulated that, regardless of the disposition of the motion to remand, each Age plaintiff will sever his or her claims into separate civil actions and file a new complaint. We will therefore proceed with our analysis as if each plaintiff in *Anderson* has filed a separate action.

I.

Under the federal removal statute, "any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court." 28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over all civil actions between citizens of different states if the amount in

controversy exceeds \$75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1). If an action originally instituted in a state court could have been brought in federal court pursuant to diversity jurisdiction, the defendants may remove it to federal court provided certain procedures are followed and certain conditions met. 28 U.S.C. § § 1441 and 1446. Similarly, if the federal court subsequently determines that it does not have subject matter jurisdiction over a removed action, it must remand the action to the state court from which it came. 28 U.S.C. § 1447(c).

In order to remove an action to the federal court, it is well settled that all defendants must timely consent to the removal. *Balazik v. County of Dauphin,* 44 F.3d 209, 213 (3d Cir.1995). The unanimity rule, however, is not applicable with respect to any defendant who has been fraudulently joined. *Id.* at 213 n. 4. Under our Court of Appeals decision in *Boyer v. Snap-on Tools Corp.,* 913 F.2d 108, 111 (3d Cir.1990), joinder is fraudulent "where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, *or* no real intention in good faith to prosecute the action against the defendant or seek a joint judgment." (quotations omitted) (emphasis added). The presence of a party fraudulently joined cannot defeat removal. *Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97, 42 S.Ct. 35, 66 L.Ed. 144 (1921).

We recognize that the burden on AHP to establish fraudulent joinder is a heavy one. *Id.* at 111, 42 S.Ct. 35. While we "must resolve all contested issues of substantive *420 fact in favor of plaintiff," we do not take this to mean we must blindly accept whatever plaintiffs may say no matter how incredible or how contrary to the overwhelming weight of the evidence. *Id.* We are also cognizant that the removal statute must be construed narrowly, and "all doubts should be resolved in favor of remand." *Steel Valley Auth. v. Union Switch and Signal Div.,* 809 F.2d 1006, 1010 (3d Cir.1987) (citation omitted). Nonetheless, we are mindful of the Supreme Court's decision in *Wilson.* The Court made it clear that if the plaintiff contests a defendant's assertion that joinder of another defendant was a sham to defeat removal, the District Court must determine the facts from the evidence. *Wilson,* 257 U.S. at 98, 42 S.Ct. 35. We are not to decide automatically in favor of remand simply because some facts may be said to be in dispute.

II.

[1] We turn first to the issue of fraudulent joinder of the phentermine defendants, all of which, as

mentioned above, are citizens of states other than Louisiana and Mississippi. The relevant facts are as follows. From 1989 through September, 1997 AHP marketed and sold two prescription drugs for weight loss in the United States under the brand names Pondimin (fenfluramine) and Redux (dexfenfluramine). Beginning in 1992, physicians commonly prescribed Pondimin alone or in combination with phentermine, another prescription diet drug. The ingestion of phentermine helped counteract some of the adverse effects of fenfluramine used by itself. Phentermine was, and still is, manufactured by various entities and is distributed and sold under several different brand names.

Following the withdrawal of Pondimin and Redux from the market in September, 1997, multiple class actions and other lawsuits were filed against AHP and the manufacturers of phentermine alleging that ingestion of their products caused VHD and primary pulmonary hypertension ("PPH"). As mentioned above, all federal cases were transferred to this court for consolidated discovery proceedings. Voluminous discovery took place in both MDL 1203 and state court proceedings, including depositions, document review, and the development of expert testimony. The evidence discovered pointed to fenfluramine and dexfenfluramine as the culprits.

Only two experts were ultimately proffered in MDL 1203 on phentermine causation. After a *Daubert* hearing, Judge Louis C. Bechtle of this court [FN5] granted the motions of the phentermine defendants to exclude this opinion testimony that using phentermine in combination with fenfluramine "induces greater cardiovascular toxicity than does fenfluramine alone." Memorandum and Pretrial Order No. 1351 at 29. The court found that "at this time, no epidemiologic data support the position that phentermine, when combined with fenfluramine, increases the risk of PPH or VHD in humans." *Id.* at 15. It concluded that the proffered experts lacked reliability and a sufficient scientific basis for their opinions. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589-90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1999).

> FN5. Judge Bechtle retired on June 30, 2001.

Similar results were reached in other courts. For example, AHP has identified over 30 cases where courts have granted the motions of phentermine defendants to exclude scientific evidence of phentermine causation under *Daubert* or its state law equivalents. These courts have granted motions for summary judgment, or other motions based on plaintiffs' failure to produce admissible scientific evidence demonstrating that phentermine causes VHD or *421 PPH. In fact, no case has been brought to our attention in which a court has found scientifically reliable evidence of phentermine causing VHD or PPH.

The effect of this lack of evidence is clear when one looks at the history of the diet drug litigation. Phentermine defendants have been routinely and voluntarily dismissed from hundreds of cases by plaintiffs without any settlement payment. [FN6] For example, in April, 2001 this court held a hearing requiring a group of plaintiffs to show cause why their cases against the phentermine defendants should not be dismissed. Not a single plaintiff out of approximately 200 appeared at the show cause hearing to oppose the dismissal of the phentermine defendants from their cases. A similar result occurred at a second show cause hearing held in September, 2001.

> FN6. While we are unaware of the exact number of plaintiffs who have dismissed their cases against the phentermine defendants, it is undoubtedly in the thousands.

Litigation in state courts has proceeded in the same manner. For instance, in Harris County, Texas, [FN7] where one of the attorneys for the Age plaintiffs served on the committee appointed to coordinate discovery, no depositions of any witnesses affiliated with a phentermine defendant have been taken. Moreover, the phentermine defendants have not been held to pretrial discovery deadlines or continuing document production obligations. Further, the phentermine defendants' motion to disallow evidence that phentermine caused VHD was unopposed by plaintiffs. This result was actually hailed as a victory by plaintiffs' attorneys, including an attorney representing one of the Age plaintiffs, because it meant to them that the "fen" part of the combination was the problem and that AHP would be unable to claim that VHD was caused by the "phen" part. *See* Ron Nissimov, *Panel Disallows "Phen" Part of Fen-Phen as Evidence,* Houston Chronicle, Mar. 31, 1999, at 32A.

> FN7. More than 25% of all state diet drug cases have been filed in Texas, and since the inception of consolidated proceedings in

Harris County, over 1,250 diet drug cases have been coordinated there.

Given the universal lack of prosecution of the phentermine defendants, AHP argues that the joinder of them as defendants is a stratagem to defeat its right of removal to federal court. Specifically, AHP contends that plaintiffs' counsel throughout the country and the phentermine defendants have reached agreements whereby plaintiffs will ultimately dismiss the phentermine defendants in exchange for their refusal to consent to removal. As evidence of such agreements, AHP provided the affidavit of Class Counsel Michael Fishbein, Esq., who swore that Edward Weltman, Esquire, national counsel for Teva/Gate Pharmaceuticals, Inc., a phentermine manufacturer, informed him that such an agreement or understanding existed. We find Mr. Fishbein, a respected Philadelphia lawyer, to be credible. Mr. Weltman's deposition, on the other hand, was permeated with evasion. Mr. Weltman testified that he did not recollect any such conversation with Mr. Fishbein. However, he did admit that Peter Resnick, Esquire, national counsel for Medeva Pharmaceuticals, Inc., another phentermine manufacturer, had sought an opinion on the ethics and effectiveness of a removal agreement with plaintiffs. Finally, AHP cites a voice message left by local counsel for a phentermine defendant in Nebraska for AHP's local counsel. The phentermine local counsel stated that he would not be able to consent to removal because of some national counsel agreement not to join in removal of cases instituted by an identified plaintiff's attorney.

**\*422** AHP also points to significant circumstantial evidence of the existence of removal agreements. The phentermine defendants have recently refused to consent to removal in cases in Louisiana, Texas, and Mississippi, although they did so earlier in other diet drug cases. Failure to consent to removal has occurred even in those jurisdictions in rural Mississippi and the Rio Grande Valley region of Texas which are well known for their high verdicts for plaintiffs against corporate defendants. AHP argues, and we agree, that it makes no sense for large out-of-state corporate defendants to forego removal to federal court in light of this history and the MDL court's favorable *Daubert* ruling, unless they are merely nominal parties. Tellingly, the phentermine defendants are silent here on the subject of removal.

We are constantly telling jurors that they must not leave their "common sense" outside the courtroom when weighing evidence. We too must follow our own advice. From what has preceded we strongly doubt that there is a colorable claim against the phentermine defendants. However, we need not decide that issue here. Based on the above evidence we find that defendants have met their heavy burden of persuasion that plaintiffs have no real intention in good faith to seek a judgment against the phentermine defendants and that as a result the phentermine defendants are fraudulently joined in these actions. *Boyer,* 913 F.2d at 111; *see Wilson,* 257 U.S. at 98, 42 S.Ct. 35. Accordingly, the lack of consent of the phentermine defendants will be ignored in determining the propriety of removal.

III.

[2] We next turn to the contention of AHP that three physicians, Dr. Terri Ditta, Dr. Beverly Yount, and Dr. Sheldon Hersh, were fraudulently joined in the *Anderson* case. As noted above, each is a Louisiana citizen and thus a non-diverse defendant. It is undisputed from the evidence before us that 48 of the 50 Age plaintiffs had no treatment by and no contact whatever with any of these medical doctors. As to the remaining two, plaintiff Crystal Gatlin was allegedly treated by Dr. Ditta and plaintiff Verna Brown by Dr. Yount. [FN8] AHP has clearly met its heavy burden of establishing that Dr. Hersh was fraudulently joined as to all plaintiffs, Dr. Ditta was fraudulently joined except as to plaintiff Crystal Gatlin and Dr. Yount was fraudulently joined except as to plaintiff Verna Brown. As discussed above, the Age plaintiffs have agreed to sever their claims from each other. We will therefore grant the motion to remand of plaintiffs Crystal Gatlin and Verna Brown and deny the motion of the remaining plaintiffs.

> FN8. Late in the afternoon on August 9, 2002, over three weeks after the argument on the pending remand motions and after the massive briefing of all issues had concluded, AHP filed a copy of the deposition of Dr. Ditta. This deposition was conducted in an unrelated diet drug case in which Dr. Ditta is also a defendant. Near the conclusion of the deposition, AHP's attorney questioned her regarding a conversation she had with an attorney for one of the Age plaintiffs. AHP argues that Dr. Ditta's responses to this line of questioning establish that there is no real intention to prosecute her and that she is therefore fraudulently joined. We find that the deposition is untimely and we will not consider it for purposes of this motion. Moreover, there was no opportunity for cross-examination since the Age plaintiffs'

attorneys were not present.

IV.

[3] In *Ashley* and *Castal* plaintiffs have also joined local Mississippi pharmacies which allegedly sold the drugs to plaintiffs upon the presentation of a prescription from plaintiffs' doctors. Plaintiffs have brought claims against the pharmacies **\*423** for failure to warn, negligence, breach of warranty, and strict liability. AHP argues that the pharmacies are fraudulently joined and that therefore their nondiverse citizenship is immaterial.

Mississippi has adopted the learned intermediary doctrine, which holds that a drug manufacturer has a duty to warn only the prescribing physician of the adverse effects of a drug, not the patient or consumer. *Wyeth Laboratories, Inc. v. Fortenberry,* 530 So.2d 688, 691 (Miss.1988). Recently, the doctrine was extended to pharmacies by the Mississippi Supreme Court. *Moore v. Memorial Hospital of Gulfport,* No.2000-CA-01976-SCT, 2002 WL 535908 (Miss. Apr. 11, 2002). In *Moore,* plaintiffs argued that their pharmacy was negligent for selling them a drug which was contraindicated for pregnant women. The lower court granted the pharmacy's motion for summary judgment, holding that the learned intermediary doctrine had been adopted by Mississippi courts. Accordingly, the court concluded that a pharmacy does not have a legal duty to question the prescribing physician's judgment or to warn the patient, and in the absence of such a duty, no actionable negligence occurred. *Id.* at \*2.

The Mississippi Supreme Court affirmed. It ruled that the learned intermediary doctrine applies to pharmacists and that they have "no legal duty to warn in the context of prescription medication." *Id.* at \*4. The court did carve out two exceptions to the doctrine as applied to pharmacists, one "where it was undisputed that a plaintiff had informed the pharmacy of health problems which contraindicated the use of the drug in question," and two "where pharmacists fill prescriptions in quantities inconsistent with the recommended dosage guidelines." *Id.* at \*5. Since neither of the two exceptions is applicable here, it is clear that plaintiffs' claims against the pharmacies are barred.

Plaintiffs attempt to distinguish *Moore* by arguing that it is limited to a negligence and failure to warn cases. They maintain that such claims are distinct from other product liability claims and that a jury could impute some liability to the pharmacies under the Mississippi Products Liability Act. We disagree.

The cases on which plaintiffs rely in support of this proposition are inapposite. They cite several Mississippi district court cases where motions to remand were granted in similar factual situations. *See, e.g., Haynes v. Parke-Davis,* No. 2:00CV263P-B (N.D.Miss. Jan 3, 2001); *Rankin v. Jannsen Pharmaceutical, Inc.,* No. 5:00CV190LN (S.D.Miss. Oct. 31, 2000); *Hodges v. Wyeth-Ayerst Laboratories,* No. 3:00CV254WS (S.D.Miss. May 18, 2000). However, each of these cases was decided applying a "no possibility" of recovery standard for fraudulent joinder. These decisions no longer have vitality as a result of *Badon v. RJR Nabisco, Inc.,* 236 F.3d 282, 286 (5th Cir.2000), where the Fifth Circuit explicitly determined that the proper question in a fraudulent joinder analysis is whether there is a "reasonable possibility" of a claim against a defendant. [FN9] Courts applying this latter standard under Mississippi law have found that pharmacy defendants were fraudulently joined and denied remand. *See In re Rezulin Prods. Liab. Litig.,* 133 F.Supp.2d 272, 288-90 (S.D.N.Y.2001); *Teague v. Parke-Davis,* Civ. A. No. 3:00CV224LN (S.D.Miss. Dec. 5, 2001).

> FN9. In addition, the court in *Rankin* explicitly premised its holding on the fact that the learned intermediary doctrine had not yet been addressed by Mississippi courts. In light of the subsequent decision in *Moore, Rankin* is no longer persuasive.

[4] As an MDL court sitting within the Third Circuit, we must apply our Court of Appeals' fraudulent joinder standard. *See* **\*424** *In re Korean Air Lines Disaster,* 829 F.2d 1171 (D.C.Cir.1987); *In re Ikon Office Solutions, Inc. Secs. Litig.,* 86 F.Supp.2d 481 (E.D.Pa.2000). It too is based upon reasonableness, that is, whether there is a "reasonable basis in fact or colorable ground supporting the claim against the joined defendant." *Boyer,* 913 F.2d at 111. First, the complaints in *Ashley* and *Castal* are devoid of specific allegations against the pharmacies. They are filled instead with general statements levied against all defendants, which most properly can be read as stating claims against the drug manufacturers. *See Rezulin,* 133 F.Supp.2d at 290-91; *Louis v. Wyeth-Ayerst Pharmaceuticals, Inc.,* No. 5:00CV102LN (S.D.Miss. Sept. 25, 2000).

Second, as with the phentermine defendants, the story of how diet drug litigation against pharmacies has proceeded is illuminating. Again, there is a pattern of pharmacies being named in complaints, but never pursued to judgment, typically being

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

voluntarily dismissed at some point after the defendants' ability to remove the case has expired. *See* 28 U.S.C. § 1446(b). By way of flagrant example, there is the Bankston Drugstore, in Fayette, Mississippi. As the only pharmacy in Jefferson County, Mississippi, the store is named in hundreds of lawsuits involving the sale of allegedly defective drugs, including fen-phen. *See* Testimony of Hilda Bankston before the Judiciary Committee of the U.S. House of Representatives, dated February 6, 2002, *available at* http:// www.house.gov.judiciary/ bankston--020602.htm ("Bankston Testimony"). Hilda Bankston, the former owner of the pharmacy, testified that because of this "lawsuit frenzy" she has had to spend innumerable hours retrieving information for potential plaintiffs, testifying in court, enduring the whispers and questions of customers and neighbors who wonder what the pharmacy did to end up in court so often, and worrying about whether her business would survive. *Id.* Although she sold the pharmacy in January, 2000, she is still deeply mired in the lawsuits, as is her successor. Although the pharmacy is usually dropped from the lawsuits, the costs of hiring lawyers and obtaining insurance can become prohibitive. *See* Mark Ballard, *Mississippi Becomes a Mecca for Tort Suits,* National Law Journal, Apr. 30, 2001, at A1. As Ms. Bankston sees it, her "life's work was merely a means to an end for trial lawyers seeking to cash in on lucrative class actions--a back door into the Jefferson County court system." Bankston Testimony.

In light of all of the above, as well as the thorough and well reasoned analysis of the same issue in *Rezulin,* 133 F.Supp.2d at 288-90, we conclude that there is no "reasonable basis in fact" supporting the *Ashley* and *Castal* plaintiffs' claims against the pharmacy defendants under Mississippi law. Thus, they are fraudulently joined. *Boyer,* 913 F.2d at 111.

[5] Plaintiffs in *Ashley* and *Castal* also name three sales representatives of AHP as defendants who are citizens of Mississippi ("sales representative defendants"). It appears from the complaints and the argument on the pending motions that these plaintiffs intend to pursue claims of negligence, failure to warn, misrepresentation, and breach of warranty against the sales representative defendants. Again, AHP argues that these defendants are fraudulently joined. We agree. We note first that there is no indication in either of the complaints that any of the plaintiffs, or any of the plaintiffs' doctors, received any drugs from the sales representative defendants. Further, any allegations of misrepresentation or fraud

fall far short of what is required under both federal and Mississippi law. *See* Fed.R.Civ.P. 9(b); Miss.R.Civ.P.; **\*425***Allen v. Mac Tools Inc.,* 671 So.2d 636, 642 (Miss.1996); *Brabham v. Brabham,* 483 So.2d 341, 342 (Miss.1986).

Even overlooking these deficiencies, there is no reasonable basis under Mississippi law for such claims against the sales representatives defendants. We are persuaded by the analysis and conclusion in both *Johnson v. Parke-Davis,* 114 F.Supp.2d 522, 524-25 (S.D.Miss.2000), [FN10] and *Rezulin.* Both of these cases extended the learned intermediary doctrine to sales representatives, prior to the *Moore* decision applying it to pharmacies. These holdings are now bolstered by *Moore.*

> FN10. Plaintiffs attempts to distinguish *Johnson* by arguing that it deals only with a failure to warn claim. This is not so. The case addresses negligence, in the context of a duty to warn, misrepresentation, and breach of warranty.

Similarly, we concur that under Mississippi law sales representatives are not liable for breach of warranty. *Rezulin,* 133 F.Supp.2d at 286; *Johnson,* 114 F.Supp.2d at 525. As in *Johnson,* "[p]laintiffs have not cited any authority for the proposition that a sales representative, as opposed to the manufacturer of the product he or she was selling, would ever be liable as the warrantor of the product." 114 F.Supp.2d at 525. On the contrary, sales representatives are not considered "sellers" under Mississippi law, but rather, employees of the businesses who are sellers. *McCurtis v. Dolgencorp, Inc.,* 968 F.Supp. 1158, 1160-61 (S.D.Miss.1997). Accordingly, there is "no reasonable basis in fact or colorable ground supporting the claim against" the sales representative defendants. *Boyer,* 913 F.2d at 111.

V.

In sum, we will disregard the nonconsent to removal of the phentermine defendants because we find that they are fraudulently joined. In *Anderson,* the resident doctor defendants are fraudulently joined as to all plaintiffs, except Crystal Gatlin and Verna Brown. Likewise, in *Ashley* and *Castal,* we find that the nondiverse pharmacy and sales representative defendants are fraudulently joined. Their citizenship therefore will be ignored in determining the propriety of removal.

The plaintiffs, whether or not in collusion with the phentermine defendants, are engaging in improper

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

efforts to prevent AHP from exercising its statutory right under 28 U.S.C. § 1441 to remove cases based on diversity of citizenship to the federal courts in Louisiana and Mississippi. This statutory right, we should not forget, emanates from Article III, Section 2 of the Constitution. As long as Congress authorizes the federal district courts to exercise subject matter jurisdiction over diversity actions we must protect the right of parties to invoke it. We recognize that AHP has a heavy burden to prevent remand, but that burden has been met here except as to plaintiffs Crystal Gatlin and Verna Brown. What has been transpiring can only be characterized as a sham, at the unfair expense not only of AHP but of many individuals and small enterprises that are being unfairly dragged into court simply to prevent the adjudication of lawsuits against AHP, the real target, in a federal forum. As aptly stated by our Court of Appeals in *Boyer,* quoting the *ALI Study of the Division of Jurisdiction between State and Federal Courts,* "so long as federal diversity jurisdiction exists ... the need for its assertion may well be greatest when plaintiff tries hardest to defeat it." *Boyer,* 913 F.2d at 111.

Accordingly, except for plaintiffs Crystal Gatlin and Verna Brown in *Anderson,* the motion of plaintiffs to remand their actions to the state courts in Louisiana and Mississippi will be denied.

## \*426 *PRETRIAL ORDER NO. 2567*

AND NOW, this 13th day of August, 2002, it is hereby ORDERED that:

(1) the motion and amended motion of plaintiffs to remand in *Anderson v. American Home Products Corp.* (Doc. Nos. 202790 and 202945) is DENIED except as to plaintiffs, Crystal Gatlin and Verna Brown. The actions of these two plaintiffs are remanded to the Civil District Court for the Parish of Orleans, Louisiana.

(2) the motion of plaintiffs to remand to the Circuit Court of Sunflower County, Mississippi in *Ashley v. American Home Products Corp.* (Doc. No. 202835) is DENIED; and

(3) the motion of plaintiffs to remand to the Circuit Court of Coahoma County, Mississippi in *Castal v. American Home Products Corp.* (Doc. No. 202836) is DENIED.

220 F.Supp.2d 414

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 1857558 (Trial Filing) Seventh Amendment to the Nationwide Class Action Settlement Agreement with American Home Products Corporation (Jul. 21, 2004)

• 2004 WL 1576280 (Trial Pleading) Defendant, Celltech Pharmaceuticals Inc.'s Answer and Affirmative Defenses to Plaintiff's First Amended Petition (Apr. 26, 2004)

• 2004 WL 1576281 (Trial Pleading) Defendant, Fisons Corporation's Answer and Affirmative Defenses to Plaintiff's First Amended Petition (Apr. 26, 2004)

• 2004 WL 1576272 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum in Opposition to Motion to Dismiss (Apr. 13, 2004)

• 2004 WL 785071 (Trial Motion, Memorandum and Affidavit) Pretrial Order No. %Y(16)6D (Mar. 30, 2004)

• 2004 WL 1576277 (Trial Pleading) Answer of Defendants IVAX Pharmaceuticals, Inc. and Goldline Laboratories, Inc. to Plaintiff's Original Petition (Mar. 19, 2004)

• 2004 WL 1576278 (Trial Pleading) Answer of Defendants IVAX Pharmaceuticals, Inc. and Goldline Laboratories, Inc. to Plaintiff's Original Petition (Mar. 19, 2004)

• 2004 WL 1576279 (Trial Pleading) Answer of Defendants IVAX Pharmaceuticals, Inc. and Goldline Laboratories, Inc. to Plaintiff's First Amended Petition (Mar. 19, 2004)

• 2004 WL 1576271 (Trial Motion, Memorandum and Affidavit) Brief in Support of Motion of Non-Party Woodlawn Medical Group, Inc. for Protective Order and to Quash Subpoena (Feb. 2004)

• 2003 WL 23653397 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Motion to Dismiss (Dec. 03, 2003)

• 2003 WL 23653410 (Trial Motion, Memorandum and Affidavit) The Drug Store's Response to Plaintiffs' Motion to Remand (Dec. 2003)

• 2003 WL 23145555 (Trial Motion, Memorandum and Affidavit) Motion to Disqualify all Echomotion Echocardiograms from Supporting Claims for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Benefits (Nov. 19, 2003)

• 2003 WL 23653413 (Trial Pleading) Jones Pharma Incorporated, Formerly Known as Jones Medical Industries, Inc., as Successor to Abana Pharmaceuticals, Inc.'s Original Answer, Affirmative Defenses, and Jury Demand (Nov. 12, 2003)

• 2003 WL 23653414 (Trial Pleading) Jones Pharma Incorporated, Formerly Known as Jones Medical Industries, Inc., as Successor to Abana Pharmaceuticals, Inc.'s Original Answer, Affirmative Defenses, and Jury Demand (Nov. 12, 2003)

• 2003 WL 23653415 (Trial Pleading) Original Answer of Defendant Wal-Mart Stores Texas, LP (Oct. 27, 2003)

• 2003 WL 23653412 (Trial Pleading) Answer and Affirmative Defenses of the Drug Store (Oct. 2003)

• 2003 WL 23653402 (Trial Motion, Memorandum and Affidavit) P laintiff, F redda R ainey's O pposition to Defendant Franco's Motion to Dismiss, Response to Defendant Wyeth's Opposition to Reconsideration, and Renewed Motion to Reconsider Order Denying Remand (Sep. 17, 2003)

• 2003 WL 22331117 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Wyeth's Motion for Entry of an Order Establishing a Procedure for Challenging the Eligibility of Plaintiffs in MDL No. 1203 to Exercise Intermediate or Back-End Opt-Out Rights and for Entry of an Order Approving a Revised Pla intiffs' Fact Sheet and Medical Authorization form (Apr. 07, 2003)

• 2003 WL 22023324 (Trial Filing) Pretrial Order No. (Jan. 13, 2003)

•     2:02CV20107 _____ (Docket) (Mar. 25, 2002)

•     2:02CV20098 _____ (Docket) (Mar. 11, 2002)

•     2:01CV20182 _____ (Docket) (Dec. 31, 2001)

• 2001 WL 34134825 (Trial Motion, Memorandum and Affidavit) American Home Products Corporation%7Ds Motion to Enforce Pretrial Order No. 1415 Against Plaintiff Suzanne Jortner (Nov. 05, 2001)

• 2001 WL 34134824 (Trial Motion, Memorandum and Affidavit) Motion of American Home Products Corporation for Order Enforcing Pto 1415 Against Certain Plaintiffs Asserting Settled Claims Under the Guise of Asserting Claims Based on Primary Pulmonary Hypertension (Oct. 19, 2001)

• 2000 WL 34016470 (Trial Motion, Memorandum and Affidavit) American Home Products Corporation%7Ds Opposition to the Dunn Objectors%7D Request for Further Discovery (Nov. 29, 2000)

• 2000 WL 34016465 (Trial Motion, Memorandum and Affidavit) Memorandum of Vinson Carithers, III in Opposition to Class Counsels%7D Motion to Impose Bond Requirement on Certain Objectors for the Filing of an Appeal (Oct. 30, 2000)

• 2000 WL 34016471 (Trial Motion, Memorandum and Affidavit) Memorandum of Vinson Carithers, III in Opposition to Class Counsels%7D Motion to Impose Bond Requirement on Certain Objectors for the Filing of an Appeal (Oct. 23, 2000)

• 2000 WL 34016462 (Trial Motion, Memorandum and Affidavit) Joint Motion for Approval of Fourth Amendment to Nationwide Class Action Settlement Agreement (Aug. 10, 2000)

• 2000 WL 34016441 (Trial Filing) Pretrial Order No. (Jun. 20, 2000)

• 2000 WL 34016442 (Trial Filing) Cigna Healthcare%7Ds Statement of the Issues to be Presented on Appeal (Jun. 09, 2000)

• 2000 WL 34017133 (Trial Filing) Pretrial Order No. 1227 (Apr. 06, 2000)

• 2000 WL 34016457 (Trial Motion, Memorandum and Affidavit) Plaintiffs%7D Memorandum in Response to Defendants%7D Motions to Exclude the Expert Testimny of Paul J. Wellman, Ph.D. and Timony J. Maher, Ph.D. (Feb. 25, 2000)

• 2000 WL 34016440 (Trial Filing) Pretrial Order No. (Feb. 14, 2000)

• 2000 WL 34016448 (Trial Motion, Memorandum and Affidavit) Motion of American Home Products Corporation for a Preliminary Injunction Regarding False and Misleading Communications with Absent Class members Through the Internet Addresses (Jan. 19, 2000)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

• 1999 WL 33740480 (Trial Motion, Memorandum and Affidavit) American Home Products Corporation's Objection to Certain Provisions of the Interneuron Settlement Agreement (Feb. 05, 1999)

• 1998 WL 34190446 (Trial Motion, Memorandum and Affidavit) Les Laboratoires Servier's Reply Memorandum of Law in Support of its Motion for Reconsideration and Clarification of PTO 373 (Dec. 16, 1998)

• 1998 WL 34190447 (Trial Motion, Memorandum and Affidavit) Les Laboratoires Servier's Memorandum of Law in Opposition to the PMC's Motion to Compel Discovery (Dec. 14, 1998)

• 1998 WL 34202072 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiffs' Opposition to Les Laboratoires Servier's Motion for Reconsideration of Pretrial Order No. 271 (Sep. 22, 1998)

• 1998 WL 34202071 (Trial Motion, Memorandum and Affidavit) Les Laboratoires Servier's Motion for a Reconsideration of Pretrial Order No. 271 (Sep. 21, 1998)

• 1998 WL 34202074 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Points and Authorities in Support of Their Opposition to Defendant, Les Laboratoires Servier's Motion for Protective Order and Stay of All Discovery (Sep. 18, 1998)

• 1998 WL 34202075 (Trial Motion, Memorandum and Affidavit) Les Laboratoires Servier's Motion for a Protective Order for a Temporary Stay of all Discovery Against the Sole Non-U.S. Defendant During the Pendency of its Motion to Dismiss (Aug. 31, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
**(Cite as: 133 F.Supp.2d 272)**

Page 1

▷

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
In re REZULIN PRODUCTS LIABILITY
LITIGATION
This paper relates to 00 Civ. 6069, 00 Civ. 7627, 00
Civ. 7628, 00 Civ. 7629,
00 Civ. 7630, 00 Civ. 7631, 00 Civ. 7632, 00 Civ.
7634, 00 Civ. 7635, 00 Civ.
7636, 00 Civ. 7072, 00 Civ. 8501, 00 Civ. 9033, 00
Civ. 9039, 00 Civ. 9131, 01
Civ. 0049.
**00 Civ. 2843(LAK).**

March 1, 2001.

Plaintiffs in sixteen actions sought recovery for
personal injuries allegedly resulting from the use of
the prescription diabetes medication, against
manufacturer, pharmacies, physicians, and others,
and the Judicial Panel on Multidistrict Litigation
consolidated the cases for pretrial proceedings. Each
of the sixteen originally was commenced in a state
court and removed by defendants on the basis of
diversity of citizenship. Plaintiffs moved to remand.
The District Court, Kaplan, J., held that: (1) joinder
of pharmaceutical drug sales representatives as
defendants in product liability case lacked any
reasonable basis in fact and was improper; (2)
although plaintiffs characterized their claims against
drug sales representatives as being for negligence, in
actuality their claims alleged fraud, and thus,
consumers' claims would be found deficient for
failure to plead fraud with particularity; (3) under
Mississippi law, plaintiffs failed to establish cause of
action against sales representatives for breach of a n
implied warranty of merchantability; (4) under
predicted Alabama law, there was no reasonable
basis for imposing liability under the Alabama
extended manufacturer's liability doctrine (AEMLD)
on sales representative; (5) under predicted
Mississippi, Louisiana, Texas, and West Virginia
law, there was no reasonable possibility that
pharmacists would be held liable; and (6) claims
exceed the $75,000 amount required for diversity
jurisdiction.

Motions granted in part and denied in part.

West Headnotes

**[1] Federal Courts** 🔑**433**
170Bk433 Most Cited Cases
Question whether a non-diverse party has been joined
improperly is one of federal law.

**[2] Federal Courts** 🔑**303**
170Bk303 Most Cited Cases
Although the joinder of parties lacking a genuine
interest in the controversy frequently is referred to as
fraudulent joinder, thus suggesting that the
determinative issue is one of motive, motive usually
has nothing to do with it; rather, the only issue is
whether plaintiff has legitimate claim against non-
diverse or in-state defendant.

**[3] Removal of Cases** 🔑**36**
334k36 Most Cited Cases

**[3] Removal of Cases** 🔑**107(7)**
334k107(7) Most Cited Cases
Standard for determining whether plaintiff's claim
against defendant who is a citizen of plaintiff's state
is sufficiently substantial to defeat removal
jurisdiction requires removing defendant to
demonstrate, by clear and convincing evidence, either
that there has been outright fraud committed in
plaintiff's pleadings, or that there is no possibility,
based on the pleadings, that plaintiff can state a cause
of action against the non-diverse defendant in state
court; burden on removing defendant to meet this
standard is a heavy one, and all reasonable doubts of
fact and law are resolved in favor of the plaintiff.

**[4] Federal Courts** 🔑**372**
170Bk372 Most Cited Cases
Federal courts sitting in diversity commonly apply
state law as rules of decision under *Erie R.R. Co. v.
Tompkin;* federal courts make their best judgments as
to how the state courts would resolve the issues
before them and decide their diversity cases
accordingly.

**[5] Removal of Cases** 🔑**36**
334k36 Most Cited Cases

**[5] Removal of Cases** 🔑**102**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
**(Cite as: 133 F.Supp.2d 272)**

334k102 Most Cited Cases
If defendants contend that joinder of non-diverse defendant is fraudulent because the claim against non-diverse defendant is insufficiently substantial as a matter of law, court must consider the state law upon which the claim rests and then determine only whether there is a reasonable possibility that the relevant state's highest court would rule in favor of the plaintiff were the issue presented to it; if there is such a possibility, then the joinder was appropriate, and case must be remanded.

**[6] Removal of Cases ☜═36**
334k36 Most Cited Cases
Second Circuit's standard for fraudulent joinder allows for removal despite the presence of non-diverse defendants if the claims against those defendants have no basis in fact; this is so when the allegations in plaintiff's pleading are shown to be so clearly false and fictitious that no factual basis exists for an honest belief on part of plaintiff that there is liability; in other words, that joinder is without any reasonable basis in fact and is made without any purpose to prosecute the cause in good faith.

**[7] Federal Courts ☜═303**
170Bk303 Most Cited Cases
Joinder of pharmaceutical drug sales representatives as defendants in product liability case lacked any reasonable basis in fact and was improper, where plaintiff never responded in any way to affidavits of sales representatives stating that they had made no representations, by way of promotion or advertising or otherwise, or any statements whatsoever, including but not limited to representations regarding the drug at issue to plaintiff or to the general public.

**[8] Products Liability ☜═46.2**
313Ak46.2 Most Cited Cases
        (Formerly 138k18  Drugs and Narcotics)
Under Mississippi law, where prescription drugs are concerned, manufacturer's duty to warn is limited to obligation to advise the prescribing physician of any potential dangers that may result from the drug's use; the rationale for this rule is that the prescribing physician is the learned intermediary between the manufacturer and the customer, as the physician can take into account drug's propensities and his patient's susceptibilities.

**[9] Products Liability ☜═46.2**
313Ak46.2 Most Cited Cases
        (Formerly 138k17.1  Drugs and Narcotics)
Under predicted Mississippi law, if pharmaceutical

sales representatives handling prescription drugs have any duty to warn anyone of dangers of their products, the duty is to warn the physicians to whom they promote the product; in any case, drug sales representatives have no duty to warn patients.

**[10] Negligence ☜═372**
272k372 Most Cited Cases
Under Mississippi law, injury complained of must be the proximate consequence of the alleged breach of duty.

**[11] Products Liability ☜═46.2**
313Ak46.2 Most Cited Cases
        (Formerly 138k17.1  Drugs and Narcotics)
Under Mississippi law, complaints by consumers of diabetes drug failed to state claim against sales representatives who allegedly fraudulently represented that the drug was not defective or unreasonably dangerous, where complaints did not allege that the sales representatives knew that the drug was unsafe at the time they spoke but withheld the truth to mislead the consumers, nor did complaints properly alleged the time and place of particular representations.

**[12] Fraud ☜═3**
184k3 Most Cited Cases
Under Mississippi law, to state cause of action for fraud, plaintiffs must allege (1) false representation of a material fact; (2) speaker's knowledge or belief in its falsity; (3) hearer's belief in its truth; (4) speaker's intent that it should be acted upon; (5) hearer's right to rely on it; and (6) hearer's actual detrimental reliance.

**[13] Federal Civil Procedure ☜═636**
170Ak636 Most Cited Cases

**[13] Pleading ☜═18**
302k18 Most Cited Cases
Under either federal or Mississippi law, averments of fraud must be stated with particularity, and thus, fraud complaint will be sustained only if the circumstances of the alleged fraud, including matters such as the time, place, content, and speaker of the allegedly fraudulent misrepresentations, are set forth.

**[14] Federal Courts ☜═303**
170Bk303 Most Cited Cases

**[14] Federal Courts ☜═317**
170Bk317 Most Cited Cases
Although defendant bears heavy burden to establish

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
**(Cite as: 133 F.Supp.2d 272)**

Page 3

fraudulent joinder, it need not negate any possible theory that plaintiffs might allege in the future; only the present allegations count.

### [15] Federal Civil Procedure ☜636
170Ak636 Most Cited Cases
As allegations of intent to defraud or deliberate wrongdoing are not essential
to state claim for negligent misrepresentation, rule on pleading with particularity is not necessarily applicable to such claims, but on the other hand, if plaintiff states claim for n egligent m isrepresentation but alleges the additional element of fraudulent intent, that rule does come into play. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

### [16] Fraud ☜13(3)
184k13(3) Most Cited Cases
Under Mississippi law, elements of negligent misrepresentation are (1) misrepresentation or omission of material fact; (2) failure to exercise reasonable care on the part of defendant; (3) reasonable reliance on the misrepresentation or omission; and (4) damages as a direct result of such reasonable reliance.

### [17] Federal Civil Procedure ☜636
170Ak636 Most Cited Cases
Although consumers of drug for diabetes characterized their claims against drug sales representatives as being for negligence, in actuality their claims alleged fraud, and thus, consumers' "negligent misrepresentation" claims would be found deficient for failure to plead fraud with particularity, where claims asserted that sales representatives knew, or should have known, that dangerous risks were associated with use of the drug, but that despite this knowledge the representatives consciously ignored and understated the health risks associated with the drug and participated in producing advertisements that contained misrepresentations that were intended to create in the minds of the public the false sense that the drug was safe.   Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

### [18] Fraud ☜20
184k20 Most Cited Cases

### [18] Fraud ☜21
184k21 Most Cited Cases
Under Mississippi law, to state a claim for negligent misrepresentation, plaintiffs must allege that a misrepresentation was made to t hem, a s o pposed t o others, and that they relied on it.

### [19] Products Liability ☜73
313Ak73 Most Cited Cases
(Formerly 138k20.1 Drugs and Narcotics)
Under Mississippi law, conclusory statements by consumers of diabetes drug in complaint, which failed to allege that sales representatives made any representations to consumers who used the drug, and which instead alleged merely that representatives misrepresented risks of drug to public and that representatives were therefore guilty of making misrepresentations to the complaining consumers, were insufficient to meet the required nexus between the consumers and the representatives' alleged misrepresentations, as required
to allege negligent misrepresentation.

### [20] Sales ☜272
343k272 Most Cited Cases
Under Mississippi's Uniform Commercial Code (UCC), implied warranty of merchantability arises if the seller is a merchant with respect to goods of that kind.

### [21] Sales ☜255
343k255 Most Cited Cases
Under Mississippi's Uniform Commercial Code (UCC), sales representatives for prescription diabetes drug were not "sellers" of the drug for purposes of the implied warranty of merchantability, and thus, diabetes patients failed to establish cause of action against sales representatives for breach of implied warranty of merchantability; the seller who impliedly warranted the merchantability of the drug was the pharmaceutical manufacturer, and there was no contention that the individual sales representatives sold the drug to the patients, either directly or indirectly. West's A.M.C. § 75-2-314.

### [22] Sales ☜425
343k425 Most Cited Cases
Mississippi Products Liability Act (MPLA) created additional cause of action in tort for breach of express warranty, but it did not preclude breach of implied warranty claims under the Mississippi Uniform Commercial Code (UCC) in products liability actions. West's A.M.C. § 11-1-63.

### [23] Products Liability ☜23.1
313Ak23.1 Most Cited Cases
In any products liability action, plaintiff must establish a connection, however indirect, between defendant and defective product that caused plaintiff's injuries.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272                                                                                    Page 4
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
**(Cite as: 133 F.Supp.2d 272)**

[24] **Products Liability** 🔑23.1
313Ak23.1 Most Cited Cases

[24] **Products Liability** 🔑46.2
313Ak46.2 Most Cited Cases
            (Formerly 138k17.1 Drugs and Narcotics)
To recover under the Alabama extended
manufacturer's liability doctrine, plaintiff must show
that he suffered injury caused by one who sold a
defective product, and thus, absence of any alleged
connection between drug sales representatives and
plaintiff who used prescription drug for diabetes
would be fatal to plaintiff's AEMLD claim against
sales representatives.

[25] **Fraud** 🔑20
184k20 Most Cited Cases

[25] **Fraud** 🔑25
184k25 Most Cited Cases
Under Alabama law, to establish a claim of fraud or
fraudulent suppression, plaintiff must show that he or
she reasonably relied on the alleged
misrepresentation and suffered damage as a
proximate consequence.

[26] **Abatement and Revival** 🔑54
2k54 Most Cited Cases
Under Alabama law, personal claims other than
contract claims which were not filed prior to the
decedent's death do not survive in favor of the
decedent's personal representative.

[27] **Death** 🔑7
117k7 Most Cited Cases

[27] **Death** 🔑10
117k10 Most Cited Cases

[27] **Death** 🔑31(3.1)
117k31(3.1) Most Cited Cases
Under Alabama law, complaint alleging that the
alleged fraud of sale representatives who sold
prescription diabetes drug caused the death of
plaintiff's decedent would be regarded as asserting a
wrongful death claim, rather than a survival action,
and thus, decedent's personal representative could
bring the action. Ala.Code 1975, § § 6-5-410, 6-5-
462.

[28] **Products Liability** 🔑23.1
313Ak23.1 Most Cited Cases

[28] **Products Liability** 🔑24
313Ak24 Most Cited Cases
Alabama extended manufacturer's liability doctrine
imposes liability only on manufacturers, sellers, and
suppliers.

[29] **Products Liability** 🔑46.2
313Ak46.2 Most Cited Cases
            (Formerly 138k17.1 Drugs and Narcotics)
Under predicted Alabama law, sales representative
who neither manufactured, sold, nor supplied
prescription diabetes drug, and who instead was an
agent of the manufacturer, was not the one best able
to prevent sales of the allegedly defective drug, and
thus, there was no reasonable basis for imposing
liability on the sales representative under the
Alabama extended manufacturer's liability doctrine.

[30] **Products Liability** 🔑46.2
313Ak46.2 Most Cited Cases
            (Formerly 198Hk706, 138k19 Drugs and
Narcotics)
Under predicted Mississippi law, pharmacies s elling
prescription diabetes drug did not owe duty to warn
patients about the drug.

[31] **Products Liability** 🔑46.2
313Ak46.2 Most Cited Cases
            (Formerly 198Hk706, 138k19 Drugs and
Narcotics)
Under M ississippi l aw, p rescription d rug c onsumers
could not assert failure to warn claim against
pharmacists who dispensed diabetes drug, where
theory of consumers' case was that drug
manufacturers hid the dangers of the drug from
everyone, including the pharmacists, so allegations
that pharmacists knew and failed to warn of the
dangers were purely tendentious. West's A.M.C. §
11- 1-63(f).

[32] **Products Liability** 🔑46.2
313Ak46.2 Most Cited Cases
            (Formerly 198Hk706, 138k19 Drugs and
Narcotics)
Under Mississippi law, complaints alleging claims
under Mississippi Pharmacy Practice Act (MPPA), in
which prescription drug users maintained that
pharmacies negligently dispensed diabetes drug to
them without adequately reviewing their records,
without consulting with them based on that review,
and without warning them of adverse effects and
interactions resulting from diabetes drug, failed to
state cause of action for negligence against the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pharmacies, where drug users alleged that their injuries resulted from the defective product, not clinical abuse, drug interactions, incorrect dosage, or any of the other problems that the pharmacies allegedly neglected to guard against; even if pharmacies' failure to review records of and consult with the users did breach a duty, it was not this particular breach that proximately caused injuries. West's A.M.C. § 73-21-69 et seq.

## [33] Sales 425
343k425 Most Cited Cases
Mississippi Pharmacy Practice Act (MPPA) does not apply to actions for implied warranty. West's A.M.C. § 73-21-69 et seq.

## [34] Sales 255
343k255 Most Cited Cases
Under Mississippi law, absent showing that pharmacist defendants actually sold diabetes drug to consumer plaintiffs, there was no cause of action for breach of implied warranty under the Mississippi Uniform Commercial Code (UCC). West's A.M.C. § 75-2-314, 75-2-315.

## [35] Sales 262
343k262 Most Cited Cases

## [35] Sales 439
343k439 Most Cited Cases
Under express warranty provision of Mississippi Uniform Commercial Code (UCC), which provides that such a warranty arises by any affirmation of fact or promise made by seller to buyer which relates to the goods and becomes part of the basis of the bargain, the "basis of the bargain" element requires buyer to show that he or she relied upon seller's representations when deciding whether to purchase the goods, and such reliance may be presumed when seller makes affirmations about the product, but only when those affirmations are made during the bargain; the presumption arises, in other words, only in instances in which seller's words were part of a negotiation and thus have formed, at least in part, the reason for buyer's acceptance of the goods. West's A.M.C. § 75-2-313(1)(a).

## [36] Sales 260
343k260 Most Cited Cases
Under Mississippi Uniform Commercial Code (UCC), patients who used prescription diabetes drug had no cause of action for breach of express warranty against pharmacies who sold the drug, because patients do not negotiate or bargain with pharmacists

about the product's suitability, and even assuming pharmacist were

to make representation about the safety of a particular drug, the representation would not form "part of the basis of the bargain" as required by the Mississippi UCC because the patient purchases the drug on basis of discussions with his or her physician. West's A.M.C. § 75-2-313(1)(a).

## [37] Sales 255
343k255 Most Cited Cases
Under Mississippi Uniform Commercial Code (UCC), patients who purchased diabetes drug failed to state a claim for breach of implied warranties of merchantability and fitness for goods sold by one who is a merchant with respect to goods of that kind, against pharmacists; pharmacists are not retail merchants like any other with respect to the sale of prescription drugs, and pharmacists' sales of prescription drugs are not attributable to their marketing the properties of the drugs. West's A.M.C. §§ 75-2-314, 75-2- 315.

## [38] Sales 255
343k255 Most Cited Cases
Under predicted Alabama law, pharmacists would not be held liable for selling prescription diabetes drugs to consumers under theory of breach of the implied warranties of fitness and merchantability.

## [39] Products Liability 46.2
313Ak46.2 Most Cited Cases
(Formerly 198Hk706, 138k19 Drugs and Narcotics)
Under predicted Alabama law, pharmacists would not be held liable for selling prescription diabetes drugs to consumers under failure to warn theory; failure to warn claim presupposes defendant's knowledge of the danger, but Alabama complaints at issue did not allege that pharmacies knew of the dangers, but instead alleged that the manufacturer defendants concealed the risks.

## [40] Products Liability 46.2
313Ak46.2 Most Cited Cases
(Formerly 198Hk706, 138k19 Drugs and Narcotics)

## [40] Sales 255
343k255 Most Cited Cases
Under predicted Louisiana law, patients who were allegedly injured by using diabetes drug had no reasonable possibility of recovery against pharmacists who dispensed the prescription drug, on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims of fraudulent misrepresentation, failure to warn, or breach of express and implied warranties, all of which were based on theory that pharmacists could be held liable for failing to tell patients of harmful side effects of the drug, where pharmacists' duties under Louisiana law are solely to fill prescription correctly and to warn patient or to notify prescribing physician of an excessive dosage or of obvious inadequacies on face of prescription which create substantial risk of harm to patient.

**[41] Products Liability ☜46.2**
313Ak46.2 Most Cited Cases
        (Formerly 198Hk706, 138k19   Drugs and Narcotics)
Under predicted Texas law, pharmacies would not be held strictly liable for manufacture and marketing, in interstate commerce, of a defective diabetes drug, as pharmacies neither manufacture nor market prescription drugs, and because Texas law does not hold pharmacists liable for failure to warn of the risks of medications, it would be unreasonable to suppose a different result with respect to strict products liability claims.

**[42] Products Liability ☜46.2**
313Ak46.2 Most Cited Cases
        (Formerly 198Hk706, 138k19   Drugs and Narcotics)

**[42] Sales ☜427**
343k427 Most Cited Cases
Under predicted West Virginia law, patients who used prescription drug for diabetes had no causes of action for negligence, wilfulness, wantonness, or breach of express and implied warranty against pharmacy that dispensed the drug, where West Virginia Code expressly provides that all persons, whether licensed pharmacists or not, shall be responsible for the quality of all drugs, chemicals and medicines they may sell or dispense, with the exception of those sold in or dispensed unchanged from the original retail package of the manufacturer, in which event the manufacturer shall be responsible, and the patients did not allege that the drug that the pharmacy dispensed was removed from its original packaging. W.Va.Code, 30-5-12.

**[43] Removal of Cases ☜82**
334k82 Most Cited Cases
While consent of all defendants ordinarily is required to effect removal, failure of improperly joined party to participate in the petition will not defeat removal.

**[44] Federal Courts ☜358**
170Bk358 Most Cited Cases

**[44] Federal Courts ☜359**
170Bk359 Most Cited Cases
Defendants, as the parties invoking federal jurisdiction, carry burden of proving to a reasonable probability that the claim is in excess of the statutory jurisdictional amount.

**[45] Federal Courts ☜350.1**
170Bk350.1 Most Cited Cases
Focus of defendants' efforts in proving to a reasonable probability that the claim is in excess of the statutory jurisdictional amount need not be whether plaintiff is likely to secure amount greater than $75,000; rather, focus is on the claim, and while plaintiff is the master of its claim whose monetary demand is to be accorded deference, plaintiff's claim must be made in good faith.

**[46] Federal Courts ☜359**
170Bk359 Most Cited Cases
To determine whether defendants' burden of proving to a reasonable probability that the claim is in excess of the statutory jurisdictional amount has been met, federal district court looks not only to the complaint, but to any other evidence in the record.

**[47] Federal Courts ☜341**
170Bk341 Most Cited Cases
Complaint by patients who were allegedly injured by prescription diabetes drug obviously asserted a claim exceeding the $75,000 minimum amount for federal jurisdiction, where complaint alleged that compensatory and punitive damages were in excess of minimum jurisdictional limits of Mississippi state court in which action was originally filed, complaint contained allegations of economic loss such as loss of earnings, as well as past and future medical, health, and related expenses, and other complaints in the multi-district litigation alleged damages between $50 and $100 million for similar injuries.

**[48] Federal Courts ☜351**
170Bk351 Most Cited Cases
Damages claims of $74,000 by patients who were allegedly injured by prescription diabetes drugs were not made in good faith, and thus, federal district court would find that the allegations met minimum statutory amount for diversity jurisdiction, where complaints averred that patients had incurred expenses for numerous diagnostic procedures, sustained injuries that were permanent in nature and

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
**(Cite as: 133 F.Supp.2d 272)**

Page 7

would require future medical care and treatment, and suffered great mental, emotional and physical pain and suffering and mental anguish, and suffered loss of income and wage earning capacity and loss of vitality and capacity to enjoy life, and patients' allegations of injury were identical to other cases in which other patients sought $50 million in compensatory damages and $100 million in punitive damages.

**[49] Federal Courts** ☜265
170Bk265 Most Cited Cases
(Formerly 170Bk269)

**[49] Removal of Cases** ☜11
334k11 Most Cited Cases
(Formerly 334k26)

Eleventh Amendment, which applies only to suits commenced or prosecuted against a state, did not bar removal of case in which State of Mississippi Division of Medicaid was a plaintiff; even assuming arguendo that Mississippi was the real party in interest in the case involving alleged injuries caused by prescription diabetes drug, the suit was brought by, not against, the state. U.S.C.A. Const.Amend. 11.

**[50] Federal Courts** ☜157
170Bk157 Most Cited Cases

Transfer order, transferring case to federal district court, was effective when it was filed in office of the clerk of transferee court, which would be deemed to be the date it was file-stamped as received. 28 U.S.C.A. § 1407(c)(ii).

**[51] Removal of Cases** ☜107(7)
334k107(7) Most Cited Cases

When party seeking remand challenges the jurisdictional predicate for removal, burden falls squarely upon removing party to establish its right to a federal forum by competent proof.

**[52] Removal of Cases** ☜107(7)
334k107(7) Most Cited Cases

Because removing defendants failed to meet burden of establishing right to federal forum by competent proof, federal district court was bound to resolve the issue in favor of the plaintiffs who moved for remand.

**\*278** Charles A. Mathis, Herman, Mathis, Casey & Kitchens, Atlanta, GA, Arnold Levin, Levin Fishbein Sedran & Berman, Philadelphia, PA, Regina L. LaPolla, Milberg Weiss Bershad Hynes & Lerach LLP, **\*279** New York City, Edward Blackmon, Jr.,

Blackmon & Blackmon, Canton, MS, David P. Matthews, for Plaintiffs.

David Klingsberg, New York City, Alan E. Rothman, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City, John E. Goodman, Bradley Arant Rose & White LLP, Birmingham, AL, Frank A. Wood, Jr., Watkins & Eager, PLLC, Jackson, MS, Quentin F. Urquhart, Jr., Irwin Fritchie Urquhart & Moore LLC, New Orleans, LA, for Defendants.

**MEMORANDUM OPINION**

KAPLAN, District Judge.

These sixteen actions are among the hundreds seeking recovery for personal injuries allegedly resulting from the use of the prescription diabetes medication, Rezulin, formerly manufactured by defendants Warner-Lambert Co. and its Parke-Davis division, that have been consolidated here for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. Each of these sixteen originally was commenced in a state court and removed by defendants on the basis of diversity of citizenship. The matter now is before the Court on plaintiffs' motions to remand on the ground that subject matter jurisdiction is lacking.

*I. Fraudulent Joinder*

Plaintiffs' chief claim is that these actions were removed improperly because there is at least one defendant in each--usually a pharmacy or an employee of one of the defendant pharmaceutical companies--that is a citizen of the same state as a plaintiff, thus destroying the complete diversity of citizenship essential to the exercise of removal jurisdiction. Defendants rejoin that the non-diverse defendants must be disregarded.

[1][2] The question whether a non-diverse party has been joined improperly is one of federal law. [FN1] Moreover, although the joinder of parties lacking a genuine interest in the controversy frequently is referred to as fraudulent joinder, thus suggesting that the determinative issue is one of motive, motive in fact usually has nothing to do with it. The only issue is whether the plaintiff has a legitimate claim against the non-diverse or in-state defendant--whether, in other words, the plaintiff has no real or direct interest in the controversy vis-a-vis the non-diverse or in-state defendant because it cannot state a legally sufficient and factually arguable claim for relief against it. [FN2]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
(Cite as: 133 F.Supp.2d 272)

FN1. *Pampillonia v. RJR Nabisco, Inc.,* 138 F.3d 459 (2d Cir.1998). Accordingly, Second Circuit precedent is persuasive. *See In re Pan American Corp.,* 950 F.2d 839, 847 (2d Cir.1991) (transferee federal court should apply its interpretations of federal law, rather than those of the transferor circuit); *M enowitz v. Brown,* 991 F .2d 36, 40 (2d Cir.1993) (applying *In re Pan American* to transfer made pursuant to 28 U.S.C. § 1407).

FN2. Of course, the issue may arise in different frameworks. A single plaintiff may s ue two defendants, one of which is a citizen of the same state as the plaintiff. A single defendant may be sued by two or more plaintiffs, at least one of which is a citizen of the same state as the defendant. Multiple plaintiffs may sue multiple defendants with at least one plaintiff and one defendant being citizens of different states. But the question presented always is the same in substance: whether there is a legally sufficient and factually arguable claim for relief as between the parties whose presence would destroy complete diversity of citizenship.

[3] The standard for determining whether a plaintiff's claim against a defendant who is a citizen of the plaintiff's state is sufficiently substantial to defeat removal jurisdiction is governed by *Pampillonia v. RJR Nabisco, Inc.* [FN3] In order to warrant disregard of the citizenship of a non-diverse party, a removing defendant must "demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse **\*280** d efendants in st ate c ourt." [ FN4] The burden on a removing defendant to meet this standard is a heavy one, and all reasonable doubts of fact and law are resolved in favor of the plaintiff. [FN5] Nevertheless, the burden is not impossible of satisfaction.

FN3. 138 F.3d 459.

FN4. *Id.* at 461. *Accord, Saxe, Bacon & Bolan,* 521 F.Supp. at 1047. The statement in *Pampillonia* that a defendant must establish that there is "no possibility" that the plaintiff might prevail against a non-diverse defendant, *id.* at 461, as plaintiffs

conceded at oral argument, Tr., Jan. 25, 2001, at 6-7, cannot be taken literally. Even if a plaintiff's claim against a non-diverse defendant were squarely precluded by a recent d ecision o f a s tate's h ighest c ourt o r by a statute precisely applicable to the claim, there always would be a "possibility," however remote, that the court or legislature might change its mind so as to permit the plaintiff to prevail. In consequence, several circuits, in decisions cited with approval by the Second Circuit in *Pampillonia,* have indicated that the standard more accurately is described as requiring a showing that there is "no reasonable basis" for predicting liability on the claims alleged. *Pampillonia,* 138 F.3d at 461 n. 3 (citing *Badon v. RJR Nabisco, Inc.,* 224 F.3d 382, 393 (5th Cir.2000); *Boyer v. Snap-on Tools Corp.,* 913 F.2d 108, 111 (3d Cir.1990), *cert. denied,* 4 98 U.S. 1 085, 1 11 S.Ct. 9 59, 1 12 L.Ed.2d 1046 (1991)). That is the standard this Court applies. *Accord American Mutual Liability Ins. Co. v. Flintkote Co.,* 565 F.Supp. 843, 845 (S.D.N.Y.1983) (noting test for fraudulent joinder "has uniformly been at least whether there is any reasonable basis for predicting that state law might impose liability in the non-diverse defendant").

FN5. *See id.* at 461.

[4][5] The a pplication o f t his s tandard t o q uestions of state law also merits a further word. Federal courts sitting in diversity commonly apply state law as rules of decision under *Erie R.R. Co. v. Tompkins.* [FN6] Their role in such cases is familiar--they make their best judgments as to how the state courts would resolve the issues before them and decide their diversity cases accordingly. [FN7] As the reasonable possibility standard implies, however, the task here is more limited. In a case in which the defendants contend that joinder is "fraudulent" because the claim against a non-diverse defendant is insufficiently substantial as a matter of law, the Court must consider the state law upon which the claim rests and then determine only whether there is a reasonable possibility that the relevant state's highest court would rule in favor of the plaintiff were the issue presented to it. If there is such a possibility, then the joinder was appropriate and the case must be remanded.

FN6. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1188 (1938).

FN7. *See Travelers Insurance Co. v. 633
Third Assocs.,* 14 F.3d 114, 119 (2d
Cir.1994) ("Where the substantive law of the
forum state is uncertain or ambiguous, the
job of the federal courts is carefully to
predict how the highest court of the forum
state would resolve the uncertainty or
ambiguity."); *Bailey Employment System,
Inc. v. Hahn,* 655 F.2d 473, 477 (2d
Cir.1981) ("Where there is an absence of
state authority on an issue presented to a
federal court sitting in diversity ... the
federal court must make an estimate of what
the state's highest court would rule to be its
law.").

## A. Sales Representatives

In six cases filed in Mississippi and one filed in
Alabama, defendants claim that plaintiffs improperly
joined Warner-Lambert sales representatives. [FN8]
All six Mississippi complaints allege that the sales
representatives "falsely and fraudulently advertised,
marketed, distributed and sold the defendants'
Rezulin drug to pharmacies, plaintiffs, decedents, and
the general public of the state of Mississippi, and in
particular, to Plaintiffs and other [Mississippi] *281
residents." [FN9] They allege failure to warn,
fraudulent and negligent misrepresentation, and
breach of warranty. The Alabama complaint makes
substantially similar claims as well as one based on
the Alabama extended manufacturer's liability
doctrine (the "AEMLD"), which is a common law
doctrine that has subsumed all claims involving
injury caused by defective products. [FN10]

> FN8. The Mississippi cases are *Johnson v.
> Parke-Davis,* No. 00 Civ. 7631 (referred to
> here as *H. Johnson* for purposes of
> distinguishing it from another *Johnson* case
> in this MDL); *Hill v. Parke-Davis,* No. 00
> Civ. 7634; *House v. Parke-Davis,* No. 00
> Civ. 7628; *Hunter v. Parke-Davis,* No. 00
> Civ. 7635; *Southern v. Parke-Davis,* No. 00
> Civ. 7636; and *Williams v. Parke-Davis,* No.
> 00 Civ. 7627. The Alabama case is *Frost v.
> Warner-Lambert Co.,* No. 00 Civ. 9131.

> FN9. *See House* Sec. Am. Cpt. ¶ 5B. The
> substance of this allegation is contained in
> all six Mississippi complaints. The
> complaints name some or all of the
> following defendant sales representatives:

Lee Miers III, Davis J. Lemoine, Alice E.
Bonar, Liesl Daly Bold, Philip Thower, and
Karen M. Ewan. The Alabama complaint
alleges similar claims against sales
representative Gene Flood. *See Frost* Cpt ¶
9C.

> FN10. *See Johnson v. General Motors
> Corp.,* 82 F.Supp.2d 1326, 1329
> (S.D.Ala.1997) (failure to warn claims
> subsumed by AEMLD); *Veal v. Teleflex,
> Inc.,* 586 So.2d 188, 190-91 (Ala.1991)
> (negligence and wantonness claims
> subsumed by AEMLD).

## 1. Factual Basis for Claims

[6] The Second Circuit's standard for fraudulent
joinder allows for removal despite the presence of
non-diverse defendants if the claims against those
defendants have no basis in fact. [FN11] This is so
when "the allegations in the plaintiffs pleading ... are
shown to be so clearly false and fictitious that no
factual basis exists for an honest belief on the part of
plaintiff that there is liability--in short that the joinder
is without any reasonable basis in fact and is made
without any purpose to prosecute the cause in good
faith ...." [FN12]

> FN11. *Pampillonia* 138 F.3d at 461.

> FN12. *Metropolitan Prop. and Cas. Ins. Co.
> v. J.C. Penney Cas. Ins. Co.,* 780 F.Supp.
> 885, 888 (S.D.N.Y.1991) (quoting *Quinn v.
> Post,* 262 F.Supp. 598 (S.D.N.Y.1967)).

[7] Defendants challenge the factual allegations of
the complaints with respect to the sales
representatives. Affidavits of the defendant sales
representatives filed in each of the Mississippi cases
state that the sales representatives "made no
representations, by way of promotion or advertising
or otherwise, or any statements whatsoever, including
but not limited to representations regarding Rezulin
to plaintiff or to the general public." [FN13] The
affidavit filed in the Alabama case states that the
sales representative had no dealings with plaintiff or
plaintiff's decedent and did not "make any statements
to the general public or participate in any advertising
or promotion to the general public concerning
Rezulin." [FN14] Plaintiffs have not responded to
the affidavits in any way. In consequence, the Court
can conclude only that the joinder of these sales
representatives lacked any reasonable basis in fact.
[FN15] This is not, however, the only basis upon

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
(Cite as: 133 F.Supp.2d 272)

which the Court finds joinder of the sales representatives to have been improper.

> FN13. *E.g.,* Lemoine Aff. ¶ 4. All of the Mississippi affidavits contain this assertion.

> FN14. Flood Aff. ¶ 4.

> FN15. *See Badon,* 224 F.3d at 393 (where plaintiffs failed to respond to defendants' affidavits and failed to request time to discover evidence to contradict affidavits, no reasonable basis for predicting that plaintiffs might establish liability); *Trumps v. Harley of New York Associates,* No. 94 CV 7080(CSH), 1995 WL 656983, at * 3 (S.D.N.Y. Nov.8, 1995) (assertions in affidavits submitted by defendants in support of removal presumed true for purposes of fraudulent joinder determination, where plaintiff failed to offer evidence to controvert assertions).

### 2. Legal Sufficiency of Claims

The joinder of the sales representatives in the Mississippi and Alabama cases would have been inappropriate even if there were a reasonable factual basis for the claims against them. There simply is no reasonable basis for supposing that any of the claims against them would be found legally sufficient by Mississippi or Alabama courts.

**\*282** *a. The Mississippi cases*

#### *i. Failure to warn*

[8] The dispositive question is whether there is a reasonable possibility that the Mississippi Supreme Court would find that pharmaceutical sales representatives have a duty to warn of characteristics of prescription drugs they sell. While no Mississippi court has resolved this precise issue, it does not follow that a "possibility exists that plaintiff can establish any cause of action against [the] defendant[s]." [FN16]

> FN16. *Pampillonia,* 138 F.3d at 461 n. 3 (quoting *Allied Programs Corp. v. Puritan Ins. Co.,* 592 F.Supp. 1274, 1276 (S.D.N.Y.1984)).

Mississippi follows the learned intermediary rule. "[W]here prescription drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use." [FN17] The Mississippi Supreme Court has explained its rationale for its adoption of this principle as follows:

> FN17. *Wyeth Laboratories, Inc., v. Fortenberry,* 530 So.2d 688, 691 (Miss.1988) (quoting *Swayze v. McNeil Laboratories, Inc.,* 807 F.2d 464, 470 (5th Cir.1987)).

"As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient ... The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies, then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as the 'learned intermediary' between manufacturer and consumer." [FN18]

> FN18. *See id.* at 691 (quoting *Reyes v. Wyeth Laboratories,* 498 F.2d 1264 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974)).

[9] Precisely the same considerations apply here. If pharmaceutical sales representatives handling prescription drugs have any duty to warn anyone of dangers of their products, the duty is to warn the physicians to whom they promote the product. In any case, they have no duty to warn patients. Accordingly, insofar as these complaints rest on a contention that the sales representatives failed to warn plaintiffs or the public generally, there is no reasonable chance that the Mississippi courts would find them sufficient.

[10] Nor are these claims saved by plaintiffs' conclusory allegations that the defendant sales representatives failed adequately to warn "physicians." [FN19] In Mississippi, as elsewhere, the injury complained of must be a proximate consequence of the alleged breach of duty. [FN20] Yet plaintiffs do not allege that the defendant sales representatives failed to warn the particular physicians who prescribed the drug for them, let alone that this alleged failure was the proximate cause of their injuries. This is fatal to their claims. [FN21] And the affidavit of Dr. Calvin Ramsey, submitted in some of the Mississippi cases, which attests that Warner-Lambert sales representatives

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

promoted Rezulin to Dr. Ramsey and that he in turn prescribed it for unspecified patients, does not alter this conclusion, as there is no claim that Dr. Ramsey prescribed the drug for any of these plaintiffs. **\*283** [FN22]

> FN19. *See Hill* Cpt. ¶ 15C; *House* Second Am. Cpt ¶ 3 1C; *Hunter* Cpt ¶ 3 2C; *H . Johnson* Second Am. Cpt ¶ 18C; *Southern* Cpt ¶ 32C; *Williams* Cpt. ¶ 38C.

> FN20. *Carpenter v. Nobile,* 620 So.2d 961, 964 (Miss.1993).

> FN21. *See Thomas v. Hoffman-La Roche, Inc.,* 731 F.Supp. 224 (N.D.Miss.1989), *aff'd,* 949 F .2d 8 06 ( 5th C ir.), *c ert. denied,* 504 U.S. 956, 112 S.Ct. 2304, 119 L.Ed.2d 226 (1992) ("A plaintiff in a prescription drug products liability case has the burden of p roving t hat a n a dequate warning t o t he *prescribing* physician would have altered the physician's conduct.") (citing *Wyeth Laboratories,* 530 So.2d at 691) (emphasis added).

> FN22. Defendants have moved to strike Dr. Ramsey's affidavit on this ground. But the fact that the affidavit does not remedy the defects in plaintiffs' position is not a ground for striking it.

### ii. Fraud and negligent misrepresentation

[11] Plaintiffs allege also that the defendant sales representatives fraudulently represented to plaintiffs "that the Rezulin drug was not defective or unreasonably dangerous to its users." [FN23] But these claims would be insufficient as a matter of law even if plaintiffs had contested the sales representatives' affidavits denying any contact with them.

> FN23. *See House* Sec. Am. Cpt. ¶ 5C. The allegations against the sales representatives in *House* are identical to those in *H. Johnson, Hill, Hunter, Southern* and *Williams.*

[12][13] To s tate a c ause o f a ction for f raud under Mississippi law, plaintiffs must allege (1) false representation of a material fact; (2) the speaker's knowledge or belief in its falsity; (3) the hearer's belief in its truth; (4) the speaker's intent that it should be acted upon; (5) the hearer's right to rely on it; and (6) the hearer's actual detrimental reliance.

[FN24] Moreover, averments of fraud must be stated with particularity under either federal or Mississippi law. [FN25] Thus, a fraud complaint will be sustained only if the circumstances of the alleged fraud-- including matters such as the time, place, content and speaker of the allegedly fraudulent misrepresentations--are set forth. [FN26]

> FN24. *See Allen v. Mac Tools Inc.,* 671 So.2d 636, 642 (Miss.1996).

> FN25. fed. R. Civ. P. 9(b); miss. R. Civ. P. 9(b).

> FN26. *See, e.g., Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d. C ir.1994)); miss. R. Civ. P. 9(b), comment.

Plaintiffs assert simply that "on or after March, 1997, in the State of Mississippi, and particularly in LeFlore County, Mississippi" the individually named sales representatives "represented to [plaintiffs] that the R ezulin d rug was not d efective o r u nreasonably dangerous to its users." [FN27] They have supported these general allegations with a laundry list of information tending to show the dangers of Rezulin and argue that "the defendants" fraudulently withheld each bit of this information from plaintiffs. [FN28] But this is well short of the mark. The complaints do not allege all of the essential elements of fraud, most obviously that the sales representatives knew that Rezulin was unsafe at the time they spoke but withheld the truth to mislead plaintiffs. [FN29] Nor have plaintiffs properly alleged the time and place of particular representations. Instead, they have peppered their complaints with allegations of management-level corporate wrongdoing, which they ascribe to salespeople through the use of the catch-all attribution to "defendants." [FN30] **\*284** Such general allegations do not meet the Rule 9(b) requirements. If sustained, they would undermine the rule's intent "to provide a defendant with fair notice of a plaintiff's claim, [and] to safeguard a defendant's reputation from improvident charges of wrongdoing." [FN31]

> FN27. *See House* Sec. Am. Cpt. ¶ 5C. As explained previously, the *House* complaint is substantially similar in all relevant respects to the complaints in *H. Johnson, Hill, Hunter, Southern* and *Williams.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN28. *See id.* ¶¶ 30-34, including ¶¶ 31A-X.

FN29. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 812-13 (2d Cir.1996) (complaint insufficient where it created mere inference of fraud based on general allegations, and did not allege circumstances to show that defendants' knew their representations were false when made).

FN30. For instance, plaintiffs allege that "[t]he defendants fraudulently failed to disclose to plaintiff, health care providers and the general public that data from their own clinical trials showed that 2.2 % of Rezulin users showed liver damage." *See House* Am. Cpt. ¶ 31X. This allegation suffers from the same defects in specificity as almost all the other allegations of fraud. It fails to allege, for instance, that the sales representatives in particular knew of the results of Warner-Lambert's clinical trials or, if they did, that the sales representatives made specific statements to the plaintiffs at a particular time and place that falsely misrepresented the results of those clinical trials or fraudulently withheld information they knew to be material.

FN31. *Shields,* 25 F.3d at 1128 (quoting *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)).

[14] Plaintiffs argue that these deficiencies in their pleadings might be cured by amendment (although they have not sought leave to do so) and that this possibility requires remand. Stated differently, they argue that the mere possibility that they *might* successfully amend their complaints to state a cause of action against non-diverse defendants defeats the "no possibility" standard for fraudulent joinder. [FN32]

FN32. Plaintiffs advanced this theory at oral argument with reference to the *Gannon* case, but the theory would apply by implication to all instances in which the Court makes a fraudulent joinder determination based on deficiencies in pleadings that conceivably might be amended.

Carried to its logical conclusion, the argument implies that a plaintiff could join any defendant without setting forth any basis in fact or law for liability--in short, that a plaintiff "could defeat diversity jurisdiction by joining his grandmother as a defendant, [as] surely some set of facts might make her liable." [FN33] The Court declines to adopt this theory. While federal and many state courts have adopted liberal rules of notice pleading, pleadings are not inconsequential documents. Indeed, the Second Circuit has indicated that the question whether there is a reasonable possibility of recovery for purposes of determining the propriety of joinder is to be determined "based on the pleadings." [FN34] Federal courts across the nation have relied upon that standard to deny remand based on inadequate pleadings and to disregard allegations not contained in the original complaint. [FN35] Indeed, it would be difficult *285 to justify any different approach in resolving claims of improper joinder in the removal context, as another approach could close the doors to federal courts solely on the basis of plaintiffs' wishful speculation. Although a defendant "bears a heavy burden to establish fraudulent joinder, it need not negate any possible theory that [plaintiffs] might allege in the future: Only [the] present allegations count." [FN36] As the existing complaints fail to state a claim upon which relief may be granted against the sales representatives for fraudulent misrepresentation, there is no reasonable possibility of recovery on those claims.

FN33. *Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 74 (7th Cir.1992).

FN34. *Pampillonia,* 138 F.3d at 461.

FN35. *See Pullman Co. v. Jenkins,* 305 U.S. 534, 537-38, 59 S.Ct. 347, 83 L.Ed. 334 (1939) (court should determine validity of removal based on pleadings in original complaint); *Poulos,* 959 F.2d at 74 (no fraudulent joinder where complaint failed to allege facts required to find liability under applicable state law, despite fact that plaintiff could have cured deficiencies in complaint by amendment); *Kruso v. Int'l Telephone & Telegraph Corp.,* 872 F.2d 1416, 1424 (9th Cir.1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990) (declining to consider potential allegations in proposed complaint because fraudulent joinder is determined on basis of pleadings at time removal was filed); *McCabe v. General Foods Corp.,* 811 F.2d 1336, 1339 (9th Cir.1987) (where plaintiffs alleged facts insufficient to state claim

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

against non-diverse defendants, fact that plaintiffs had moved to amend their complaint to state a claim irrelevant to fraudulent joinder determination); *Smith v. City of Picayune,* 795 F.2d 482, 485 (5th Cir.1986) ("Generally, the right of removal is determined by the pleadings as they stand when the petition for removal is filed."); *Vasura v. Acands,* 84 F.Supp.2d 531, 539 (S.D.N.Y.2000) (fraudulent joinder analysis made with reference to original complaint); *Inman v. Daimler-Chrysler Corp.,* No. 00 CV 0134(SBC), 2000 WL 283016, at *6 (N.D.Ill. March 9, 2000) (fact that Illinois law allows pleadings to be amended at any time before judgment irrelevant to determination of fraudulent joinder; plaintiffs "had no chance of recovering" based on allegations in complaint, and did not attempt to amend or give indication as to how deficiencies could be cured); *Sonnenblick-Goldman Co. v. ITT Corp.,* 912 F.Supp. 85, 90 (S.D.N.Y.1996) (joinder improper where plaintiff failed to meet Rule 9(b) pleading requirements because "before the Court can even evaluate the possibility of Plaintiff making out a claim of fraud there must be a Complaint that has been properly pled"); *Waters v. State Farm Mutual Automobile Insurance Co.,* 158 F.R.D. 107, 109 (S.D.Tex.1994) (failure to satisfy Rule 9(b) pleading requirements and to specify a factual basis for recovery against non-diverse defendant "constitutes failure to state a claim and fraudulent joinder of that party"; speculation that evidence exists to support claim irrelevant to fraudulent joinder determination) (citing *Doe v. Cloverleaf Mall,* 829 F.Supp. 866, 870 (S.D.Miss.1993)); *Mays v. United Insurance Co. of America,* 853 F.Supp. 1386, 1388-89 (M.D.Ala.1994) (basing fraudulent joinder determination in part on whether complaint met Rule 9(b) requirements). *But see Ratnesar v. Royal & Sunalliance Financial Services,* No. 00-CV 1171 CRB, 2000 WL 769223, at * 2 (N.D.Cal. June 9, 2000) ("[W]hile plaintiff's complaint does not allege that [defendant] made any representations to plaintiff, plaintiff represents in his motion that he can [so] allege.... Thus, the Court cannot conclude as a matter of law that plaintiff cannot possibly recover against [defendant].").

> FN36. *Poulos,* 959 F.2d at 74.

[15][16] Plaintiffs allege also negligent misrepresentation by "defendants" in general. As allegations of intent to defraud or deliberate wrongdoing are not essential to state such a claim, [FN37] Rule 9(b) is not necessarily applicable to such claims. On the other hand, where a plaintiff states a claim for negligent misrepresentation but alleges the additional element of fraudulent intent, Rule 9(b) comes into play. [FN38]

> FN37. The elements of negligent misrepresentation are (1) a misrepresentation or omission of a material fact; (2) failure to exercise reasonable care on the part of the defendant; (3) reasonable reliance on the misrepresentation or omission; and (4) damages as a direct result of such reasonable reliance. *Levens v. Campbell,* 733 So.2d 753, 760-61 (Miss.1999).

> FN38. Courts often have applied this theory in the context of claims pled under Sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § § 77k(1), 771(a)(2). *See, e.g., In re Ultrafem Inc. Securities Litigation,* 91 F.Supp.2d 678, 690 (S.D.N.Y.2000) (Rule 9(b) applicable where complaint made "classic fraud allegations ... of misrepresentations and omissions made with intent to defraud"); *Schoenhaut v. American Sensors, Inc.,* 986 F.Supp. 785, 795 (S.D.N.Y.1997) ("it seems only fair that if plaintiffs have pled fraud, they must comply with the requirements of 9(b)") (citing *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 288 (3d. Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990)). The reasoning of these and similar cases is persuasive here.

[17] Here, plaintiffs allege that defendants "knew, or should have known, that dangerous risks were associated with the use of [Rezulin]" but that despite this knowledge they "consciously ignored and understated the health risks associated with Rezulin" and participated in producing advertisements and promotions that "contained misrepresentations and omissions of fact that were intended to create in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
(Cite as: 133 F.Supp.2d 272)

Page 14

minds of the consuming public the false sense and feeling that [Rezulin] was safe ...." [FN39] Thus, although plaintiffs have characterized their claims as being for negligence, in substance they charge fraud. Accordingly, their negligent misrepresentation claims are deficient for failure to comply with Rule 9(b).

> FN39. *Hill* Cpt. ¶ ¶ 22-24. All six Mississippi complaints contain identical allegations.

[18][19] The negligent misrepresentation claims are insufficient for another reason. In order to state a claim for negligent misrepresentation, plaintiffs must allege that a misrepresentation was made to them, as opposed to others, [FN40] and that they relied on it. Plaintiffs here fail to allege that defendants made any representations to them. Rather, they allege that defendants misrepresented the risks of Rezulin "to the public," and conclude that "each of the defendants were, therefore, guilty of misrepresentation or omissions of *286 material facts to the plaintiff ..." [FN41] These conclusory statements are insufficient to meet the required nexus between the plaintiffs and the defendants' alleged misrepresentations. [FN42]

> FN40. *Arnona v. Smith*, 749 So.2d 63, 67 (Miss.1999).

> FN41. *Hill* Cpt. ¶ ¶ 22-28.

> FN42. See *Arnona*, 749 So.2d at 67 (upholding dismissal of complaint alleging misrepresentation made to plaintiffs' purchasers, rather than plaintiffs).

### iii. Breach of warranty

[20][21][22][23] Under Mississippi's Uniform Commercial Code ("UCC"), an implied warranty of merchantability arises "if the seller is a merchant with respect to goods of that kind." [FN43] Plaintiffs allege that the defendant sales representatives breached an implied warranty of merchantability when they marketed, sold and distributed Rezulin. The defendant sales representatives, however, were not "sellers" of the product for purposes of warranty; the "seller" who impliedly warranted the merchantability of Rezulin was the pharmaceutical manufacturer. [FN44] In any case, there is no contention that the individual sales representatives "sold" Rezulin to plaintiffs, either directly or indirectly. Hence, there is no reasonable basis for supposing that Mississippi would impose liability on the sales representatives for breach of warranty. [FN45]

> FN43. Miss. Code Ann. § 75-2-314. The Mississippi Products Liability Act ("MPLA") created an additional cause of action in tort for a breach of express warranty, *see* miss. Code Ann. § 11-1-63, but it did not preclude breach of implied warranty claims under the Mississippi UCC in products liability actions. See *Childs v. General Motors Corp.*, 73 F.Supp.2d 669, 672 (N.D.Miss.1999).

> FN44. See *McCurtis v. Dolgencorp, Inc.*, 968 F.Supp. 1158, 1161 (S.D.Miss.1997) (finding no cause of action for breach of warranty against sales representatives who "are not in the business of selling products but rather are employed by companies that are in the business of selling products...") (internal quotations omitted). *See also Lobato v. Pay Less Drug Stores, Inc.*, 261 F.2d 406, 408 (10th Cir.1958) (drug store employee who transacted with and delivered defective bicycle to plaintiff was not "seller"; corporation was "seller" and employee was thus not personally liable).

> FN45. In any products liability action, a plaintiff must establish a connection, however indirect, between the defendant and the defective product that caused plaintiff's injuries. See *Johnson v. Parke-Davis*, 114 F.Supp.2d 522, 525 (S.D.Miss.2000) (no cause of action for breach of implied warranty where plaintiffs did not allege that they or their physicians purchased or received Rezulin from any of named sales representatives); *Albritton v. Coleman Co.*, 813 F.Supp. 450, 454 (S.D.Miss.1992) ("essential element of plaintiffs' case is the identification of some named defendant as the manufacturer or supplier of the defective product in question"). Without alleging that the sales representatives supplied the Rezulin that plaintiffs eventually bought, there is no allegation that the sales representatives supplied "the defective product in question."

As there is no reasonable possibility that plaintiffs have alleged legally sufficient claims for relief against the Warner-Lambert sales representatives for failure to warn, fraudulent or negligent misrepresentation, or breach of warranty, the sales representatives were joined improperly in these six

actions.

### b. The Alabama case

The plaintiff in the A labama case asserts on behalf of her decedent claims against a Parke-Davis sales representative for n egligence, w antonness, f ailure to warn, strict products liability under the AEMLD, and "fraud, misrepresentation, and suppression." [FN46]

> FN46. *See Frost* Cpt Counts I, II, IV-VI. Defendants believe that the complaint alleges also breach of warranty claims against the sales representative, but that claim is specifically directed at the "defendant Manufacturers," *see Frost* Cpt Count III ¶ 5.

[24][25][26][27] To begin with, the Alabama complaint suffers from the same defect as the Mississippi cases joining sales representatives: There is nothing in it indicating that the defendant sales representative sold Rezulin to plaintiff's decedent or to **\*287** plaintiff's decedent's physician, thereby causing the alleged injuries. In order to recover under the AEMLD, a plaintiff must show "that he suffered injury caused by one who sold a defective product ...." [FN47] Similarly, to establish a claim of fraud or fraudulent suppression, a plaintiff must show that he or she reasonably relied on the alleged misrepresentation and suffered damage "as a proximate consequence." [FN48] The absence of any alleged connection between the sales representative and plaintiff's decedent therefore is fatal to all of the claims against the sales representative. [FN49]

> FN47. *Carter v. Cantrell Machine Co., Inc.,* 662 So.2d 891, 892 (Ala.1995) (internal citations omitted).

> FN48. *Ex Parte Michelin North America, Inc.,* No. 1990615(AHM), 2001 WL 29198, at \* 3 (Ala. Jan.12, 2001) (fraud); *Ex Parte Dial Kennels of Alabama, Inc.,* 771 So.2d 419, 421 (Ala.1999) (fraudulent suppression).

> FN49. Defendants argue also that plaintiff's fraud claim does not survive the death of her decedent under the Alabama survival statute, ala. Code § 6-5-462. The argument is somewhat puzzling, however. Under Alabama law, personal claims other than contract claims which were not filed prior to

the decedent's death do not survive in favor of the decedent's personal representative. *See id. See also Brooks v. Hill,* 717 So.2d 759, 763 (Ala.1998) ("unfiled claim sounding in tort will not survive the death of the person with the claim"). Hence, one would expect defendants to m ake the s ame argument as to all of the tort claims. But there is no need to pause on this anomaly. This action w as f iled after the death of the plaintiff's decedent. In consequence, the tort and fraud claims may be maintained, if at all, only under Alabama's wrongful death statute. ala. Code § 6-5-410. *See Mattison v. Kirk,* 497 So.2d 120, 124-25 (Ala.1986), *overruled on other grounds, Carbon Hill Mfg., Inc. v. Moore,* 602 So.2d 354 (Ala.1992) (only remedy for personal injuries causing death is under wrongful death statute). And contrary to defendants' contentions, it is clear that this action is one for wrongful death.

For the proposition that the Alabama case is a survival rather than a wrongful death action, defendants rely on the first paragraph of the complaint, which states that "Plaintiff refers to the estate of William M. Frost and/or William M. Frost, deceased." However, many Alabama cases have allowed for wrongful d eath a ctions filed i n the name of the administrator of the decedent's estate, and the Alabama Supreme Court has looked to the substance of the claim, rather than the wording of the caption, to determine whether it is a survival or wrongful death action. *See, e.g., Mattison,* 497 So.2d at 120 (wrongful death action filed by "Dorothy Mattison and Gary Mattison, as co-administrators of the Estate of Woodrow W. Mattison, deceased"); *Miller v. Dobbs Mobile Bay, Inc.,* 661 So.2d 203 (Ala.1995) (insurance fraud action filed by "Joyce Miller, individually and as administratrix of the Estate of Mearl M. Miller, deceased" construed as survival action because insurance fraud cannot result in wrongful death). Here, the Alabama complaint alleges that the alleged fraud caused the death of plaintiff's decedent. *See Cantley v. Lorillard Tobacco Co., Inc.,* 681 So.2d 1057 (Ala.1996) (stating fraud claims in wrongful death action). This Court therefore regards the Alabama complaint as asserting a wrongful death claim. Accordingly, defendants' attack on the fraud

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
(Cite as: 133 F.Supp.2d 272)

Page 16

claim as having been extinguished by the death of plaintiff's decedent is without merit.

[28] There is another problem with the Alabama complaint against the sales representative. The AEMLD is founded on "broader moral notions of consumer protection and on economic and social grounds, placing the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of these products." [FN50] Accordingly, the AEMLD imposes liability only on manufacturers, sellers and suppliers. [FN51]

> FN50. *Atkins v. American Motors Corp.,* 335 So.2d 134, 139 (Ala.1976).

> FN51. *See Turner v. Azalea Box Co.,* 508 So.2d 253, 254 (Ala.1987) (AEMLD applies only to manufacturers and sellers); *Atkins,* 335 So.2d at 139 (rejecting theory that retailer without knowledge of product's danger may be liable simply for "the mere selling of a defective product"); *King v. S.R. Smith, Inc.,* 578 So.2d 1285, 1287 (Ala.1991) (liability for failure to warn under AEMLD attaches only if defendant "knows or should know" of the product's danger).

[29] The sales representative joined in the Alabama case neither manufactured, sold nor supplied Rezulin. [FN52] Rather, he was an agent of the manufacturer and *288 seller. As a corporate employee, he was not "the one best able" to prevent sales of defective drugs. In light of the Alabama Supreme Court's clear explanation of the AEMLD's scope and purpose, there is no reasonable basis for supposing that it would impose liability on the sales representative in this case.

> FN52. *See* Flood Aff. ¶¶ 6, 7. Plaintiffs have not challenged the assertions in the affidavit.

*B. Pharmacies*

In seven cases filed in Mississippi, two in Alabama, and one each in Texas, West Virginia, and Louisiana, defendants argue that plaintiffs improperly joined pharmacies. [FN53]

> FN53. The seven Mississippi cases are *Hill v. Parke-Davis,* No. 00 Civ 7634; *Hunter v. Parke-Davis,* No. 00 Civ 7635; *Love v. Parke-Davis,* No. 00 Civ 7629; *Southern v.*

*Parke-Davis,* No. 00 Civ. 7636; *Teague v. Parke Davis,* No. 00 Civ. 7630; *Armstrong v. Warner-Lambert Co.,* No. 00 Civ. 7632; and *Williams v. Parke-Davis,* No. 00 Civ. 7627. The Alabama cases are *Gray v. Warner-Lambert Co.,* No. 00 Civ. 8501, and *Gannon v. Warner-Lambert Co.,* No. 00 Civ 6069. The Texas case is *Hernandez v. Parke-Davis,* No. 00 Civ. 9033. The West Virginia case is *Mahon v. Parke-Davis & Co., Inc., [sic ]* No. 00 Civ. 9039. The Louisiana case is *Burnworth v. Nielson's Pharmacy, L.L.C.,* No. 01 Civ. 0049. The Court does not address the *Teague* case for lack of jurisdiction, *see infra* part VI.

*1. Mississippi cases*

[30] While the seven actions contain slightly different allegations, they all fail to state any legally sufficient claim for relief against the pharmacies and thus present no reasonable possibility of recovery against them. As noted above, Mississippi adheres to the learned intermediary doctrine, which holds that prescription drug manufacturers have a duty to warn only physicians of the dangers of their products. Nevertheless, plaintiffs argue that there is a possibility that they will prevail because the Mississippi Supreme Court has not yet decided whether pharmacies selling prescription drugs owe a duty to warn patients about the drugs they dispense and whether they warrant the merchantability of those drugs to their customers. Accordingly, they assert, these cases must be remanded to the Mississippi courts.

Plaintiffs would be right if the Court were bound to remand if there were *any* possibility that the Mississippi courts would rule in their favor. As noted, however, the "no possibility" standard is a misnomer. It is expressed more accurately as one of no reasonable possibility.

The Mississippi Supreme Court has been quite clear in the rationale for its adoption of the learned intermediary doctrine. Its central point is that physicians determine the proper care of the patient. Imposing a duty to warn patients would threaten to undermine reliance on the physician's informed judgment regarding the appropriateness of a particular drug for a particular patient by confronting the patient with warnings from risk averse manufacturers, which may be difficult for lay persons to understand, which often will have no relevance to the particular patient, and which in any case cannot

take account of all of the patient-specific information in the hands of the prescribing physician. In consequence, the manufacturer has a duty to warn the physician and the physician alone.

The rationale of Mississippi's learned intermediary doctrine applies four-square to the question whether pharmacies have a duty to warn of the intrinsic dangers of prescription drugs. [FN54] Such warnings would create substantially the same risks as manufacturer warnings to patients. A risk averse pharmacist would have every incentive to dispense cautions that may be uninformed, inapplicable to or misunderstood by the patient. Such cautions would be at least as likely to undermine the physician's judgment as manufacturer **289** warnings. Almost every state confronted with the question has declined to impose on pharmacists a duty to warn of intrinsic dangers of prescription drugs for precisely this reason. [FN55] Moreover, these states have not limited their holdings to failure to warn claims, but have shielded pharmacists from liability on theories of strict liability and breach of warranty as well. [FN56]

> FN54. This sentence and discussion does not extend to extrinsic dangers such as the possibility of interactions among drugs which the pharmacy knows the patient is taking at the same time, particularly where those drugs have been prescribed by different physicians.

> FN55. *See, e.g., Jones v. Irvin,* 602 F.Supp. 399, 402 (S.D.Ill.1985) (applying state law finding no liability for pharmacists because "placing these duties to warn on the pharmacist would only serve to compel the pharmacist to second guess every prescription a doctor orders to escape liability"); *Morgan v. Wal-Mart Stores, Inc.,* 30 S.W.3d 455, 466 (Tex.App.2000) (*petition for review filed,* Nov. 3, 2000) (pharmacist who accurately fills prescription not liable for harm caused by dangers inherent in drug); *Walker v. Jack Eckerd Corp.,* 209 Ga.App. 517, 521, 434 S.E.2d 63, 67 (1993), *cert. denied,* Oct. 29, 1993 ("need for preserving, without interference of third parties, trusted physician-patient relationship" counsels rule that pharmacist has no duty to warn); *Frye v. Medicare-Glaser Corp.,* 153 Ill.2d 26, 34, 178 Ill.Dec. 763, 605 N.E.2d 557, 560 (1992) ("consumers should principally look to their

prescribing physician to convey the appropriate warnings regarding drugs, and it is the prescribing physician's duty to convey these warnings to patients"); *Coyle v. Richardson-Merrell, Inc.,* 526 Pa. 208, 214, 584 A.2d 1383, 1386 (1991) ("If the manufacturer has no duty to directly warn patients of the risks of drugs, it would indeed be incongruous to hold pharmacists to such a duty in the dispensing of drugs."); *Nichols v. Central Merchandise, Inc.,* 16 Kan.App.2d 65, 67, 817 P.2d 1131, 1133 (1991) (learned intermediary doctrine shields pharmacists from liability); *McKee v. American Home Products Corp.,* 113 Wash.2d 701, 711, 782 P.2d 1045, 1050-51 (1989) (same); *Stebbins v. Concord Wrigley Drugs, Inc.,* 164 Mich.App. 204, 218, 416 N.W.2d 381, 387-88 (1987) ( "pharmacist has no duty to warn the patient of possible side effects of a prescribed medication where the medication is proper on its face and neither the physician not the manufacturer has required that any warning be given to the patient by the pharmacist"); *Ingram v. Hook's Drugs, Inc.,* 476 N.E.2d 881, 886 (Ind.Ct.App.1985) (learned intermediary doctrine shields pharmacists from liability); *Pysz v. Henry's Drug Store,* 457 So.2d 561, 562 (Fla.Dist.Ct.App.1984) (no liability for pharmacists who properly fill a lawful prescription because "it is the physician who has the duty to know the drug that he is prescribing and to properly monitor the patient"). *See also* David J. Marchitelli, *Liability of pharmacist who accurately fills prescription for harm resulting to user,* 44 A.L.R.5th 393 (1996) (concluding based on multistate survey that "courts have been reluctant to hold pharmacists liable for injuries caused by drugs accurately dispensed according to the terms of valid prescriptions").

> FN56. *E.g., Robinson v. Williamson,* 245 Ga.App. 17, 19, 537 S.E.2d 159, 161 (2000) (claims against a pharmacist for breach of warranty require a showing of negligence amounting to professional malpractice, such as failing to properly fill prescription); *In re New York County Diet Drug Litigation,* 262 A.D.2d 132, 133, 691 N.Y.S.2d 501, 502 (1st Dept.1999) (where no allegation that pharmacist failed to fill prescriptions precisely as directed, no basis to hold

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pharmacists liable under theories of negligence, breach of warranty or strict liability); *Murphy v. E.R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 679, 221 Cal.Rptr. 447, 710 P.2d 247, 252 (1985) (pharmacists sell prescription drugs only on order of doctors and therefore are immune from strict liability that would attach to ordinary sellers). *See also* Marchitelli, 44 A.L.R.5th at 393 ("In cases [where] plaintiffs have asserted claims based on negligence, strict products liability, breach of warranty, statutory provisions regulating the pharmacy profession, and pharmacy trade association standards, ... successes [have been] limited largely to cases in which the circumstances indicate that the defendant pharmacists knew or should have known that the particular plaintiff was at risk."). For a discussion of the legal deficiencies specific to breach of warranty claims against pharmacists, *see infra* notes 73--75 and accompanying text.

Plaintiffs argue that there are cases to the contrary in some jurisdictions and that Mississippi might follow them if the issue were presented. But those cases are inapplicable here. One involved a failure to warn of possible drug interactions, not of an intrinsic property of the prescribed drug, and thus raised an entirely different issue. [FN57] Another involved a failure to advise the patient of the maximum safe dosage for the medication where the prescription was silent on the subject, [FN58] and two more dealt with the unquestioning provision **\*290** of addictive drugs over lengthy periods. [FN59] In light of the existing Mississippi learned intermediary doctrine and the overwhelming majority of other states applying it to pharmacies, there is no reasonable possibility that Mississippi would recognize a cause of action against pharmacists in the circumstance of these cases. Yet even if the Court were to find it reasonably possible that Mississippi here would decline to apply the learned intermediary rule to pharmacies, plaintiffs' claims would fail on other grounds.

> FN57. *Dooley v. Everett,* 805 S.W.2d 380 (Tenn.Ct.App.1990).
>
> FN58. *Riff v. Morgan Pharmacy,* 353 Pa.Super. 21, 508 A.2d 1247 (1986), *appeal denied,* 514 Pa. 648, 524 A.2d 494 (1987).
>
> FN59. *Lasley v. Shrake's Country Club Pharmacy, Inc.,* 179 Ariz. 583, 880 P.2d

1129 (1994); *Horner v. Spalitto,* 1 S.W.3d 519 (Mo.Ct.App.1999), *application for transfer to Supreme Court denied,* Aug. 31, 1999.

[31] First, plaintiffs in all seven actions fail to state a claim for failure to warn. A failure to warn claim necessarily presupposes the defendant's knowledge of the dangers of which no warning was given. [FN60] Plaintiffs, however, allege that the defendant manufacturers and sales representatives "sought to minimize the growing awareness of the drug's harmful effects, by representing to the plaintiff, general public, physicians, *and others authorized to dispense said drug,* that Rezulin was safe ..." [FN61] and that the defendant manufacturers and sales representatives " falsely and fraudulently represented to ... pharmacists ... that despite reports from various sources that the Rezulin drug was unreasonably dangerous to its users, the drug was in fact safe ...." [FN62] Thus, the theory underlying the complaints is that the manufacturer defendants hid the dangers of Rezulin from plaintiffs, the public, physicians, distributors, and pharmacists--indeed, from everyone. Plaintiffs' allegations that pharmacists knew and failed to warn of the dangers therefore are purely tendentious. [FN63]

> FN60. *See* miss. Code Ann. § 11-1-63(f) ("In any action alleging that a product is defective because of its design ... the ... product seller shall not be liable if the claimant does not prove ... that at the time the product left the control of the ... seller ... [the seller] knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought ...").
>
> FN61. *E.g., Hill* Cpt ¶ 5C (emphasis added).
>
> FN62. *Id.*
>
> FN63. *See Louis v. Wyeth-Ayerst Pharm. Inc.,* No. 5:00 CV 120LN, at 4-5 (S.D.Miss. Sept. 25, 2000) (because "knowledge or reason to know is a necessary requisite for a claim of failure to warn," and because "the complaint, the major theme of which is the manufacturers' intentional concealment of the true risks of the drug(s) ... belies any suggestion of knowledge, or reason to know by these resident defendants ... it is plain

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
(Cite as: 133 F.Supp.2d 272)

Page 19

that the complaint on the whole ... [does not allege] a ny f actual b asis f or the c onclusion that any of the pharmacy defendants had any knowledge or any reason to know of any of the danger associated with the products ...").

[32] Second, five of the seven Mississippi complaints allege claims arising under the Mississippi Pharmacy Practice Act ("MPPA"). [FN64] They maintain that defendant pharmacies negligently dispensed Rezulin to plaintiffs without adequately reviewing the plaintiffs' "records," [FN65] consulting with plaintiffs based on that review, and warning patients of, among other things, adverse effects and interactions resulting from the use of Rezulin. [FN66] Yet plaintiffs allege also that plaintiffs' injuries resulted "from the defective product"--not clinical abuse, drug interactions, incorrect dosage, or any of the other problems defendants allegedly neglected to guard against. Hence, even if the pharmacy defendants' failure to review records of and *291 consult with plaintiffs did breach a duty, it was not this particular breach that proximately caused the injuries suffered by plaintiffs. Accordingly, plaintiffs in these five cases have failed to state a cause of action for negligence.

> FN64. miss. Code Ann. § 73-21-69 *et seq.* The five cases are *Hill, Hunter, Love, Southern,* and *Teague.* Again, the Court does not here consider *Teague* for lack of jurisdiction.

> FN65. By "records," it is unclear whether plaintiffs mean medical records (although it is doubtful a pharmacist would have access to medical records) or pharmaceutical records.

> FN66. *See, e.g., Hill* Am. Cpt. ¶ ¶ 43-45. The allegations in the other four complaints are identical.

[33][34] *Armstrong* suffers from an added defect. Plaintiffs there make no allegations specifically against the defendant pharmacies, but instead lump them together with the manufacturers and attribute the acts alleged--failure to warn, [FN67] breach of warranty, and fraud--to the "defendants" generally. But they do not connect themselves to any alleged acts of the pharmacy defendants. Under any of the theories proffered in *Armstrong,* the complaint must allege that the defendant pharmacies sold or supplied Rezulin *to plaintiffs.* Without drawing that connection, plaintiffs have no way of showing that

the pharmacy defendants' acts proximately caused the alleged injuries. [FN68] Accordingly, the *Armstrong* plaintiffs improperly joined the pharmacies as defendants.

> FN67. Plaintiffs allege also failure to use ordinary care in design and manufacture, but these claims do not apply to the pharmacy defendants.

> FN68. *See* Miss. Code Ann. § 11-1-63 (holding manufacturer or seller of product liable "in any action for damages *caused* by a product") (emphasis added). While the MPLA does not apply to actions for implied warranty, the Mississippi UCC attaches an implied warranty of merchantability and fitness to goods sold by one who is a merchant with respect to goods of that kind. *See* miss. Code Ann. § § 75-2-314, 75- 2- 315. Without showing that the pharmacist defendants actually sold Rezulin to plaintiffs, there is no cause of action for breach of implied warranty.

[35] Finally, in *Williams,* plaintiffs allege that the pharmacy defendant breached both express and implied warranties. The express warranty provisions of the Mississippi UCC provide that such a warranty arises by "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." [FN69] The "basis of the bargain" element requires a buyer to show that he or she relied upon the seller's representations when deciding whether to purchase the goods. [FN70] Reliance may be presumed when a seller makes affirmations about the product, but only when those affirmations are made "during the bargain." The presumption arises, in other words, only in instances in which the seller's words were "part of a negotiation" and thus have formed, at least in p art, t he r eason f or t he b uyer's a cceptance o f t he goods. [FN71]

> FN69. *See* miss. Code Ann. § 75-2- 313(1)(a).

> FN70. *See Fitzner Pontiac-Buick-Cadillac, Inc. v. Smith,* 523 So.2d 324, 327 (Miss.1988) (where representation made after sale, and w here plaintiff admitted that at time of purchase he did not consider goods to be under warranty, no breach because warranty "was not part of the basis of the bargain," within meaning of statute).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272                                                                    Page 20
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
**(Cite as: 133 F.Supp.2d 272)**

FN71. *See* Miss. Code Ann. § 75-2-313 comment ¶ 3.

[36] Patients w ho purchase p rescription drugs f rom pharmacists do not negotiate or bargain with the pharmacists about the suitability of the product. Even assuming a pharmacist were to make a representation about the safety of a particular drug, the representation would not form "part of the basis of t he b argain" a s r equired by the M ississippi U CC because the patient purchases the drug on the basis of discussions with his or her physician. Unlike the buyer-seller relationship in normal sales transactions, the relationship between the patient and pharmacist is a function of a regulatory system requiring that certain drugs be sold solely by prescription of a physician. It is through the pharmacy that the patient purchases the drug, but in only this sense does the pharmacy function as a "seller." The only representations regarding the intrinsic properties of the drug that form t he basis of the buyer's purchase are those of the physician. It is precisely for this reason that the learned intermediary doctrine focuses **\*292** on communications between the manufacturer and physicians, rather than patients or pharmacies; it is the physicians who make the ultimate decision on whether to prescribe the drug.

[37] Nor do plaintiffs state a claim for breach of implied warranty. The Mississippi UCC creates implied warranties of merchantability and fitness for goods sold by one who is a merchant with respect to goods of that kind. [FN72] Yet just as there is no basis for finding consumer reliance on pharmacists, so too there is no basis for adopting the view that a pharmacist is a retail merchant like any other with respect to the sale of prescription drugs. A pharmacist's sales of prescription drugs are not attributable to his or her marketing the properties of the drugs. They are attributable to physicians' prescriptions. In this sense, a pharmacist provides "a service to the doctor and [acts] as an extension of the doctor in the same sense as a technician who takes an x-ray or analyzes a blood sample on a doctor's order." [FN73] In light of the special circumstances of pharmacy sales, "it is pure hyperbole to suggest ... that the role of the pharmacist is similar to that of a clerk in an ordinary retail store." [FN74]

FN72. *See* Miss. Code Ann. § § 75-2-314, 75-2-315.

FN73. *Murphy,* 221 Cal.Rptr. 447, 710 P.2d at 251.

FN74. *Id.* (citing RESTATEMENT (SECOND) TORTS, § 402A, comment k (1963-64 Main Vol.), which exempts "sellers" of prescription drugs from strict products liability in part based on the rationale that such "sellers" do not chose the product for the consumer).

For these reasons, almost every state that has considered the issue has declined to find pharmacists liable for breach of either implied or express warranty with respect to properties of prescription drugs. [FN75] And t hese c ases make s ense from a public policy perspective: One of the purposes of imposing strict liability or liability for breach of warranty on retailers is to encourage retailers to pressure manufacturers to make safer products. Yet this goal is lost on pharmacists, who have little or no impact on a manufacturer's marketing of prescription drugs. There is therefore no reasonable basis for supposing that a cause of action exists against a pharmacist for breach of warranty under Mississippi law.

FN75. *See Coyle,* 526 Pa. at 217, 584 A.2d at 1387 (refusing to find pharmacists strictly liable for dispensing defective drugs because "[i]t is not the pharmacist on whom the public is forced to rely to obtain the products they need"); *Presto v. Sandoz Pharmaceuticals Corp.,* 226 Ga.App. 547, 551, 487 S.E.2d 70, 75 (1997), *cert. denied,* Jan. 5, 1998 ("because the patient is legally deemed to rely on the physician and not the package label for [a] warning, [plaintiffs] cannot show they were 'relying on the seller's skill or judgment to select or furnish suitable goods,' as is required to prove an implied warranty of fitness"); *Makripodis v. Merrell-Dow Pharmaceuticals,* 361 Pa.Super. 589, 593-94, 523 A.2d 374, 376 (1987) (druggist does not warrant that prescription drugs are fit for "ordinary uses," as use of drug is a decision made by physician); *Bichler v. Willing,* 58 A.D.2d 331, 333, 397 N.Y.S.2d 57, 58-59 (1st Dept.1977) (warranties not implied in sale of prescription drugs, as patient places confidence in doctor's skill, not pharmacist's); *McLeod v. W.S. Merrell Co.,* 174 So.2d 736, 739 (Fla.1965) (a transaction involving a prescription drug "is not one out of which a warranty, even by the most modern standards, would be implied");

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
(Cite as: 133 F.Supp.2d 272)

*Batiste v. American Home Products,* 32 N.C.App. 1, 11-12, 231 S.E.2d 269, 276, *review denied,* 292 N.C. 466, 233 S.E.2d 921 (1977) (a pharmacy is not liable under the UCC and general warranty principles for injury arising out of a prescription drug).

### 2. Alabama cases

[38][39] Plaintiffs in *Gray* and *Gannon* allege failure to warn, and the *Gray* plaintiffs allege also breach of the implied warranties of fitness and merchantability against the non-diverse pharmacy. [FN76] While at least one Alabama court and *293 three federal district courts applying Alabama law have ruled against plaintiff's position, [FN77] there is no definitive Alabama Supreme Court decision on the question of whether the learned intermediary doctrine shields pharmacists from liability for failure to warn. Nevertheless, given the law on pharmacist liability pronounced by state courts across the nation, [FN78] and in light of the unanimous conclusions of the Alabama decisions that have considered the issue, the Court finds no reasonable possibility that the Alabama Supreme Court would rule otherwise.

> FN76. *See Gray* Cpt ¶ ¶ 2 0, 2 3; *G annon* Cpt ¶ 5 (naming pharmacy as defendant). The *Gannon* complaint makes no allegations specifically against the pharmacy defendant, but the only possible allegation relevant to the pharmacy defendant is the failure to warn.

> FN77. *See Sanks v. Parke-Davis,* No. 00-S-1122-E (CSC) (M.D.Ala. Oct. 30, 2000); *Lansdell v. American Home Products Corp.,* No. CV-99-S-2110-NE (N.D. Ala. Oct 26, 1999); *Harrell v. Wyeth-Ayerst Labs,* No. 98- 1194-BH-M (S.D.Ala. Feb. 1, 1999); *Orr v. Wyeth-Ayerst Labs Co.,* No. 98 CV 3000-DIET (Ala. Cir. Court, Mobile County) (Aug. 2, 1998).

> FN78. *See supra* notes 55-59 and accompanying text.

Even if the Court were to assess Alabama law differently, p laintiffs' c laims nevertheless would f ail to state a cause of action for failure to warn. As indicated earlier, a failure to warn claim presupposes the defendant's knowledge of the danger. But these complaints do not allege that the pharmacies knew of the dangers. Indeed, the complaints allege that the manufacturer defendants concealed the risks. [FN79]

Moreover, the *Gannon* complaint does not even make specific allegations against the pharmacy defendant; it simply names the pharmacy in the list of defendants, never to be mentioned again. Accordingly, plaintiffs have no cause of action against the pharmacy defendants for failure to warn.

> FN79. *See Gray* Cpt ¶ 13(d) ("The Pharmaceutical Defendants engaged in fraudulent and bad faith activities in promoting the drug Rezulin in every aspect of its development, approval and marketing"); ¶ 13(3) ("The Pharmaceutical Defendants knew of the dangerous toxicity associated with Troglitazone [i.e. Rezulin] and intentionally modified and manipulated critical data to disguise Troglitazone's dangerous properties ..."); ¶ ¶ 19(d)(5) and 19(d)(7) ("The Pharmaceutical Defendants were negligent in the design, labeling, marketing, sale, testing and/or distribution of Rezulin in that they ... failed to timely warn the medical community and/or Plaintiffs regarding the risks associated with Rezulin ... [and] that the drug had not been adequately tested."). *See Gannon* Cpt ¶ 50(h) ( "[Defendants] recklessly, falsely and/or deceptively represented or knowingly omitted, suppressed or concealed facts of materiality regarding the safety and efficacy of Rezulin from prescribing p hysicians and the consuming public ....").

Neither plaintiffs nor defendants acknowledge that the *Gray* complaint makes a breach of warranty claim and therefore neither side has addressed its viability. Nevertheless, this Court finds that the claim is untenable under Alabama law. While the Alabama Supreme Court has not ruled definitively on the matter, one decision of that court makes its position clear. In *Stafford v. Nipp,* [FN80] the plaintiff sued her pharmacist for injuries she incurred as an alleged result of taking oral contraceptives for a period of nine years. The court reversed a grant of summary judgment in favor of the pharmacist because there was a factual issue as to whether the pharmacist had dispensed the contraceptives without a prescription from the plaintiff's physician. In so doing, it wrote that "[t]he manufacturer's warnings accompanying the drug at the time of its purchase and sale by the pharmacy do not, as a matter of law, shield the pharmacist from liability based on breach of warranty where the pharmacist continues to fill a prescription without a uthorization from a d octor." [FN81] The holding strongly indicates that there is no cause of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
(Cite as: 133 F.Supp.2d 272)

action under Alabama law against a pharmacy for breach of warranty in the sale of a prescription drug absent a showing that the pharmacist dispensed the drug without a valid prescription. As the *Gray* plaintiffs have made no such allegations, their claims against the pharmacy defendant will not lie.

> FN80. 502 So.2d 702 (Ala.1987).

> FN81. *Id.* at 705.

**\*294** *3. Texas, West Virginia, and Louisiana cases*

Plaintiffs in *Burnworth, Hernandez,* and *Mahon* also fail to state a sufficient claim against the non-diverse pharmacists joined in those actions.

[40] The *Burnworth* plaintiffs make claims of fraudulent misrepresentation and breach of express and implied warranties. Although the Louisiana Supreme Court has not ruled on whether a pharmacist may be liable on these theories for dispensing defective prescription drugs, Louisiana courts have held in the context of failure to warn claims that a pharmacist's duties are solely "to fill a prescription correctly and to warn the patient or to notify the prescribing physician of an excessive dosage or of obvious inadequacies on the face of the prescription which create a substantial risk of harm to the patient." [FN82] Given the limited scope of a pharmacist's duty under Louisiana law, it is unreasonable to suppose that a pharmacist, who is not required to provide any information to the patient other than whether a dosage is excessive or whether there are deficiencies on the face of the prescription, could be held liable for failing to tell patients of the harmful side-effects of Rezulin, whether that failure is couched in terms of failure to warn, breach of warranty or fraudulent misrepresentation. Accordingly, plaintiffs have no reasonable possibility of recovery against the pharmacists under Louisiana law.

> FN82. *Guillory v. Dr. X,* 679 So.2d 1004, 1010 (La.App. 3 Cir.1996) (citing *Hayes v. Travelers Ins. Co.,* 609 So.2d 1084 (La.App. 2 Cir.1992), *writ of appeal denied,* 613 So.2d 975 (La.1993); *Hendricks v. Charity Hosp. of New Orleans,* 519 So.2d 163 (La.App. 4 Cir.1987)). *See also Pilet v. Ciba-Geigy Corp.,* No. 96 CV 021, 1996 WL 89262, at \*3 (E.D. La. Feb 28, 1996); *Kinney v. Hutchinson,* 449 So.2d 696, 698 (La.App. 5 Cir.1984).

[41] The Texas plaintiff alleges that pharmacies should be held strictly liable "for manufacture and marketing, in interstate commerce, of a defective drug." [FN83] Pharmacies neither manufacture nor market prescription drugs. Moreover, as Texas law does not hold pharmacists liable for failure to warn of the risks of medications, [FN84] it would be unreasonable to suppose a different result with respect to strict products liability claims. Indeed, many of the cases upon which Texas law relies shield pharmacists from strict liability for injuries resulting from dangerous or defective medications. [FN85]

> FN83. *Hernandez* Cpt ¶ VII.

> FN84. *See Morgan,* 30 S.W.3d at 461-69.

> FN85. *See id.* (citing *Ramirez v. Richardson-Merrell, Inc.,* 628 F.Supp. 85, 86-87 (E.D.Pa.1986); *Batiste,* 32 N.C.App. at 11, 231 S.E.2d at 275; *Bichler,* 58 A.D.2d at 333-35, 397 N.Y.S.2d at 58-60).

[42] Finally, the West Virginia plaintiffs allege claims of negligence, wilfulness, wantonness, and breach of express and implied warranty against the defendant pharmacy. The West Virginia Code expressly provides that "all persons, whether licensed pharmacists or not, shall be responsible for the quality of all drugs, chemicals and medicines they may sell or dispense, with the exception of those sold in or dispensed unchanged from the original retail package of the manufacturer, in which event the manufacturer shall be responsible." [FN86] Plaintiffs have no cause of action against the pharmacist defendant under West Virginia law, as they have not alleged that the Rezulin it dispensed was removed from its original packaging.

> FN86. W. Va.Code § 30-5-12.

*C. Physicians*

Defendants allege that the plaintiffs in *Gannon* fraudulently joined a physician, Jose Oblena. That Mr. Oblena is even a physician is impossible to determine from the face of the complaint, which simply lists him as a "resident of Calhoun County, Alabama, and over the age of nineteen (19) **\*295** years." [FN87] In fact, it is impossible to determine anything about Oblena, because he is not mentioned in the complaint, other than in this introduction. He simply is included in all of the allegations against "defendants" in general.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN87. In this respect the Court relies on the assertion in plaintiffs' original brief in support of their motion to remand that Oblena is a physician. D efendants do not refute the assertion.

Plaintiffs do not come close to alleging that Oblena proximately caused their injuries or that he knew or should h ave known o f the r isks o f R ezulin. I n fact, the assertion that "[d]efendants ... recklessly, falsely and/or deceptively represented or knowingly omitted, suppressed or concealed facts of such materiality regarding the safety and efficacy of Rezulin from prescribing physicians" refutes the assumption that Oblena, a s a p hysician, h ad knowledge o f R ezulin's harmful effects.    In short, plaintiffs have failed to state any legally cognizable claim against Oblena, and this Court holds that he was joined improperly.

### II. Absence of Consent for Removal

In seven cases, [FN88] plaintiffs allege that removal was improper, as not all defendants joined in or consented to it.    The questions whether and to what extent consent is required for removal is one of federal law, to be answered with reference to Second Circuit precedent. [FN89]

FN88. The cases are *Hill v. Parke-Davis,* No. 00 Civ. 7634, *House v. Parke-Davis,* No. 00 Civ. 7628, *Hunter v. Parke-Davis,* No. 00 Civ. 7635, *H. Johnson v. Parke-Davis,* No. 00 Civ. 7631, *Southern v. Parke-Davis,* No. 00 Civ. 7636, *Teague v. Parke-Davis,* No. 00 Civ. 7630, and *Love v. Parke-Davis,* No. 00 Civ. 7629.

FN89. *See* supra note 1 and a ccompanying text.

[43] While the consent of all defendants ordinarily is required to effect removal, [FN90] "the failure of an improperly joined party to participate in the petition will not defeat removal." [FN91]   Consent thus was not required from those defendants that Warner-Lambert has shown to have been joined improperly.

FN90. *See Bradford v. Harding,* 284 F.2d 307, 309 (2d Cir.1960).

FN91. *Avon Products, Inc. v. A/J Partnership,* N o. 8 9 C iv. 3 743(PNL), 1 990 WL 422416, at * 2 (S.D.N.Y. March 1, 1990) (quoting 14A WRIGHT, MILLER & COOPER, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 2D §

3731 (1985)).    *See also McKay v. Point Shipping Corp.,* 587 F.Supp. 41, 42 (S.D.N.Y.1984) (agreement of fraudulently joined party not necessary for removal) (citing *Broidy v. State Mutual Life Assurance Co.,* 186 F.2d 490, 492 (2d Cir.1951)).

In *Villarreal v. Medico, Inc.,* [FN92] Warner-Lambert's co-defendant, Medico, Inc., removed the action to federal court.    Warner-Lambert, however, did not consent to the removal, and does not oppose plaintiffs' remand motion in that case.

FN92. No. 00 Civ. 7672.

### III. Amount in Controversy

Plaintiffs in four cases [FN93] seek remand on the ground that the requisite $75,000 amount in controversy is absent.    Defendants assert that the matter i n c ontroversy i n e ach c ase e xceeds $ 75,000 and that removal was proper.

FN93. The cases are *Armstrong v. Warner-Lambert Co.,* No. 00 Civ. 7632, *Hill v. Parke-Davis,* No. 00 Civ. 7634, *Hunter v. Parke-Davis,* No. 00 Civ. 7635, and *Southern v. Parke-Davis,* No. 00 Civ. 7636.

[44][45] Defendants, as the party invoking federal jurisdiction, carry the burden of "proving to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." [FN94] On the other hand, the focus of defendants' efforts need not be whether the plaintiff is likely to secure an amount greater than $75,000. *296 Rather, the focus is on the claim, [FN95] and while "plaintiff is the master of its claim whose monetary demand is to be accorded deference," [FN96] a plaintiff's claim must be made in good faith. [FN97]

FN94. *United Food & Commercial Workers Union v. CenterMark Properties Meriden Sq. Inc.,* 30 F.3d 298, 305 (2d Cir.1994) (internal quotations omitted).

FN95. *See Zacharia v. H arbor I sland S pa, Inc.,* 684 F.2d 199, 202 (2d Cir.1982) ("The jurisdictional determination is to be made on the basis of the plaintiff's allegations, not on a decision on the merits.").

FN96. *United Food,* 30 F.3d at 300 (internal quotations omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
**(Cite as: 133 F.Supp.2d 272)**

Page 24

> FN97. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

[46][47] To determine whether defendants' burden has been met, this Court looks not only to the complaint, but to any other evidence in the record. [FN98] Plaintiffs in *Armstrong* allege compensatory and punitive damages "in an amount in excess of the minimum jurisdictional limits of this court," [FN99] a reference to the Mississippi state court in which the action was filed. The complaint therefore does not preclude recovery in excess of $75,000. Moreover, the complaint contains allegations of "economic loss, including loss of earnings and diminution and/or loss of earning capacity," as well as "medical, health, incidental and related expenses," future expenses to be incurred from "reasonable and necessary health care, attention and services," and claim "serious and life-threatening medical conditions." [FN100] Other complaints in this MDL allege damages between $50 and $100 million [FN101] for similar injuries. In all the circumstances, the *Armstrong* complaint obviously asserts a claim exceeding $75,000.

> FN98. *United Food,* 30 F.3d at 305.

> FN99. *Armstrong* Cpt ¶ 62.

> FN100. *Armstrong* Cpt ¶ 32.

> FN101. *See* def. Mem. Ex. B (comparing injuries alleged in *Armstrong* to those alleged in *House, H. Johnson, Love* and *Teague* ). The comparison shows that the injuries alleged are substantially the same.

[48] The defendants have met their burden with respect to *Hill, Hunter,* and *Southern,* all of which allege damages in the amount of $74,000. First, the complaints themselves indicate damage claims over the minimum jurisdictional amount. They are worded identically and aver, *inter alia,* that plaintiffs have incurred expenses for "numerous diagnostic procedures;" sustained injuries that "are permanent in nature and will require future medical care and treatment which will mean future expenditures;" have suffered "great mental, emotional and physical pain and suffering and mental anguish coupled with worry depression and anxiety and psychological problems which will continue in the future;" suffered "a loss of income and wage earning capacity which will continue in the future;" and suffer "a loss of vitality and capacity to enjoy life which is also permanent in nature." [FN102] These complaints, moreover,

contain allegations of injury identical to those in *House, H. Johnson, Love* and *Teague,* all of which seek $50 million in compensatory damages and $100 million in punitive damages. [FN103] In fact, defendants point out, the original complaint in *Hill* sought these same damage amounts, and only later was amended to reduce alleged damages below the statutory minimum.

> FN102. *Hill, Hunter, Southern* Cpts ¶ 13(G).

> FN103. Notably, these actions were all filed by the same counsel. *See DeAguilar v. Boeing Co.,* 11 F.3d 55, 58 (5th Cir.1993) (defendants "easily met" their burden "by showing that many of the same plaintiffs in this action pled damages of up to $5,000,000 in other [fora] for the same injuries").

Defendants have met their burden. Plaintiffs' damages claims in these four cases are not made in good faith, a conclusion confirmed by their refusal to agree to cap their recovery below $75,000. [FN104] Accordingly, the Court finds the allegations in *Armstrong, Hill, Hunter* and *Southern* **\*297** meet the minimum statutory requirement for diversity jurisdiction.

> FN104. *See* Tr. Jan. 25, 2001 at 30.

*IV. Eleventh Amendment Basis for Remand*
[49] Plaintiffs argue that the presence of the State of Mississippi Division of Medicaid as a plaintiff in *Armstrong* defeats removal on the theory that the State of Mississippi is a party in interest in the litigation and may not be hailed into federal court against its will by virtue of the Eleventh Amendment.

The Eleventh Amendment does not bar removal. It applies only to suits "commenced or prosecuted against" a state. Assuming *arguendo* that Mississippi is the real party in interest, the fact remains that this suit was brought by-- not against-- the state. And while the Eleventh Amendment in some areas has been extended beyond its textual limits, this is not the case with respect to state plaintiffs. Rather, the heavy weight of authority holds that the Eleventh Amendment does not bar removal. [FN105]

> FN105. *See Illinois v. City of Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (where state is plaintiff in suit involving federal rights, "those suits may be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 25

brought in or removed to the [federal] courts without regard to the character of the parties.") ( citing *Ames v. Kansas,* 111 U.S. 449, 470, 4 S.Ct. 437, 28 L.Ed. 482 (1884)); *Regents of the University of Minnesota v. Glaxo Wellcome, Inc.,* 58 F.Supp.2d 1036, 1040 (finding majority of cases have found no bar to removal); *New York v. Citibank, N.A.,* 537 F.Supp. 1192, 1197 (S.D.N.Y.1982) ("it is clear that an action can be removed notwithstanding the fact that a state is a plaintiff") (citing *Ames;* 1A J. MOORE & J. WICKER, MOORE'S FEDERAL PRACTICE § 0.160, at 192 (2d ed.1981)). *Contra, California v. Steelcase, Inc.,* 792 F.Supp. 84 (C.D.Cal.1992).

### *V. The* Teague *Case*

[50] Plaintiffs in *Teague* filed a motion to remand in the Southern District of Mississippi, which was granted by Judge Lee on October 10, 2000 and filed with the clerk on October 11. The Multidistrict Panel's order transferring *Teague* to this Court was entered by the Clerk of this Court on October 10, but not received by the Southern District of Mississippi until October 16. There is, in consequence, a question as to whether the order transferring *Teague* to this Court took effect, and thus deprived the Mississippi c ourt o f j urisdiction, b efore Ju dge Lee's order became effective.

According to 28 U.S.C. § 1407(c)(ii), a transfer order is effective when it is filed in the office of the clerk of the transferee court. [FN106] Accordingly, the transfer of *Teague* became effective on October 10, the date it was file-stamped as received, unless Judge Lee previously had remanded it to state court. [FN107]

> FN106. *See also In re Copper Antitrust Lit.,* No. 1303, C.A. No. 1:98-4067, 3:99-377, 1999 U.S. Dist. LEXIS 20178(JFN) (JPML Dec. 22, 1999) (vacating order issued by transferor court one day after transferee court clerk's office stamped the transfer order "rec'd/filed"); JPML Rule 1.5.

> FN107. *See* def. Compend. of Auth. Ex. 31. (copy of docket sheet indicating date of filing of transfer order).

Plaintiffs argue that Judge Lee's order became effective on the day it was signed, October 10. They rely on *Weedon v. Gaden* [FN108] and *United States v. Hunt.* [FN109] But *Weedon* merely holds that the

entry of judgment by the clerk is not an adjudication, and *Hunt* involved state rules of actual notice and did not concern the standard for when an order is effective.

> FN108. 419 F.2d 303 (D.C.Cir.1969).

> FN109. 513 F.2d 129 (10th Cir.1975).

Defendants, for their part, point to Rule 58 of the Federal Rules of Civil Procedure, which states that a judgment is final only upon entry on the docket by the clerk of court [FN110] and argue that the Mississippi *298 remand order therefore did not become effective before the transfer order. However, "judgment" is defined in Rule 54(b) as "a decree and any order from which an appeal lies." [FN111] As an order remanding to a state court based on lack of subject matter jurisdiction is unappealable, [FN112] Judge Lee's order was not a "judgment" and therefore was unaffected by Rule 58. Defendants point also to *In re American Precision Vibrator Co,* [FN113] where the Fifth Circuit held that the bankruptcy court had retained jurisdiction of the petition because an order dismissing the petition never had been docketed. [FN114] But the case is distinguishable because the dismissal order was appealable and therefore governed by Rule 58.

> FN110. *See* fed. R. Civ. P. 58 ("a judgment is effective only when ... entered as provided in Rule 79(a)"). fed. R. Civ. P. 79(a) in turn requires the clerk to docket judgments.

> FN111. *See* Fed. R. Civ. P. 54(b).

> FN112. *See* 28 U.S.C. § 1447(d). Although the Supreme Court has limited Section 1447(d) to remand orders based on a timely raised defect in removal procedure or lack of subject matter jurisdiction, *see Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995), Judge Lee remanded *Teague* based on lack of subject matter jurisdiction. His order therefore was unappealable.

> FN113. 863 F.2d 428 (5th Cir.1989).

> FN114. *Id.* at 429.

[51][52] As the foregoing makes clear, there is no controlling or, for that matter, persuasive authority on either side of the argument. When a party seeking remand challenges the jurisdictional predicate for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 F.Supp.2d 272
133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028
(Cite as: 133 F.Supp.2d 272)

removal, "the burden falls squarely upon the removing party to establish its right to a federal forum by 'competent proof.' " [FN115] Because the defendants have failed to meet that burden here, this Court is bound to resolve the issue in favor of the plaintiffs.

> FN115. *R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 655 (2d Cir.1979) (citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)).

### *VI. Conclusion*

The motions to remand in *Hill,* No. 00 Civ. 7634, *Hunter,* No. 00 Civ. 7635, *Southern,* No. 00 Civ. 7636, *Armstrong,* No. 00 Civ. 7632, *H. Johnson,* No. 00 Civ. 7631, *House,* No. 00 Civ. 7628, *Gray,* No. 00 Civ. 8501, *Gannon,* No. 00 Civ. 6069, *Love,* No. 00 Civ. 7629, *Burnworth,* No. 01 Civ. 0049, *Mahon,* No. 00 Civ. 9039, *Hernandez,* No. 00 Civ. 9033, *Frost,* No. 00 Civ. 9131, and *Williams,* No. 00 Civ. 7627, are denied. The motion to remand in *Villarreal,* No. 00 Civ. 7072, is granted. The Court does not consider the motion in *Teague,* No. 00 Civ. 7630, for lack of jurisdiction; accordingly, the remand order issued by Judge Lee stands. The Clerk will close that case. Defendants' motions in *Hill,* No. 00 Civ. 7634, *Hunter,* No. 00 Civ. 7635, *Southern,* No. 00 Civ. 7636, *House,* No. 00 Civ. 7628, and *H. Johnson,* No. 00 Civ. 7631, to strike the affidavit of Calvin Ramsey are denied.

SO ORDERED.

133 F.Supp.2d 272, Prod.Liab.Rep. (CCH) P 16,028

### **Motions, Pleadings and Filings (Back to top)**

• 2001 WL 34133941 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Pec's Petition for an Order Securing an Equitable allocation of Counsel Fees and Costs for Common Benefit Work (May. 14, 2001)

• 2001 WL 34133949 (Trial Filing) Pretrial Order No. 19 (May. 14, 2001)

• 2001 WL 34133975 (Appellate Petition, Motion and Filing) Pec%7Ds Petition for an Order Securing an Equitable Allocation of Counsel Fees and Costs for Common Benefit Work (May. 14, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2002 WL 31852826 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,506
**(Cite as: 2002 WL 31852826 (S.D.N.Y.))**

# H

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
In re: REZULIN PRODUCTS LIABILITY
LITIGATION (MDL No. 1348)
**No. 00 Civ. 2843(LAK).**

Dec. 18, 2002.

Diabetes patients who had used prescription
medication later withdrawn from market brought
multiple personal injury actions against drug's
manufacturer, pharmacies, physicians, and others.
Actions were removed on diversity grounds, then
consolidated for pretrial proceedings by Multidistrict
Litigation panel. On reconsideration of its initial
denial of patients' remand motions, 2002 WL
31507635, the District Court, Kaplan, J., held that:
(1) plaintiffs asserting claims against non-diverse
defendants were misjoined with other plaintiffs, and
(2) plaintiffs failed to state claim against non-diverse
physician defendants.

Motions denied.

See also 168 F.Supp.2d 136.

West Headnotes

**[1] Removal of Cases** 📄➔36
334k36 Most Cited Cases
Where removing party contends that joinder of non-
diverse party is fraudulent because that party's claim
is insufficient as matter of law, that party's citizenship
will be disregarded only where there is no reasonable
possibility that relevant state's highest court would
uphold sufficiency of complaint. 28 U.S.C.A. §
1332.

**[2] Federal Civil Procedure** 📄➔387.1
170Ak387.1 Most Cited Cases
Plaintiffs asserting personal injury claims against
non-diverse prescribing physicians in connection
with diabetes drug later withdrawn from market and
toxic tort claims against diverse manufacturer were
misjoined with tort claims asserted by other plaintiffs
who did not have patient relationship with physicians

in question. Fed.Rules Civ.Proc.Rule 20(a), 28
U.S.C.A.

**[3] Health** 📄➔813
198Hk813 Most Cited Cases
Under Mississippi law, diabetes patients' conclusory
allegation that physicians failed to warn them of risks
of taking drug was insufficient to provide physicians
adequate notice of claim; there was no allegation as
to whether failure was to warn of concealed risks,
known risks, or both, and how and when physicians
came to be aware of any such risks.

**[4] Removal of Cases** 📄➔107(4)
334k107(4) Most Cited Cases
Federal court, in deciding motion to remand removed
case, must look to allegations in complaint, rather
than to plaintiffs' wishful speculation as to what
allegations might be made in amended complaint
following discovery.

PRETRIAL ORDER NO. 121

KAPLAN, J.

**\*1** This Document Relates to: 02 Civ. 4568, 02 Civ.
4569

(Motion to Remand in *Blakeney* and *Kaho*--
Reconsideration)
On November 12, 2002, this Court adopted the
report and recommendation of Magistrate Judge Katz
with respect to plaintiffs' motion to remand in these
actions, noting that no objections had been filed. It
subsequently has come to the Court's attention that
objections were timely filed, although the Clerk's
office failed to docket them until November 14,
2002. In view of the Clerk's office's failure, the Court
treats the objections as embracing a motion for
reconsideration, grants that motion, and considers the
objections *de novo*.

[1] As this Court held in *Rezulin I*, a claim of
fraudulent joinder will prevail only if the removing
defendant "demonstrate[s], by clear and convincing
evidence, either that there has been outright fraud
committed in the plaintiff's pleadings, or that there is
no possibility, based on the pleadings, that a plaintiff
can state a cause of action against the non-diverse
defendants in state court." [FN1] It went on to hold,
however, that where the removing party contends that

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2002 WL 31852826 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,506
**(Cite as: 2002 WL 31852826 (S.D.N.Y.))**

joinder of a non-diverse party is fraudulent because the claim is insufficient as a matter of law, the citizenship of the non-diverse party will be disregarded only where there is no "reasonable possibility that the relevant state's highest court would rule in favor of the plaintiff were the issue presented to it." [FN2] While Judge Katz quoted only the second of these passages, plaintiffs' contention that he did not apply the correct standard in reaching his recommendation is without merit. Their further suggestion that the rule he applied would "allow ... judges sitting in motion hearings to decide the reasonableness of the Plaintiffs' claims" and that this would be "tantamount to ... granting a Rule 56 Motion without being presented with any evidence from either side" (Obj. at 3) borders on the preposterous. All that this Court, or Judge Katz, has said is that where the propriety of considering the citizenship of a non-diverse party turns on the sufficiency of the claim against it as a matter of state law, that citizenship will be considered unless there is no reasonable possibility that the state court would uphold the sufficiency of the complaint. Plaintiffs offer no responsible basis for supposing that the law is otherwise. Indeed, their assertion that the non-diverse party's citizenship should matter as long as there is *any possibility,* no matter how small, that a state court would approve the legal sufficiency of the claim against it was flatly rejected in *Rezulin I* for reasons that continue to make perfect sense. [FN3]

> FN1. *In re Rezulin Prods. Liab. Litig.,* 133 F.Supp.2d 272, 279-80 (S.D.N.Y.2001) (internal quotation marks and footnote omitted).
>
> FN2. *Id.* at 280.
>
> FN3. *Id.* at 280 n. 4.

[2] With respect to plaintiffs' claim that the presence of non-diverse physician defendants defeats diversity, Judge Katz found that, in each action, the physician-defendant is alleged to have treated only one of the plaintiffs. Thus, Judge Katz recommended that the motions for remand of all plaintiffs except Jonnie S. Newell and Juanita Kaho, the two plaintiffs who pled a physician-patient relationship, be denied. This recommendation was appropriate because the plaintiffs with patient relationships with defendant physicians are misjoined with the other plaintiffs. [FN4]

> FN4. *See In re Rezulin Prods. Liab. Litig.,* 168 F.Supp.2d 136, 148 (S.D.N.Y.2001)

*("Rezulin II"* ).

**\*2** There is one respect, however, in which the Court finds merit in plaintiffs' objections, although the motions to remand ultimately should be denied. Judge Katz recommended that the motions to remand of the two plaintiffs who allege a physician-patient relationship with the defendant physicians be denied because, given the plaintiffs' allegation that pharmaceutical representatives "fraudulently represented to physicians ... [that] the drug was in fact safe," the physicians could not have breached any duty to warn patients of a risk of which they were not aware. He therefore found that there was no reasonable possibility that the plaintiffs could recover under state law.

This Court reaches the same conclusion, albeit by a different path. The fact that plaintiffs' pleadings may be inconsistent is not fatal. Parties may plead in the alternative and inconsistently pursuant to Fed. R. Civ. P. 8(e)(2). [FN5] In any case, each plaintiff's assertion that his or her physician breached his "duty to warn patients of known risks of taking the drug Rezulin" [FN6] is not necessarily refuted by other allegations in the complaints that pharmaceutical representatives "falsely and fraudulently represented to physicians ... [that] the drug was in fact safe ... when the Defendants knew or should have known that Rezulin was unsafe." [FN7] For example, these allegations are not inconsistent to the extent that any failure to warn related to information contained in the Rezulin package inserts. [FN8]

> FN5. These cases were commenced in Mississippi state courts. As Miss. R. Civ. P. 8 is substantially identical to Fed. R. Civ. P. 8, there is no need to determine which governs here.
>
> FN6. Blakeney Cpt. ¶ 39; Kaho Cpt. ¶ 25.
>
> FN7. Blakeney Cpt. ¶ 58(c); Kaho Cpt. ¶ 45(c). Plaintiffs are cautioned, however, that "[t]he right to plead alternatively or hypothetically does not sanction deviations from the obligation to plead comprehensibly. Indeed, it is in the context of alternative and hypothetical pleading that a party must exercise the greatest care so as not to transgress the requirement in Rule 8(e)(1) of simple, direct, and concise pleading." 5 Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1282, p. 532 (1990).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN8. Under Mississippi law, a package insert i s " some e vidence o f the s tandard o f care." *Thompson v. Carter*, 5 18 S o.2d 609, 613 (Miss.1987).

[3] Nevertheless, plaintiffs' claims against the physician defendants fail for the fundamental reason that they do not provide the physician defendants sufficient notice of the claims against them. Although pleading standards were relaxed with the adoption of the Federal Rules of Civil Procedure and their substantial codification by Mississippi and other states, a pleading nevertheless must "advise the other party of the event being sued upon." [FN9] Furthermore, the appropriate level of generality for a pleading varies depending upon the nature of the claim at issue. [FN10] In these cases, and hundreds of others like them that have been consolidated here for pretrial proceedings by the Judicial Panel on Multidistrict Litigation, the main tenor of plaintiffs' complaints is that Rezulin was an unsafe drug and that the manufacturers concealed its risks from the public, physicians, and others. In this context, an entirely conclusory allegation that the physicians failed to warn of the risks of Rezulin is insufficient. [FN11] The pleadings shed no light on such matters as whether the defendant physicians allegedly failed to warn of concealed risks, known risks, or both, and how and when the physicians came to be aware of any such risks. Absent such information, plaintiffs cannot be said to have provided the defendant physicians adequate notice of the claims against them. [FN12]

FN9. 5 Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1202, at 69 (1990).

FN10. 5 *id.* § 1218, at 185.

FN11. *See, e.g., Rodriguez v. Beechmont Bus Svce., Inc.*, 173 F.Supp.2d 139, 145 (S.D.N.Y.2001) ("Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains are insufficient as a matter of law."); *Strickland v. Brown Morris Pharmacy Inc.*, Civ. A. No. 96-815, 1996 WL 5 37736, at *2 ( E.D.La. Sept.20, 1 996) (conclusory allegations that defendant knew or should have known that drug was dangerous do not warrant remand).

FN12. *Strickland*, 1996 WL 537736, at *2.

Nor are plaintiffs incapable of providing clearer notice of their claims against the physician defendants. Plaintiffs know when they were treated by the physicians, what the physicians told them, and what information concerning the risks of Rezulin was available to medical professionals at the relevant time. But they have not included any such information in their complaints.

**\*3** [4] Plaintiffs' argument that their motions to remand should be granted because future discovery may reveal more information about the relationship between the physicians and the manufacturers has no merit. As this Court previously has stated, "a court in deciding a motion to remand must look to the allegations in the complaint, rather than to plaintiffs' wishful speculation as to what allegations might be made in an amended complaint following discovery." [FN13] Accordingly, there is no reasonable possibility, based on the pleadings, that plaintiffs Newell and Kaho will succeed with their medical malpractice claims against the nondiverse physicians.

FN13. *Rezulin II*, 168 F.Supp.2d at 141.

Plaintiffs' complaints can be construed to plead additional claims against the physicians for negligent misrepresentation and breach of warranty. Plaintiffs' negligent misrepresentation claims are insufficient because, having alleged fraudulent intent, plaintiffs must comply with Rule 9(b). [FN14] Furthermore, plaintiffs have failed to allege, as Mississippi law requires, that a misrepresentation was made to them, as opposed to others. [FN15] Plaintiffs' breach of warranty claims, alleged against the "defendants" in general, likewise fail against the physicians because plaintiffs do not allege that the physicians sold Rezulin or were " merchant[s] with r espect t o g oods of that kind," as is required for liability under Mississippi's Uniform Commercial Code. *Rezulin I*, 133 F.Supp.2d at 286 (quoting Miss.Code Ann. § 75-2- 314).

FN14. *Rezulin I*, 133 F.Supp.2d at 285.

FN15. *Id.* at 285-6 (citing *Armona v. Smith*, 749 So.2d 63, 67 (Miss.1999).

Finally, the Court notes that plaintiffs, correctly, do not q uarrel with Ju dge K atz's c onclusions r egarding the pharmacy defendants. As for the pharmacy representative defendants, plaintiffs' objections are without merit.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 31852826 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,506
**(Cite as: 2002 WL 31852826 (S.D.N.Y.))**

The plaintiffs' motions to remand are denied.

SO ORDERED.

Not Reported in F.Supp.2d, 2002 WL 31852826
(S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,506

### Motions, Pleadings and Filings (Back to top)

• 2004 WL 2973888 (Trial Motion, Memorandum
and A ffidavit) D efendants' M emorandum o f Law i n
Support of Their Motion for Summary Judgment as
to Claims for Certain Side-Effects Warned About in
the Adverse Reactions Table of the Rezulin Labeling
(Jan. 06, 2004)

• 2003 WL 23951442 (Trial Motion, Memorandum
and Affidavit) Defendants' Reply Memorandum of
Law in Support of Their Motion for Summary
Judgment as to Non-Liver-Related Claims Asserted
by Plaintiff Orlean Maxwell (Nov. 07, 2003)

• 2003 WL 23951439 (Trial Motion, Memorandum
and A ffidavit) D efendants' M emorandum o f Law i n
Support of Their Motion for Summary Judgment as
to Non-Liver-Related Claims (Aug. 07, 2003)

• 2001 WL 34133949 (Trial Filing) Pretrial Order
No. 19 (May. 14, 2001)

• 2001 WL 34133975 (Appellate Petition, Motion
and Filing) Pec%7Ds Petition for an Order Securing
an Equitable Allocation of Counsel Fees and Costs
for Common Benefit Work (May. 14, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21276425 (S.D.N.Y.)
**(Cite as: 2003 WL 21276425 (S.D.N.Y.))**

Page 1

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re: REZULIN PRODUCTS LIABILITY
LITIGATION (MDL No. 1348)
**No. MDL 1348, 00 Civ. 2843(LAK).**

June 2, 2003.

PRETRIAL ORDER NO. 150

KAPLAN, J.

*1 This Document Relates to: 02 Civ. 6812(LAK)

(Motions to Remand--*Lusteck* )
This action was brought in a Mississippi state court,
removed to federal court on the basis of diversity
notwithstanding the presence of a non-diverse
physician defendant, and transferred to this Court.
Plaintiff moves to remand on the ground that the
physician defendant deprives the Court of complete
diversity.

The complaint against the physician is for medical
malpractice (count II) and breach of express and
implied warranty that Rezulin was safe and effective
(counts V and VI). Counts V and VI are asserted also
against the drug's manufacturer. The alleged
malpractice was the physician's alleged negligent
failures to (1) conduct liver and cardiac monitoring
even after physicians were warned of the risk of liver
and cardiac damage, (2) warn plaintiff of the risks
associated with Rezulin and (3) diagnose plaintiff's
liver dysfunction in time to prevent irreparable
injury. (Cpt ¶ ¶ 26-28)

Magistrate Judge Katz, in a report and
recommendation dated April 28, 2003, concluded
that plaintiff had no meaningful possibility of success
against the doctor on counts V, VI, and the failure to
warn and monitor claims in count II, but thought the
failure to diagnose malpractice claim sufficient, albeit
misjoined with the claims against the manufacturers
and other defendants in this case. He therefore

recommended severance and remand of the
malpractice claim to the state court, that the doctor be
dropped as a defendant here, and that the motion to
remand otherwise be denied. Plaintiff objects,
arguing that the physician was joined properly, that
the sufficiency of the malpractice claim against him
destroys diversity, that the physician in any case did
not join in the removal as required, and that the entire
action therefore should be remanded.

Everything turns on the propriety of the joinder of
the physician. The malpractice claim here is based in
substance on the physician's failure to diagnose
plaintiff's alleged liver dysfunction. The breach of
warranty and other claims go principally to the safety
and efficacy of the drug and have little if anything to
do with the malpractice claim. For the reasons set
forth by the Magistrate Judge, the joinder of the
malpractice claim with the others was inappropriate
because the claims do not both involve common
questions of law or fact and assert "joint, several, or
alternative liability ... arising from the same
transaction, occurrence, or series of transactions or
occurrences." Fed.R.Civ.P. 20. *Accord, e.g., Lee v.
Mann,* 2000 WL 724046, at *2 (Va.Cir.Ct. Apr. 5,
2000) (claims against drug manufacturer and
malpractice claim against prescribing physician did
"not arise out of the 'same transaction or occurrence"
'). Plaintiff has no meaningful prospect of success on
the other claims against the physician.

Accordingly, the Court adopts the report and
recommendation of the Magistrate Judge. The motion
to remand is granted to the extent, and only to the
extent, that Count II of the complaint is severed and
remanded to the Court from which it was removed.
Dr. Evans is dropped as a defendant on the balance of
the complaint. The motion to remand is denied in all
other respects.

*2 SO ORDERED.

Not Reported in F.Supp.2d, 2003 WL 21276425
(S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2973888 (Trial Motion, Memorandum
and Affidavit) Defendants' Memorandum of Law in
Support of Their Motion for Summary Judgment as

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21276425 (S.D.N.Y.)
**(Cite as: 2003 WL 21276425 (S.D.N.Y.))**

to Claims for Certain Side-Effects Warned About in the Adverse Reactions Table of the Rezulin Labeling (Jan. 06, 2004)

• 2003 WL 23951442 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment as to Non-Liver-Related Claims Asserted by Plaintiff Orlean Maxwell (Nov. 07, 2003)

• 2003 WL 23951439 (Trial Motion, Memorandum and A ffidavit) D efendants' M emorandum o f Law i n Support of Their Motion f or S ummary Judgment as to Non-Liver-Related Claims (Aug. 07, 2003)

• 2001 WL 34133941 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Pec's Petition for an Order Securing an Equitable allocation of Counsel Fees and Costs for Common Benefit Work (May. 14, 2001)

• 2001 WL 34133949 (Trial Filing) Pretrial Order No. 19 (May. 14, 2001)

• 2001 WL 34133975 (Appellate Petition, Motion and Filing) Pec%7Ds Petition for an Order Securing an Equitable Allocation of Counsel Fees and Costs for Common Benefit Work (May. 14, 2001)

•          1:00cv02843 ___  ___  ___(Docket)
(Apr. 13, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN − 5 2002

at __2__ o'clock and __47__ min)__ M.
WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DONNA MEIFERT JONES, ETC., ET AL., | CIVIL NO. 02-00186 SOM-LEK |
| Plaintiffs, | |
| vs. | |
| MERCK & COMPANY, INC., ET AL., | |
| Defendants. | |

## FINDINGS AND RECOMMENDATION
## DENYING PLAINTIFF'S MOTION TO REMAND

On November 23, 2001, Plaintiff Donna Meifert Jones,
individually and as Personal Representative of the Estate of
Frank Newton Jones, Jr., also known as Frank N. Jones, deceased,
("Plaintiff"), filed a Complaint in the Circuit Court of the
First Circuit State of Hawaii against Defendant Merck & Company,
Inc. ("Defendant"), alleging inter alia, strict liability,
negligence, negligence per se, breach of implied warranty, breach
of express warranty, deceit by concealment, negligent
misrepresentation, violation of the Uniform Deceptive Trade
Practices Act, Chapter 481A, Hawaii Revised Statutes ("HRS"), HRS
§ 480-2, and punitive damages. On March 28, 2002, Defendant

filed a Notice of Removal in the United States District Court for the District of Hawaii pursuant to 28 U.S.C. § 1441(a).

On April 26, 2002, Plaintiff filed the instant Motion to Remand, which District Judge Susan Oki Mollway referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(B) on April 29, 2002. Defendant filed its opposition on May 17, 2002, and Plaintiff replied on May 23, 2002. Pursuant to Local Rule 7.2(d), the Court finds this matter suitable for disposition without a hearing. After careful consideration of the parties' submissions and arguments, this Court FINDS that the action was properly removed from state court, and thus, RECOMMENDS that Plaintiff's motion be DENIED in its entirety.

## DISCUSSION

Defendant removed this case from state court on the basis of diversity jurisdiction. A federal district court has original jurisdiction over all civil actions involving citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs. See 28 U.S.C. § 1332(a). When federal subject matter jurisdiction is predicated on diversity of citizenship, complete diversity must exist between the opposing parties. See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 373-74 (1978).

Plaintiff now contends that discovery has revealed four

2

distributors who "may have distributed Vioxx in Hawaii." (Pl.'s Mem. in Supp. at 4.) While Plaintiff admits that further discovery is needed to ascertain the nature and extent of Vioxx distribution in Hawaii, Plaintiff asserts an intent to add these distributors to the action. Further, Plaintiff suggests that because these distributors "are licensed to do business in the State of Hawaii," (Id.) the addition of these distributor defendants will destroy diversity jurisdiction and divest the Court of its subject matter jurisdiction.

It is well-established that the Court's diversity jurisdiction is determined at the time the notice of removal is filed. See St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289 (1938). Furthermore, under the removal statute, the citizenship of defendants sued under fictitious names is to be explicitly disregarded for purposes of diversity removal. See 28 U.S.C. § 1441(a).[1]

Plaintiff is a citizen of the State of Hawaii. Defendant, whose principal place of business is in the State of

---

[1] The statute states, in pertinent part, "[f]or purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(a). This language was added in 1988 under the Judicial Improvements and Access to Justice Act, in order to curtail the practice of naming fictitious defendants merely to destroy diversity. See Wright & Miller, Federal Practice & Procedure § 3642.

3

New Jersey, is a citizen of New Jersey. It is undisputed, therefore, that complete diversity exists between Plaintiff and Defendant and that the Court has diversity jurisdiction in this action. Moreover, given the explicit language of the removal statute, the Court must necessarily disregard the citizenship of the unnamed defendants.[2]

Nevertheless, the Court is convinced that mere allegations that the unnamed defendants may be residents of Hawaii without more, is insufficient to destroy diversity. Plaintiff's papers seem to suggest that further discovery is necessary to ascertain the identity and citizenship of the unnamed defendants. Under the circumstances, therefore, there is no specific reason to believe that the unnamed defendants will prove to be Hawaii citizens.

Accordingly, and based on the clear language of 28 U.S.C. § 1441(a), this Court FINDS that removal was proper, and thus, RECOMMENDS that Plaintiff's Motion to Remand be DENIED.[3]

---

[2] While Plaintiff's Memorandum in Support identified the distributors as McKesson Corporation, McKesson Drug Company, Amerisource Bergen and R. Weinstein, Inc., Plaintiff's Reply states "Plaintiff does not have the identity of the Hawaii distributor of Vioxx." (Pl.'s Reply at 2.) Accordingly, and given that Plaintiff has not moved to amend the Complaint to include these defendants, the Court treats these defendants as unnamed.

[3] Defendant aptly cites to Newcombe v. Adolf Coors Co., 157 F.3d 686 (9th Cir. 1998), and points out that the "proper

4

### CONCLUSION

For the foregoing reasons this Court FINDS and RECOMMENDS that Plaintiff's Motion to Remand be DENIED.

IT IS SO FOUND AND RECOMMENDED.

DATED: Honolulu, Hawaii:    _____ June 5, 2002 _____.


_____
LESLIE E. KOBAYASHI
United States Magistrate Judge


DONNA MEIFERT JONES, ETC., ET AL. V. MERCK & COMPANY, INC., ET AL; CIVIL NO. 02-00186 SOM-LEK; FINDINGS AND RECOMMENDATION DENYING PLAINTIFF'S MOTION TO REMAND
_____

procedure" would have been for Plaintiff to first seek to add the unnamed defendants and then to move to remand.  Id. at 691 n.2. This Court agrees, and further notes that the ruling herein is consistent with the rationale set forth in Newcombe.  See id. at 690 ("[T]he district court was correct in only considering the domicile of the named defendants . . . . [Plaintiff] filed this suit knowing that there was complete diversity among the named defendants and that removal was a real possibility.").

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

SEP 25 ...

MARGIE LOUIS, PEARLIE COX, MARY
DOTTOREY, OTIS ABRON, GLORIA LOTT,
EARL PIGG, MARION WEATHERS AND KATHY
ROBERTS                                                          PLAINTIFFS

VS.                                    CIVIL ACTION NO. 5:00CV102LN

WYETH-AYERST PHARMACEUTICALS, INC. F/K/A
WYETH-AYERST LABORATORIES, A DIVISION OF
AMERICAN HOME PRODUCTS, INC.; WYETH
LABORATORIES. INC., A.H. ROBBINS COMPANY,
INC., AMERICAN HOME PRODUCTS, INC.
POLK'S DISCOUNT DRUGS, INC.; ECONOMY DRUG
STORE, INC.; BRANDON DISCOUNT DRUGS, INC.;
KING'S DISCOUNT DRUGS, INC.; FORREST BRATLEY,
JR.; SUSAN BODNE; CHRIS L. LUCKETT; LESTER A.
LALA; CHARLES CARTER, JR.; GINA SABBATINI;
SCOTT M. BOONE; VICTOR E. RUSSELL; JIMMY ROBINSON,
JR.; JEWELL E. NORMAN; MCR PHARMACEUTICALS INC.,
A/K/A AMERICAN PHARMACEUTICALS, INC, A/K/A
MCR/AMERICAN PHARMACEUTICALS, INC.; JONES
MEDICAL INDUSTRIES, A/K/A ABANA PHARMACEUTICALS,
INC.; QUALITEST PRODUCTS, INC.; SEATRACE
PHARMACEUTICALS. INC.; EON LABS MANUFACTURING,
INC.; FISONS CORPORATION; GATE PHARMACEUTICALS;
INTERNEURON PHARMACEUTICALS, INC.; MEDEVA
PHARMACEUTICALS, INC.; RUGBY LABORATORIES,
INC.; SMITHKLINE BEECHAM CORPORATION;
AND ECKERD CORPORATION                                          DEFENDANTS

## ORDER

This cause is before the court on the motion of plaintiffs to
remand this case to the Circuit Court of Claiborne County,
Mississippi. Defendants have responded in opposition to the motion
and the court, having considered the memoranda of authorities
submitted by the parties in the light of plaintiffs' complaint in
this cause, concludes for reasons to follow that plaintiffs' motion
should be denied.

Plaintiffs, like many others throughout this country, brought
this action to recover damages for injuries they claim to have

suffered as a result of their taking the diet drugs Pondimin, Redux (also known by fenfluramine and dexfenfluramine, respectively) and/or Phentermine.  The plaintiffs herein, Mississippi residents, filed their suit in Mississippi state court, and in addition to suing the manufacturers of these drugs, all of which are of diverse citizenship from plaintiffs, and another diverse company, Eckerd Corporation, which is alleged to have distributed, marketed and promoted these drugs, plaintiffs sued a number of Mississippi pharmacies (Polk's Discount Drugs, Inc., Economy Drugs of Greenwood, Inc., Liberty Drug Store, Brandon Discount Drugs, Inc. and King's Discount Drugs) and a multitude of other Mississippi residents (Forest Bratley, Jr., Susan Bodne, Chris L. Luckett, Lester A. Lala, Charles Charter, Jr., Gina Savatini, Scott M. Stone, Victor E. Russell, Jimmy L. Robinson, Jr. and Jewell E. Herman) who were employed as sales representatives for one or other of the defendant drug companies.  Defendants, contending that all of the Mississippi defendants were fraudulently joined, removed the case to this court on the basis of diversity of citizenship, following which plaintiffs filed their present motion to remand.

The standard for evaluating claims of fraudulent joinder is, of course, well known by all of the parties, as well as by the court; and the court, having given due consideration to that standard on the basis of the complaint filed by plaintiffs in this cause, concludes that plaintiffs have no possibility of recovery against any of the nondiverse defendants.

2

The complaint filed by plaintiffs in this cause includes, so far as the court can tell, ten counts, numbered and headed as follows:

        Count I:    Strict Product Liability
        Count II:   Failure to Warn
        Count IV:   Negligence
        Count I:    Strict Product Liability (Defective Design) Against
                    the AHP Defendants
        Count II:   Strict Product Liability (Failure to Warn) Against
                    All Defendants
        Count III:  Negligence Against All Defendants
        Count IV:   Fraud and Misrepresentation Against All Defendants
        Count V:    Wantoness
        Count VI:   Fraud, Misrepresentation and Suppression
        Count VI:   Conspiracy

A premise of each count that can reasonably be construed as having been asserted against the resident pharmacy defendants[2] is knowledge on the part of these defendants of the dangers posed by

---

[1]    It appears that plaintiffs may have taken two complaints from other cases and attempted to combine them into a single complaint, amending the content as needed for this case.  That would explain why they have asserted their causes of action in this duplicate fashion, and why the complaint begins on page one, continues through page 19 (skipping page 18), and then picks up on a new and different page 2 and continues on through page 64, and contains two sections (each somewhat different) for each of the headings, "Parties", "Jurisdiction" and "General Allegations"/"Factual Allegations."

[2]    Plaintiffs' claims of wantoness and conspiracy, while nominally asserted against "defendants", is clearly not directed toward the pharmacy defendants, as the substance of these counts utterly belies any conclusion that these defendants are a target of these counts.  See Eadon v. RJR Nabisco Inc., No. 98-30942, 2000 WL 1115424, at *7 (5ᵗʰ Cir. Aug. 16, 2000) (noting that "[w]hile the amended complaint does often use the word 'defendants,' frequently it is evident that such usage could not be referring to the 'Tobacco Wholesalers.'").

5

the subject drugs.[2]  Yet, and notwithstanding the fact that the
complaint in places may allege or allude generally to knowledge
possessed by the "defendants,"[4] it is plain that the complaint on
the whole cannot reasonably and legitimately be construed as
alleging any factual basis for the conclusion that any of the

---

[2]      Generally speaking, under Mississippi's Products
Liability Act, Miss. Code Ann. § 11-1-63, liability of a product
seller may be based on a theory of defective design or inadequacy
of warning/failure to warn.  Either theory requires proof of
knowledge on the part of the seller.  See Miss. Code Ann. § 11-1-
63(f) ("In any action alleging that a product is defective because
of its design . . . the manufacturer or product seller shall not be
liable if the claimant does not prove by the preponderance of the
evidence that at the time the product left the control of the
manufacturer or seller: (i) (t)he manufacturer or seller knew, or
in light of reasonably available knowledge or in the exercise of
reasonable care should have known, about the danger for which
recovery is sought. . . ."); Miss. Code Ann. § 11-1-63(c)(i) ("In
any action alleging that a product is defective because it failed
to contain adequate warnings or instructions . . . the manufacturer
or seller shall not be liable if the claimant does not prove by a
preponderance of the evidence that at the time the product left the
control of the manufacturer or seller, the manufacturer or seller
knew or in light of reasonably available knowledge should have
known about the danger that caused the damage for which recovery is
sought. . . .").  Thus, even if the "learned intermediary"
doctrine, which is incorporated into the statute, see Miss. Code
Ann. § 11-1-63(c)(ii), were not an impediment to recovery, the
absence of an allegation that a defendant knew, or had reason to
know, of the product defect dooms any claim for defective design or
lack of adequate warning.  Likewise, knowledge, or a reason to
know, is also a necessary requisite for any claim of failure to
warn or negligence that a plaintiff might undertake to assert
extraneous to a claim under the Products Liability Act itself
(assuming solely for the sake of argument that such a claim could
exist).  An essential element of a claim of fraud is knowledge of
the falsity of the representation; and regarding any claim of
omission of facts, a person obviously cannot disclose what he does
not and cannot know.

[4]      They allege, for example, that the drugs "were marketed
to be used in combination which was known to the Defendants to
cause harmful side effects which outweighed any potential utility."

4

pharmacy defendants had any knowledge or reason to know of any of
the dangers associated with the product(s) of which plaintiffs
contend they were unaware.  Quite to the contrary, the complaint,
the major theme of which is the manufacturers' intentional
concealment of the true risks of the drug(s), coupled with
dissemination through various media of false and misleading
information of the safety of the drug(s) at issue, belies any
suggestion of knowledge, or reason to know by these resident
defendants.  According to the lengthy and extremely detailed
factual allegations of the complaint, the product manufacturers had
knowledge from numerous sources that the drug(s) at issue was
unsafe, yet they, in the face of this knowledge, not only concealed
this information, but affirmatively misrepresented to the FDA, to
the public, to consumers, to the plaintiffs, to pharmacists, to
dispensing entities, and even to AHP's own business partner, that
the product(s) was safe.  In the face of plaintiffs'

---

> By way of example only, plaintiffs allege variously that:
> "Plaintiffs and/or their prescribing physicians and other
> dispensing entities justifiably relied on and/or were
> induced by the misrepresentations and/or active
> concealment of Defendants to her detriment."
>
> "These defendants, having undertaken the manufacturing,
> marketing, prescription dispensing, distributing and
> promotion of the diet drugs described herein owe a duty
> to provide the Plaintiffs, and physicians, regulators and
> others upon whom it was known by Defendants that the
> plaintiffs would rely, accurate and complete information
> regarding its products."
>
> "AHP was put on notice . . . that the . . . labeling was
> probably inadequate and needed to be revised. . . .
> [D]espite this warning. . . no changes were made to the
> labeling between 1990 and mid-1996. . . . [AHP was

5

motivated] to conceal the safety hazards of [its
products]. . . . [A]lthough an FDA official warned that
there were too many adverse reaction reports . . . and
that he wanted AHP DEFENDANTS to discourage combination
use, the Defendants did not actively discourage the use
of Fen-Phen.

. . .
[AHP knew as early as 1991 that the warning on the
Pondimin labeling from 1987 through 1996] was false and
misleading . . [y]et . . . AHP did nothing to strengthen
the warning language about PPH. . . . AHP deliberately
chose not to make any change to the labeling in the
summer or Fall of 1994, but chose to provide false and
misleading information in its product labeling for
Pondmin.

. . .
By [February of 1995], APH was already concerned the FDA
might require to have a black box warning for PPH in
the Redux labeling and it had conducted market research
which showed that with a black box warning, Redux sales
could only be a fraction of what AHP hoped for. . . .
[AHP] was fully aware that its warning about PPH in the
Pondimin labeling was inadequate.

. . .
AHP DEFENDANTS believed it was in their best interest to
have consumers uninformed about the deadly risk of PPH. .
. . The PHENTERMINE DEFENDANTS also sought to keep
consumers and prescribing physicians uninformed about the
true risk of PPH. . . . Although [the risks of PPH] were
known to phentermine manufacturers around the world,
these manufacturers actively concealed this fact from
prescribing physicians and consumers, including the
Plaintiffs and their prescribing physicians, and
misrepresented the risk of PPH by failing to place any
such warning in the package insert. . . . [B]y failing to
disclose [the facts], the package insert for fenfluramine
implicitly and falsely stated to the Plaintiffs'
prescribing physicians that it could be prescribed in
combination with phentermine.

. . .
[From 1993 through 1995) [the] AHP defendants received
further information [about risks of valvular heart
disease] - yet chose to ignore it. . . . [T]he
PHENTERMINE DEFENDANTS [also] began to receive reports
[of] VHD. Defendants failed to obtain any more
information about these reports. . . . AHP DEFENDANTS
did not even report many of these cases to FDA.
AHP DEFENDANTS should have regarded the 1994-1995 reports of
VHD as an early warning signal of what was likely to

6

happen in the U.S.  However, because of its desire to
conceal safety problems and not derail the exponential
growth of Pondimin or the pending approval of Redux . .
.APH DEFENDANTS chose . . . not to report the VHD problem
[to FDA]. . . .  AHP DEFENDANTS mischaracterized many of
the reports as "non-serious" and did not report them to
FDA, to the Plaintiffs, or to the Plaintiffs' prescribing
physicians.
AHP DEFENDANTS did not change the Pondimin labeling
regarding PPH because to do so would have threatened its
diet drug business.

[AHP marketing programs] contained false and misleading
information and/or material ommisions about the true
risks . . .and the supposed benefits. . . .  The text of
one AHP document . . . falsely states "Redux is a safe
and effective product." [AHP, through its sales force]
fed false and misleading information and/or material
omissions about the true risks . . . [to doctor
advocates, whose job it was to promote AHP's products to
other physicians].
. . .
The "best case" for the company's sales was if consumers
were unaware of the risk of PPH and physicians chose not
to enlighten them.
. . .
AHP DEFENDANTS [knew of problems] but decided to say
nothing of those problems to physicians, or the
FDA. . . .  AHP DEFENDANTS withheld critical information
from the FDA Advisory Committee, the Plaintiffs, and the
Plaintiffs' physicians, about the risks of VHD.

AHP DEFENDANTS, knowing that its market research
demonstrated that [a black box] warning would destroy
sales, adamantly resisted the black box warning requested
by FDA and any other restrictions on the use of Redux.

[An internal memo authored by an AHP executive stated]
"[E]very attempt will be made to ensure that no `Black
Box' warnings, restrictions of use or negative statements
find their way into the Redux labeling."
[After a leading researcher in the field of PPH appeared on
the Today Show expressing concerns, he was threatened by
AHP's medical director and] never again spoke to the
media about his concerns about the safety of Redux.
. . .
AHP made matters worse by having its paid consultants
write an editorial minimizing the risk of PPH with diet
drugs which was published in the New England Journal of

7

Medicine without the authors disclosing that they were
paid consultants for the company. In addition, AHP
DEFENDANTS sent out a misleading press release regarding
the IPPHS study, which also tended to downplay the risk
of PPH.

AHP did everything in its power to obscure the true scope
of the problem from the Mayo Clinic, Interneuron, FDA and
the public as long as it could.
. . . [R]ather than coming clean about the knowledge in its
possession for about two years, AHP continued to withhold
that information and feigned total surprise [when a Mayo
Clinic physician reported to AHP that she had discovered
VHD in a number of patients who had been using Fen-Phen].

Worried about a leak of information to the general public
and prescribing physicians, AHP DEFENDANTS tried to keep
IPI (its business partner) in the dark about the Mayo
Clinic findings. . . .AHP [attempted] to conceal
information about the VHD problem from even its own
business partner for as long as possible.

AHP DEFENDANTS continued their policy of hiding
information about the risk of VHD even up to the day that
FDA told the company that it should take Pondimin and
Redux off the market.

[Pursuant to a conspiracy between] AHP DEFENDANTS and
ECKERD, false and fraudulent information was provided to
pharmacists, consumers, and prescribing physicians about
the risks and supposed benefits of these drugs. Upon
information and belief, and in furtherance of the
conspiracy, AHP Defendants and Eckerd supplied false and
misleading marketing and promotional material and
programs to unsuspecting pharmacists and prescribing
physicians. . . . Eckerd [agreed that it would] take "no
action, including but not limited to telephone calls or
written communication to physician providers or
Pharmacies regarding specific prescriptions, that [would]
adversely affect utilization" [of AHP's products].. . . .
Upon information and belief, [certain "patient education
programs" and "provider education programs" worked on by
Eckerd and Wyeth-Ayerst jointly] provided false and
misleading information about [the drugs].
Eon agreed and conspired with various pharmacies and/or AHP
Defendants to ensure that the off-label combination use
of these drugs could be timely provided to consumers,
pharmacists, and prescribing physicians who were
deliberately misled as to the safety and efficacy of these drugs

8

specific allegations of concerted, unabated fraud and concealment by the manufacturer defendants from virtually everyone, including pharmacists, no factual basis can be drawn from plaintiffs' complaint for their entirely general and conclusory charge that these "defendants" knew or had reason to know of the risks. Even assuming, then, for the sake of argument, that under Mississippi law, there exists the possibility that a viable cause of action could be maintained against a pharmacist who had knowledge of risks associated with a particular drug or drugs which he failed to disclose to his customer, the plaintiffs herein have failed to properly plead such a claim.[6] Accordingly, the court concludes that the pharmacy defendants have indeed been fraudulently joined.

The court also concludes, for the reasons assigned by Judge William H. Barbour in <u>Beatrice Johnson et al. v. Parke-Davis, A</u>

---

Eon agreed and conspired with other manufacturers to ensure that an adequate supply of phentermine could be delivered to consumers, pharmacists, and prescribing physicians who were deliberately misled as to the safety and efficacy of these drugs, and to the dangers of prescribing phentermine in combination with fenfluramine. . . . In furtherance of this conspiracy, prescribing physicians, consumers, and pharmacists were fed false and misleading information about fen-phen and Redux. . . .

[6]    See <u>Eadon v. RJR Nabisco Inc.</u>, 2000 WL 1159424, No. 98-30942, at *7 (5th Cir. Aug. 16, 2000) (noting that plaintiffs' conspiracy allegations were "entirely general" and did not allege "any particular or specific activity, agreement, or state of mind on the part of either the in-state distributor defendants. . . . while as to the other defendants the amended complaint is replete with innumerable specific allegations of particular, identified activities, . . . .").

9

Division of The Warner-Lambert Co., et al., No. 3:00CV315BN (S.D. Miss. July 21, 2000) (involving the drug Rezulin), that the sales representative defendants have also been fraudulently joined.

Accordingly, for the foregoing reasons, it is ordered that plaintiffs' motion to remand is denied.

SO ORDERED this 25th day of September, 2000.

_____
UNITED STATES DISTRICT JUDGE.

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
FILED
OCT 03 2003
J. T. NOBLIN, CLERK
BY_____ DEPUTY

FRANK OMOBUDE, INDIVIDUALLY AND
ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF JOSEPHINE
OMOBUDE, DECEASED                              PLAINTIFF

VS.                          CIVIL ACTION NO. 3:03CV528LN

MERCK & CO., INC. AND
ROBERT M. EVANS, M.D.                         DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of plaintiff
Frank Omobude, individually and on behalf of the wrongful death
beneficiaries of Josephine Omobude, to remand pursuant to 28
U.S.C. § 1447.  Defendant Merck & Co., Inc. has responded to the
motion and the court, having considered the memoranda of
authorities submitted by the parties, concludes that the motion is
not well taken and should be denied.

Plaintiff, a citizen of Mississippi, brought this suit in the
Circuit Court of Hinds County, Mississippi seeking to recover
damages for the alleged wrongful death of his mother, Josephine
Omobude, which he alleges resulted from her use of the
prescription drug Vioxx.  Plaintiff sued Merck, the non-resident
corporation that manufactured and distributed Vioxx, and also
named as a defendant Robert M. Evans, M.D., the local physician
who is alleged to have prescribed Vioxx to Josephine Omobude.
Merck timely removed the case on the basis of diversity

jurisdiction under 28 U.S.C. § 1332,[1] contending, based on the allegations of plaintiff's complaint, that the requirement of an amount in controversy in excess of $75,000 is clearly satisfied,[2] and contending further that there is complete diversity of citizenship since Dr. Evans, though a Mississippi resident, has been fraudulently joined to defeat diversity. See Heritage Bank v. Redcom Labs., Inc., 250 F.3d 319, 323 (5th Cir. 2001) (fraudulent joinder of non-diverse will not defeat diversity jurisdiction).

The premise of Merck's fraudulent joinder argument, as gleaned from its notice of removal and its response to plaintiff's motion to remand, is that plaintiff's complaint does not allege a sufficient factual basis for his putative claim against Dr. Evans. In particular, Merck notes that throughout his complaint, plaintiff repeatedly and consistently asserts that Merck encouraged the use of Vioxx in "improper customers;" that it "misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects;" that despite knowledge of the defective nature of its product and for the purpose of increasing its sales and profits at the expense of the

---

[1]    That statute provides, in pertinent part, as follows: (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different states.

[2]    The court notes that plaintiff has not disputed that the amount in controversy exceeds $75,000.

2

general public's health and safety, Merck aggressively marketed Vioxx both directly to the consuming public and indirectly to physicians through drug sales representatives as effective and safe and with inadequate warnings and instructions; and that Merck failed to provide timely and adequate post-marketing warnings or instructions after the manufacturer knew of the risk of injury from Vioxx. On the basis of these allegations, plaintiff alleges claims against Merck for strict liability, negligence, breach of express and implied warranties and fraudulent misrepresentation. Merck argues that in light of plaintiff's repeated allegations that Merck misrepresented the safety and efficacy of its product and consistently concealed the known risks and dangers not only from the consuming public but also from physicians, plaintiff's charge of medical negligence against Dr. Evans based on nothing more than a conclusory allegation, wholly unaccompanied by any factual support, that Dr. Evans "knew, or should have known, of the dangerous side effects of these medications," and that "his prescribing such medications in light of such knowledge presents a deviation from the standard of care," is manifestly insufficient to state a cognizable claim.

In similar cases, this court has held that conclusory and contradictory allegations of knowledge, which were belied by the factual allegations of the complaint, demonstrated that the resident defendants against whom such allegations of knowledge were made, had been fraudulently joined. See Brown v. Bristol Myers Squibb Co., Civ. Action No. 4:02CV301LN, slip op. at 11-12

3

(S.D. Miss. Dec. 2, 2002) (resident physician fraudulently joined where claim was asserted in conclusory terms and contradicted by allegations of the pharmaceutical manufacturer's concealment or misrepresentation of information); <u>Louis v. Wyeth-Ayerst Pharmaceuticals. Inc.</u>, Civ. Action No. 5:02CV102LN (S.D. Miss. Sept. 25, 2000) (same with respect to resident pharmacy defendant); <u>see also In re Rezulin Prods. Liab. Litig.</u>, No. 00 Civ. 2843, 2003 WL 31852826, at *2 (S.D.N.Y. Dec. 18, 2002) (physician defendant fraudulently joined based on conclusory allegations). In the court's opinion, the same conclusion is in order here.

In so concluding, the court is aware of plaintiff's argument that "[a] party may plead alternative and inconsistent facts or remedies against several parties without being barred." <u>Guy James Constr. Co. v. Trinity Indus.. Inc.</u>, 644 525, 530 (5th Cir. 1981). While this may be true generally, the court's point here is that the plaintiff has not pled inconsistent facts, but rather has pled consistent facts that are inconsistent with the conclusion he pleads as to Dr. Evans. Every <u>factual</u> allegation this plaintiff has made is to the effect that Merck withheld and concealed and misrepresented the true facts regarding Vioxx; and yet, without alleging any factual basis for the charge, plaintiff concludes that Dr. Evans "knew or should have known" the truth about Vioxx that Merck had misrepresented and concealed.

The court does not suggest that a "knew or should have known" allegation" will necessarily always be conclusory and hence

4

insufficient to state a cognizable claim simply because it is not attended by a specific factual allegation as to the source of such knowledge. However, in cases like this, where a plaintiff has specifically alleged facts from which one would necessarily infer that the defendant in question would not have known information otherwise alleged to have been misrepresented or concealed from him, then in the court's opinion, in that limited circumstance, to sustain his pleading burden, the plaintiff would have to plead at least some facts tending to show why or how the defendant knew or should have known of the information that has been misrepresented to or concealed from him. Otherwise, the court would be in the untenable position of assuming that a factual basis exists for a conclusory allegation that is entirely inconsistent with every factual allegation in the complaint. No precedent of which this court is aware suggests that this would be proper.[3] The caselaw,

---

[3]    Plaintiff has cited a number of cases from this district in which claims against physician and pharmacy defendants have been found sufficient to state a claim, but in the court's opinion, these cases are readily distinguishable. Henderson v. GlaxoSmithKline, No. 5:01CV159BrS (S.D. Miss. March 21, 2000), involved a question of fraudulent misjoinder, which is not an issue here. In Hancock v. Bayer Corp., No. 3:03CV67WS (S.D. Miss. Apr. 18, 2003), plaintiff alleged that the physicians in question had committed numerous acts of negligence other than merely prescribing an allegedly defective drug, such as failing to timely recognize the plaintiffs' adverse drug reactions, failing to monitor the plaintiffs, and prescribing the drug in the wrong dosage and in a manner inconsistent with the product labeling and contraindicated usages. Womack v. Bayer Corp., No. 3:03CV157WS (S.D. Miss. Apr. 18, 2003), involved specific allegations of alleged negligence by the defendant doctor, including that the physicians should have known of the risks in light of warnings actually issued to physicians by Bayer. No such claims were pled here. Likewise in the several Bayer cases remanded by Judge Pickering and cited by plaintiff, including Easterling v. Bayer

5

in fact, is to the contrary.  See <u>Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.</u>, 313 F.3d 305, 313 (5th Cir. 2002) (stating that the court will not "accept as true conclusory allegations or unwarranted deductions of fact"); <u>Sago v. Wal-Mart Stores, Inc.</u>, 2003 WL 22076954, at *2 (S.D. Miss. 2003) (holding that "conclusory or generic allegations of wrongdoing on the part of the non-diverse defendant are not sufficient to show that the defendant was not fraudulently joined") (citing <u>Badon v. RJR Nabisco, Inc.</u>, 224 F.3d 382, 392-93 (5th Cir. 2000); <u>cf.</u> <u>Fernandez-Montes v. Allied Pilots Ass'n</u>, 987 F.2d 278, 284 (5th Cir. 1996) ("When considering a motion to dismiss for failure to state a claim, the district court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff.  However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."); <u>Ross v. Citifinancial, Inc.</u>, 2003 WL 22026346, at *3 (5th Cir. 2003) (noting court's recognition of "the similarity between standards for Federal Rule of Civil Procedure 12(b)(6) (failure to state claim) and fraudulent

---

<u>Corp.</u>, No. 2:03CV37PG (S.D. Miss. Apr. 24, 2003), <u>Dearman v. Bayer Corp.</u>, No. 2:03CV38PG (S.D. Miss. Apr. 24, 2003), <u>Jones v. Bayer Corp.</u>, No. 2:03CV53PG (S.D. Miss. Apr. 24, 2003), <u>Keys v. Bayer Corp.</u>, No. 2:03CV39PG (S.D. Miss. Apr. 24, 2003), and <u>Sumrall v. Bayer</u>, No. 2:03CV52PG (S.D. Miss. Apr. 24, 2003), the court found that the plaintiffs had made specific allegations of negligence against the resident doctors "for failing to properly monitor and test each of the Plaintiffs according to the defendant drug companies' recommendations."  No such allegations were made in plaintiff's complaint in the case at bar.  <u>See</u> <u>infra</u> note 4.

6

joinder" but noting that the latter inquiry is broader); <u>Cranston</u> <u>v. Mariner Healthcare Mgmt. Co.</u>, 2003 WL 21517999, at *4 (N.D. Miss. 2003)(stating that on motion to dismiss, "[t]he court will not accept as true any conclusory allegations or unwarranted deductions of fact").[4]

---

[4]     The court notes that the only claim plaintiff has alleged against Dr. Evans in his complaint is medical negligence based on the allegation that Dr. Evans "knew, or should have known, of the dangerous side effects of these medications" and his prescribing "said medications in light of such knowledge."  In his motion to remand, however, plaintiff attempts to recharacterize and add to his claim against Dr. Evans.  He argues, for example, that his claim that Merck produced and distributed defective products does not preclude his claim against Dr. Evans with regard to his "negligence in prescribing Vioxx or his negligence in monitoring plaintiff."  He argues further that

> [j]ust as Merck failed to adequately warn Plaintiff's Decedent's physician, Dr. Evans failed to conduct regular monitoring of Plaintiff's Decedent to ensure the discovery of potentially serious side effects. . . including, not limited to, failing to perform adequate tests before the initiation of Vioxx treatment, and failing to subsequently perform other tests after initiation of Vioxx therapy to monitor any change in the status of Plaintiff's decedent. . . . Defendant Evans also failed to warn Plaintiff's Decedent of possible side effects. . . .

None of these allegations, or any hint of such allegations, appears anywhere in the complaint which, as to Dr. Evans, alleges only that he was negligent in prescribing Vioxx when he knew, or should have known, of the dangers of the drug.  Plaintiff cannot secure remand on the basis of allegations and claims that are not set forth in his state court pleading.  <u>See</u> However, the Cavallinis did not cite, nor have we found, any case in which such evidence has been considered to determine whether a claim has been stated against the nondiverse defendant under a legal theory not alleged in the state court complaint.
<u>Cavallini v. State Farm Mut. Auto Ins. Co.</u>, 44 F.3d 256, 263 263 n.14 (5th Cir. 1995)(rejecting plaintiff's "assertion that post-removal affidavits can be used to defeat removal by presenting new causes of action").

For the foregoing reasons, the court concludes that plaintiff's motion to remand is not well taken and should be denied.

Accordingly, it is ordered that plaintiff's motion to remand is denied.

SO ORDERED this 3rd day of October, 2003.

_____

UNITED STATES DISTRICT JUDGE

8

Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4203 | **DATE** | 8/30/2002 |
| **CASE TITLE** | Scott Zeedyk, on behalf of himself and all other persons similarly situated vs. Merck & Co., Inc. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Plaintiff's Motion to Remand back to Circuit Court of Cook County for lack of jurisdiction pursuant to 28 U.S.C. § 1447(c)

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due_____. Reply to answer brief due_____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry] For the reasons set forth on the reverse side of this minute order, Zeedyk's motion to remand for lack of subject matter jurisdiction is DENIED [7-1]. |
| (11) | ■ | [For further detail see order on the reverse side of the original minute order.] |

| X | No notices required, advised in open court. | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| | klb (lc) | courtroom deputy's initials | | date mailed notice | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

(Reserved for use by the Court)

# ORDER

Before this Court is the motion of plaintiff, Scott Zeedyk, to strike or deny defendant's notice of removal. Plaintiff is a citizen of Illinois. Defendant, Merck, is a citizen of New Jersey. This case involves failure to warn clams and allegations that VIOXX, a prescription medicine manufactured by Merck, caused plaintiff, Zeedyk, to sustain life-threatening injuries.

On May 8, 2002, plaintiff filed his original complaint against the defendant in the Circuit Court of Cook County. On May 20, 2002, the defendant was served with service of process. On this date as well, plaintiff was granted leave of court by the Circuit Court to file an amended complaint instanter. On May 29, 2002, this amended complaint was served on the defendant. Pursuant to 28 U.S.C. § 1332, the defendant filed its first notice of removal, on June 12, 2002, based on its receipt of the original complaint, and on its subsequent receipt of the amended complaint, filed an amended notice of removal on June 25, 2002.

Plaintiff moves to remand because it alleges that Merck failed to conform to Local Rule 81.2. This rule requires that the notice of removal be accompanied by a statement of good faith that the jurisdictional limit is met and by either a response by plaintiff to a request to admit or a response to an interrogatory stating that the jurisdictional limit is met or proof of the failure to respond to such a request to admit or interrogatory. Merck did not provide any such responses with its notice of removal. Defendant argues that where, as here, the complaint clearly establishes that the amount in controversy is in excess of the jurisdictional minimum, the defendant need not establish satisfaction of the jurisdictional minimum through the procedure outlined in Local Rule 81.2.

This Court has previously explained that Local Rule 81.2 is "not the exclusive way in which the jurisdiction amount could be established in a case removed from an Illinois court." Murphy v. Avon Products, Inc., No. 02-C-146, 2002 WL 808386 (N.D. Ill. April 30, 2002); Huntsman v. Whitehouse, No. 97-C-3842, 1997 WL 548043 (N.D. Ill. Sept. 2, 1997). Zeedyk seeks, inter alia, compensatory and punitive damages for Merck's alleged knowing, intentional, willful, reckless, and malicious failure to warn. Plaintiffs seeking similar relief against other pharmaceutical manufacturer defendants and making similar allegations of failure to warn received jury awards well in excess of $75,000. See, e.g., Proctor v. Upjohn, 291 Ill.App.3d 265, 286-87 (Ill. App. 1997) (plaintiff received approximately $3 million in compensatory damages and $6 million in punitive damages for failure to warn claim); Batteast v. Wyeth Labs, Inc., 172 Ill. App.3d 114 (Ill. App. 1988) (upholding jury's award of approximately $9 million in compensatory damages and $13 million in punitive damages). Plaintiff attempted to defeat jurisdiction in this court by specifically pleading in the amended complaint that he was waiving his right to damages in excess of $75,000. However, this is impermissible under Illinois pleading rules, which forbid a plaintiff in a personal injury action from pleading any amount of damages other than "the minimum necessary to comply with the circuit rules of assignment where the claim is filed." 735 Ill. Comp. Stat. Ann. § 5/2-604 (West 2002); In re Shell Oil Col., 970 F.2d 355, 356 (7th Cir. 1992). Thus, it is reasonably probable that the amount in controversy exceeds $75,000 where similar claims recovered damages well over that amount.

For the foregoing reasons, plaintiff's motion to remand for lack of subject matter jurisdiction is DENIED.

05 11716 MLW

JS 44 (Rev. 11/04)

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Kathleen A. Martin | Merck & Co., Inc., et als. |

**(b)** County of Residence of First Listed Plaintiff    Essex
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Hunterdon, NJ
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Andrew J. Tine, Esq., Haese, LLC, 30 Federal Street, 3rd Floor, Boston, Massachusetts 02110

Attorneys (If Known)

James J. Dillon, Esq., FOLEY HOAG LLP, 155 Seaport Boulevard, Boston, Massachusetts 02210 (617) 832-1000

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government Defendant

☒ 4 Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☒ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding    ☒ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332

Brief description of cause:
Action for compensatory damages for ingestion of VIOXX

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**

(See instructions): JUDGE      DOCKET NUMBER

DATE    8/17/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. **Title of case (name of first party on each side only)** Kathleen A. Martin v. Merck & Co., Inc., et als

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).**

| | | |
|---|---|---|
| ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
| ☐ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,  *Also complete AO 120 or AO 121<br>740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.            for patent, trademark or copyright cases |
| ☑ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,<br>315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,<br>380, 385, 450, 891. |
| ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,<br>690, 810, 861-865, 870, 871, 875, 900. |
| ☐ | V. | 150, 152, 153. |

3. **Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**

                                                                                    YES ☐        NO ☑

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)**

                                                                                    YES ☐        NO ☑

   **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**

                                                                                    YES ☐        NO ☐

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**

                                                                                    YES ☐        NO ☐

7. **Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).**

                                                                                    YES ☑        NO ☐

   A.  **If yes, in which division do all of the non-governmental parties reside?**

       Eastern Division ☑        Central Division ☐        Western Division ☐

   B.  **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**

       Eastern Division ☐        Central Division ☐        Western Division ☐

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)**

                                                                                    YES ☐        NO ☑

**(PLEASE TYPE OR PRINT)**

**ATTORNEY'S NAME** James J. Dillon, Esq., FOLEY HOAG LLP

**ADDRESS** 155 Seaport Boulevard, Boston, Massachusetts 02210

**TELEPHONE NO.** (617) 832-1000

(CategoryForm.wpd  - 5/2/05)